# EXHIBIT 1

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | |
|---|---|
| ANGELOS METAXAS, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 25-CV-5844 (AMD) (CLP) |
| MARK DAVID GRAUBARD, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       TD Bank, N.A. d/b/a TD Bank
CSC, Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Ste 150N, Sacramento, CA 95833
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Attachment A, Rider to Subpoena

| Place: Lauren J. Zimmerman, Benesch Friedlander Coplan & Aronoff; 1155 Avenue of the Americas, Floor 26; New York, NY 10036 | Date and Time: 03/11/2026; 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       02/25/2026

|  CLERK OF COURT | |
|---|---|
| | OR |
| _____ | /s/ Lauren J. Zimmerman |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*       Plaintiffs
Angelos Metaxas and Pertshire Investments LP                    , who issues or requests this subpoena, are:
Lauren J. Zimmerman, Benesch Friedlander Coplan & Aronoff, 1155 Avenue of the Americas, New York, NY 10036; lzimmerman@beneschlaw.com; (646) 356-6023

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 25-CV-5844 (AMD) (CLP)

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____    _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

## DEFINITIONS

1. "Account Holder" means and refers to the Individual the authorized to own, operate, and manage a bank, credit, or financial account and which holds a direct legal and contractual relationship with bank or financial institution which administers the relevant.

2. "Action" means any and all proceedings and litigation efforts relating to the above-captioned case. A copy of the operative complaint in the Action is annexed hereto as Attachment B.

3. "And" and "or" have both the conjunctive and disjunctive meanings.

4. "Any," "all," and "each" mean any, all, each, and every.

5. "Authorized User" means and refers to an Individual permitted by an Account Holder to access and transact on the Account Holder's bank account without having legal ownership or liability for such bank account.

6. "Communication" means the fullest and broadest scope of things discoverable under the Federal Rules of Civil Procedure ("FRCP"), encompassing an act or instance of transferring, transmitting, passing, delivering, or giving information by oral, written, or electronic means (including all drafts and non-identical copies), including on personal devices and through personal email accounts, however stored, printed, or recorded, and including all notes, letters, telegrams, facsimiles, electronic mail messages, text messages, instant messages (e.g., iMessages, WhatsApp messages, Slack messages, Signal messages, Teams messages, WeChat messages, Zoom messages, Skype messages, or Bloomberg messages), social media and forum posts and messages (e.g., Facebook posts or messages, Instagram posts or messages, LinkedIn post or messages, posts or messages on X, or Youtube posts or messages), voicemail recordings, audio recordings, and video recordings.

7. "Concerning" means relating to, referring to, describing, evidencing, or

Constituting.

8.      "<u>Document</u>" is used herein in the fullest and broadest scope of any tangible thing discoverable under the FRCP and the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York upon which any information has been recorded by any means, including by writing, by printing, by typing, by transcribing, by charting, by photographing, by photostatting, by photocopying, or by digital, electronic, magnetic, or mechanical recording, and however stored, printed, or recorded, including all Communications, bills, contracts, invoices, photographs, calendars, and electronically stored data, including hard drives, servers, portable diskette drives, laptop computers, database records, or off-site backup computer files.

9.      "<u>Esther Equities Account</u>" means and refers to Esther Equities LLC's bank account ending in -4041, held at TD Bank, N.A.

10.      "<u>Including</u>" means including but not limited to.

11.      "<u>Individual</u>" means and refers to a natural person or legal entity including any business or association.

12.      "<u>King Account</u>" means and refers to Edward Harold King, Esq.'s bank account ending in -3388, held at TD Bank, N.A.

13.      "<u>Purpose</u>" means the reason for which something is done or created or for which something exists.

14.      "<u>Queen Equities Accounts</u>" means and refers to Queen Equities LLC's or Queens Equities LLC's bank accounts ending in -8577 and -6734, held at TD Bank, N.A.

15.      "<u>Relevant Period</u>" means and refers to December 1, 2024, through the date of Your response.

16.     "Request" refers to any of the requests for Documents and Communications made herein.

17.     "Transactions" refers to any requested or executed transaction involving the Account, including any deposit, withdrawal, wire, transfer, purchase, order or sale.

18.     "You" and "Your" mean and refer to the Individual to whom this subpoena is directed, together with any agent, attorney, or representative acting or purporting to act on such Individual's behalf.

## INSTRUCTIONS

1.     These Requests calls for the production of Documents, Communications, articles, and things, wherever located, within Your possession, custody or control, or to which You have access, which shall include Documents in the custody of Your attorneys.

2.     You shall provide a written response to each Request stating either that You will produce the requested material or state the ground(s) for objecting to the Request, in full or in part.

3.     If You object to any Request, You must specify the portion of the Request to which You object, state in full the basis for Your objection, and answer as much of the Request that is not objectionable. Any objection shall state whether any responsive materials are being withheld on the basis of that objection.

4.     Each of the Requests shall be construed independently, and none of the Requests shall be construed as limiting the scope of any of the other Requests.

5.     You should produce all responsive Documents and Communications as they are kept in the manner and order in which they are maintained in the usual course of business. As to each Document and Communication, You should identify the file or location from which it was taken, as well as the name, affiliation, and position of the custodian involved. All Documents or

Communications that are attached to each other while located for production shall be left so attached. Where any portion of a Document or Communication is responsive to a Request set forth below, You shall produce the entire Document or Communication, without abbreviation or redaction, along with all attachments, enclosures, exhibits, or any other Document appended to, included with, incorporated by, or referred to in the Document or Communication.

6.	If a Document or Communication responsive to a Request is withheld under a claim of privilege, You must state the basis for doing so in writing and log each withheld Document or Communication with information sufficient to support Your assertion of privilege, including the type of Document or Communication, the general subject matter of the Document or Communication, the date of the Document or Communication, the Document or Communication custodian, and such other information as is sufficient to identify the Document or Communication, including the author of, recipient( s) of, and attachment( s) to the Document or Communication. If You believe that a portion of a Document or Communication is protected by an applicable privilege, You shall produce the non-privileged portion with the allegedly privileged portion redacted and indicated as such. You must provide the basis for the redaction and log each redacted Document or Communication with information to support Your assertion of privilege.

7.	You shall produce any Document or Communication that refers to a Document or Communication that is responsive to any Request, including routing slips, transmittal memoranda, letters, emails, or Documents or Communication referenced within emails that would otherwise not be included in attachments.

8.	If there are no Documents or Communications in your possession, custody, or control that are responsive to any particular Request, You must state so in Your response to that Request.

9. Drafts or non-identical copies are to be considered separate Documents or Communications for purposes of these Requests. Any and all drafts of each Document or Communication that is responsive to any Request shall be produced, as shall all copies of Documents or Communication responsive to any Request that are not identical in any respect, including copies containing handwritten notes, markings, stamps, or interlineations. You must identify the author(s) of each handwritten Document or Communication, or Document or Communication containing handwritten annotations, notes, or markings in a log.

10. These Requests are deemed continuing. If after Your response to any Request You obtain, locate, create, or otherwise become aware of a Document or Communication that would have been included in Your production, You are required to promptly furnish any additional Documents or Communications responsive to any of the Requests.

11. Defendants serve these Requests without prejudice to their right to serve additional Requests for the production of Documents.

12. Unless otherwise indicated, each Request seeks Documents and Communications relating to the Relevant Period.

## DOCUMENT REQUESTS

1. Documents sufficient to show all accounts held, owned, or controlled by any of the following individuals:

    a. Edward Harold King, Esq., including the King Account;

    b. Esther Equities LLC, including the Esther Equities Account;

    c. Queen Equities LLC, including the Queen Equities Accounts;

    d. 536 Holding LLC;

    e. CPE Member LLC;

f. Olden LLC;

g. Olden Equities LLC;

h. Olden Group LLC;

i. Queen Equities LLC;

j. WHP Equities LLC;

k. Chaskel Frankel;

l. Mark David Graubard, Esq, a Defendant in this Action;

m. Paul D. Montclare, Esq.;

n. Johnathan Rubin, a Defendant in this Action;

o. Frank R. Seddio, Esq., a Defendant in this Action;

p. Seddio & Associates P.C.;

q. Yeschiel Shimon "Sam" Sprei, a Defendant in this Action; and

r. Lauren J. Wachtler, Esq.

2. For each account identified in Your response to Request No. 1, including the King Account, the Esther Equities Account, and the Queen Equities Accounts, Documents sufficient to show the account opening records, including but not limited to Documents containing the following information:

a. The Account Holder;

b. All Authorized Users;

c. The date the account was established;

d. The Account Holder's mailing address;

e. Each Authorized User's mailing addresses; and

f. If the account is closed, the date the account was closed.

3.     For each account identified in Your response to Request No. 1, including the King Account, the Esther Equities Account, and the Queen Equities Accounts, Documents sufficient to show all Transactions during the Relevant Period.

4.     For each Transaction disclosed in Your response to Request No. 3, Documents sufficient to show:

a.     All available identifying information for the counterparty to each such Transaction, including the counterparty's name, address, telephone number, and email address, as well as the counterparty's bank name and address, and the bank account number and routing number utilized in the Transaction;

b.     The identity of the Individual initiating each Transaction;

c.     The amount transacted or exchanged;

d.     The date and time of the Transaction;

e.     The Purpose of the Transaction; and

f.     The resulting balance in the account following such Transaction.

5.     To the extent not disclosed in Your response to Request No. 4, Documents and Communications concerning each King Account Transaction, including:

a.     the check withdrawal of $1,850,000 on or about February 28, 2025; and

b.     the wire transfer of $200,000 on or about May 21, 2025.

6.     To the extent not disclosed in Your response to Request No. 4, Documents and Communications concerning each Queen Equities Accounts Transaction, including:

a.     the check deposit of $350,000 on or about December 6, 2024;

b.     the wire transfer of $250,000 on or about December 12, 2024; and

c.     the wire transfer of $550,000 on or about January 28, 2025.

7. All Communications between You and any of the following Individuals, or any agent or representative acting or purporting to act on such Individual's behalf:

    a. Chaskel Frankel;

    b. Israel Goldberg, Esq.;

    c. Yeshaya Gorkin, Esq.;

    d. Mark David Graubard, Esq, a Defendant in this Action;

    e. Edward Harold King, Esq.;

    f. Ethan A. Kobre, Esq.;

    g. Paul D. Montclare, Esq.;

    h. Olden LLC;

    i. Olden Group LLC;

    j. Olden Equities LLC;

    k. Johnathan Rubin, a Defendant in this Action;

    l. Frank R. Seddio, Esq., a Defendant in this Action;

    m. Seddio & Associates;

    n. Yeschiel Shimon "Sam" Sprei, a Defendant in this Action; and

    o. Lauren J. Wachtler, Esq.

8. All Communications concerning the following Individuals, or any agent or representative acting or purporting to act on such Individual's behalf:

Chaskel Frankel;

    a. Israel Goldberg, Esq.;

    b. Yeshaya Gorkin, Esq.;

    c. Mark David Graubard, Esq, a Defendant in this Action;

d.      Edward Harold King, Esq.;

e.      Ethan A. Kobre, Esq.;

f.      Paul D. Montclare, Esq.;

g.      Olden LLC;

h.      Olden Group LLC;

i.      Olden Equities LLC;

j.      Johnathan Rubin, a Defendant in this Action;

k.      Frank R. Seddio, Esq., a Defendant in this Action;

l.      Seddio & Associates;

m.      Yeschiel Shimon "Sam" Sprei, a Defendant in this Action; and

n.      Lauren J. Wachtler, Esq.

# **ATTACHMENT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANGELOS METAXAS and PERTSHIRE
INVESTMENTS LP,

                    Plaintiff,

            v.                                      Case No.  1:25-cv-5844

MARK DAVID GRAUBARD, ESQ. d/b/a          Jury Demanded
M. DAVID GRAUBARD, YESCHIEL
SHIMON "SAM" SPREI, FRANK R.
SEDDIO, ESQ., and JONATHAN RUBIN,

                    Defendants.

---

## COMPLAINT

Plaintiffs Angelos Metaxas and Pertshire Investments LP, through their attorneys, Selendy Gay PLLC, for their complaint against Defendants Mark David Graubard, Esq. d/b/a M. David Graubard, Esq. ("Graubard"), Yeschiel Shimon "Sam" Sprei ("Sprei"), Frank R. Seddio, Esq. ("Seddio"), and Jonathan Rubin ("Rubin"), allege as follows:

## NATURE OF ACTION

1.      This case is about the ongoing theft of $2 million by a group of con artists, including New York lawyers, and their subsequent abuse of the judicial process to create a smokescreen for their brazen illegality.

2.      In connection with a potential investment opportunity with Sprei, whom Plaintiffs were falsely led to believe was an honest and successful businessman, in December 2024, Plaintiffs placed $2 million in escrow with Graubard, an attorney barred in the state of New York, for the sole purpose of demonstrating their financial ability to pursue the investment.

3.      Unbeknownst to Plaintiffs, Graubard was not an independent, professionally responsible attorney, but a longtime associate of Sprei with whom, on information and belief,

Graubard, Seddio, Rubin, and others have, on multiple occasions, worked together to steal money from innocent would-be investors.

4.      Despite their unwitting entrance into a well-established embezzlement scheme, Plaintiffs' $2 million in escrow deposits ("Escrow Deposits") were protected by airtight escrow agreements (each an "Escrow Agreement") with Graubard through which Graubard covenanted that no one, other than Plaintiffs and their assigns, have the right to the Escrow Deposits and which provide Plaintiffs with the unfettered ability to demand the return of their Escrow Deposits for any reason and at any time.

5.      Approximately one month after providing Graubard with their Escrow Deposits, Plaintiffs completed their due diligence on the potential investment, decided not to pursue the venture with Sprei, and demanded the return of their deposits pursuant to their unqualified contractual right to do so. Despite acknowledging Plaintiffs' demands, for weeks, Graubard stalled in fulfilling his obligation to return the Escrow Deposits, including by blaming the bank for his delay and then going so far as to provide a false federal wire identification number to Plaintiffs as "proof" that he had returned their funds. Eventually, however, Graubard admitted that he was withholding Plaintiffs' $2 million at Sprei's direction, claiming, for the first time, that Sprei was his client to whom he owed a competing obligation. Graubard and Sprei then attempted to extort Plaintiffs by conditioning the return of their Escrow Deposits on Plaintiffs' execution of a legal agreement releasing Sprei from any potential claims.

6.      When Plaintiffs refused to be extorted and reported Sprei and Graubard's illegal conduct to law enforcement, Graubard and Sprei called upon their longtime associate, Seddio, an attorney barred in the state of New York, to file a completely bogus action in Kings County Supreme Court (the "State Court Action"), purportedly challenging Plaintiffs' rights to recover their

2

Escrow Deposits. The State Court Action, which was initiated on February 19, 2025, was not filed by Graubard or Sprei. Instead, the State Court Action was brought by Seddio on behalf of Rubin, a complete stranger to Plaintiffs, acting through an apparently fictitious company, Olden LLC. Plaintiffs have since come to understand that Rubin and Sprei are also longtime associates.

7.      Rather than filing a complaint, Seddio commenced the State Court Action by simple summons, and a one-sentence notice falsely asserting that there were "competing claims" to Plaintiffs' Escrow Deposits. On information and belief, the true purpose of the State Court Action was to manufacture a fake legal dispute that Graubard and Sprei could point to if law enforcement came knocking at their door and which would prevent any further attempts by Plaintiffs to recover their funds through legal or other process.

8.      To accomplish this goal, on the same day Seddio commenced the sham State Court Action, he also requested, on an *ex parte* basis, a temporary restraining order ("TRO") directing Graubard to either continue holding Plaintiffs' Escrow Deposits or deposit the funds with the clerk of court, and barring Plaintiffs from taking any action to recover their money pending a preliminary injunction hearing.

9.      Despite their claimed need for an emergency order restraining Graubard from returning Plaintiffs' deposits, once the TRO was granted, Seddio and Rubin actively resisted its implementation and repeatedly tried to prevent the State Court Action from proceeding on the merits. Specifically, Seddio and Rubin ignored their legal obligations to serve a copy of the TRO on Graubard or file a complaint setting forth the purported factual and legal bases for Olden LLC's claims in direct violation of New York's Civil Practice Law and Rules ("CPLR") § 3012(b). In addition, Seddio repeatedly sought and obtained adjournments of the preliminary injunction hearing he requested and ultimately did not even appear at the hearing. And finally, at the preliminary injunction

3

hearing, Seddio directed his agent to argue *against* the very relief Seddio had requested in his order to show cause motion—that Graubard be ordered to deposit Plaintiffs' Escrow Deposits with the clerk of the court—instead arguing that Graubard should be permitted, without restriction, to continue holding Plaintiffs' Escrow Deposits. In response, the court noted that its hands were tied by the language of Seddio's own order to show cause motion requesting that Graubard be ordered to deposit the funds with the court.

10. Within hours of the court's order granting Seddio's preliminary injunction motion and ordering *Graubard* to deposit Plaintiffs' Escrow Deposits with the clerk of the court by July 21, 2025, *Seddio* emailed Plaintiffs offering (on behalf of Olden LLC) to return the Escrow Deposits and pay an additional $35,000 to settle the State Court Action, confirming Seddio's control over Graubard and Plaintiffs' Escrow Deposits.

11. After Plaintiffs declined Seddio's illusory settlement offer, Seddio and Graubard again abused process and violated the law.  First, Seddio and Graubard's attorney filed a stipulation purporting to unilaterally extend the court-ordered deposit deadline, then flouted even their self-imposed deadline by not depositing Plaintiffs' funds.  In response to a direct inquiry from the state court judge's principal law clerk as to why the court's order had been violated, on July 25, 2025, Seddio admitted in writing that *he had directed Graubard not to deposit the funds* with the clerk's office. Seddio further stated that *he* would ensure that Graubard would make the deposit the following week, but that, too, was a lie.

12. To this day—over nine months since Plaintiffs demanded the return of their Escrow Deposits pursuant to the Escrow Agreements, Graubard still has not deposited Plaintiffs' Escrow Deposits with the clerk's office, depriving Plaintiffs of substantial property that unquestionably belongs to them and no one else. In addition, as a direct result of Defendants' misconduct, Plaintiffs

4

have lost out on tens of thousands of dollars in interest they could have otherwise earned on their $2 million, lost opportunities to obtain investment returns above and beyond simple interest, and have been forced to incur hundreds of thousands of dollars in legal fees to defend against the sham State Court Action and commence this action to enforce their rights.

13.     Plaintiffs bring this action to vindicate their rights and punish Defendants for their flagrant and intentional misconduct.

## THE PARTIES

14.     Plaintiff Metaxas is a resident of Switzerland.

15.     Plaintiff Pertshire is a limited partnership organized under the laws of New Zealand and a citizen of New Zealand and Italy for purposes of 28 U.S.C. § 1332.

16.     On information and belief, Defendant Graubard is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

17.     On information and belief, Defendant Seddio is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

18.     On information and belief, Defendant Rubin is a citizen and resident of New Jersey.

19.     On information and belief, Defendant Sprei is a citizen of New York, resides in this judicial district, and serves as the managing member of non-party Olden Group LLC ("Olden Group"), a limited liability company organized under the laws of New York and headquartered in this judicial district.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because this action is between citizens of New York and New Jersey and citizens of a foreign state, who

5

are not lawfully admitted for permanent residence in the United States and are domiciled in New York, and the amount in controversy exceeds $75,000.

21.     This Court has general personal jurisdiction over Defendants Graubard, Seddio, and Sprei because they are each domiciled in New York.

22.     The Court has specific personal jurisdiction over Defendant Rubin pursuant to CPLR § 302(a)(2) because Plaintiffs' claims against Rubin arise out of his tortious acts committed in New York, particularly in this judicial district.

23.     Venue is additionally proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

24.     Venue is additionally proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this district.

**FACTUAL ALLEGATIONS**

**A.     Plaintiffs Are Introduced to Sprei by Attorney Paul Montclare, Who Misrepresents Sprei as an Honest Businessman**

25.     In or around November 2024, an advisor to Plaintiff Pertshire, non-party Javier Macaya ("Macaya"), was introduced to Sprei by Paul Montclare, a partner at the New York office of the law firm Mitchell Silberberg & Knupp LLP. Montclare represented that he "personally ha[d] represented Sam [Sprei] in business transactions," and that Montclare's wife, Lauren Wachtler, was Sprei's "trusted advisor on many of his business deals." Montclare described Sprei as "honest and true to his word," and as being "very successful."

26.     During a conversation on or around November 15, 2024, Sprei proposed to Macaya that he consider a potential investment opportunity with Sprei, through Sprei's company Olden Group, in a company called "Surf 9" (the "Potential Investment").

6

27.    After meeting Sprei, Macaya expressly asked Montclare whether he would say, based on his knowledge of Sprei, as well as Wachtler's work with Sprei, that Sprei was "a careful manager of his investment portfolio and an honest partner to his co-investing partners?" Montclare responded, "Absolutely."

28.    Contrary to Montclare's representations, however, and as Montclare well knew, Sprei is neither honest nor successful.

29.    For example, in a sworn affidavit filed in connection with a separate lawsuit against him, captioned *Shimon Avrahami v. Sam Sprei et al.*, Index No. 506581/2025 (N.Y. Sup. Ct. Kings Cty.), Sprei admitted that, in November and December 2019, he induced the plaintiff in that matter to invest $1.1 million into two separate real-estate transactions, in Brooklyn and in New Jersey, but kept the money for himself instead. Sprei admits that he improperly "retained [Avrahami's] investment without legal basis or authorization." A copy of Sprei's affidavit is attached hereto as Exhibit 1. That lawsuit resulted in a $560,000 money judgment against Sprei.

30.    In another action, *Randy Chang et al. v. Sam Sprei*, Index No. 523209/2016 (N.Y. Sup. Ct. Kings Cty.), Sprei similarly admitted in a sworn affirmation confessing judgment that he had defaulted on his promise to repay $941,000 that he borrowed in 2014 from non-parties Randy Chang and Ann Hsiung. A copy of Sprei's affirmation is attached hereto as Exhibit 2. The litigation resulted in a money judgment of $871,225 against Sprei.

31.    On information and belief, Montclare was aware of Sprei's unlawful practices, including repeated thefts of unwitting investors, when he introduced Plaintiffs to Sprei.

32.    While Montclare failed to disclose, and indeed lied about, his knowledge of Sprei's dishonesty and business failures to Plaintiffs, Montclare accurately described Sprei as "politically well-connected in Brooklyn[]"—to Seddio, the former chair of the Kings County Democratic

7

Committee, whom Sprei would later engage in the State Court Action to manipulate the New York City civil court system as a means of shielding Sprei's many ongoing thefts.

33.    Based on Montclare's false representations about Sprei's character for honesty and fair dealing, Macaya informed Plaintiff Metaxas and two business associates, non-parties Reda Maamari ("Maamari") and Phillip Elias Farid El-Khoury ("El-Khoury"), about the Potential Investment, which Plaintiffs, Maamari, and El-Khoury decided to explore.

**B.    Sprei Induces Plaintiffs to Put Substantial Funds in Escrow By Falsely Claiming He Needs Proof of Their Liquidity**

34.    Before sharing substantive information about the Potential Investment, however, Sprei insisted that Plaintiffs, Maamari, and El-Khoury deposit "soft money in escrow" to demonstrate they were bona fide investors with sufficient liquidity to complete the Potential Transaction, if they so chose.

35.    Having no issue with simply displaying their liquidity, Plaintiffs agreed and engaged Montclare as their attorney to assist in drafting an escrow agreement for them.

36.    On or about December 3, 2024, Sprei emailed an initial draft escrow agreement, naming Graubard as the escrow agent, to Montclare and Macaya. Montclare then sent a revised draft escrow agreement to Sprei and Macaya.

37.    Upon seeing Graubard's name in the draft escrow agreement, Macaya asked Montclare whether Graubard worked for him and whether Montclare trusted Graubard. In response, Montclare made clear that it was *Sprei* who hand-picked Graubard to serve as Plaintiffs' escrow agent but nonetheless vouched, extensively, for Graubard, writing, "No. He does not work for me, but he is a well-known bankruptcy attorney in Brooklyn and has been practicing for 30 years. He has a good reputation, and my wife [Wachtler] has worked with him on other deals and speaks highly of him." Montclare continued, "I think [that] is why Sam [Sprei] believes [Graubard]

8

is a good person to hold these funds to show cash available so we can try to move forward to do the Surf 9 transaction." Montclare added, "Since this is a short-term IOLA attorney trust account with an attorney with years of successful [*sic*] I have no reason not to trust Mr. Graubard."[1]

38.     On information and belief, Montclare was aware of Graubard's unlawful practices, including Graubard's ongoing work with Sprei to steal money from unwitting investors, when Montclare introduced Plaintiffs to Graubard.

**C.     Plaintiffs Execute Legal Agreements with Graubard Requiring Him to Hold $2 Million in Escrow for Plaintiffs' Sole and Exclusive Benefit and to Promptly Return the Escrow Deposits upon Plaintiffs' Demand**

39.     Based on Montclare's representations about Graubard, which turned out to be false, Plaintiffs (as well as Maamari and El-Khoury) each executed a materially identical Escrow Agreement with Graubard, each governed by New York law. Plaintiffs' valid and enforceable Escrow Agreements, as executed on December 5, 2024, are attached as Exhibits 3–4.

40.     Pursuant to Paragraph 2 of each Escrow Agreement, each depositor agreed to deposit funds to Graubard's IOLA ending in -1102 at the Valley National Bank branch located at 2054 86th Street, Brooklyn, NY 11214.

41.     Pursuant to Paragraph 3 of each Escrow Agreement, the "sole purpose" of the Escrow Deposits was to "establish" that each depositor "ha[d] available cash equal to" the amount of the Escrow Deposit. Paragraph 3 further provides, in bold capital letters, "Nothing in this escrow agreement nor the depositing of the escrow amount shall be construed as an agreement of any kind made by the Escrowee in connection with any actual or potential surf 9 transaction or any other transaction."

---

[1] "IOLA" refers to an "interest on lawyer account" for holding certain client funds that is governed by N.Y. Judiciary Law § 497 and related regulations.

42.     The Escrow Agreements expressly grant each depositor the unconditional right to have their Escrow Deposits returned upon demand. Paragraph 4 of each Escrow Agreement provides, in bold capital letters, "The Escrow Amount will be returned to the Escrowee,[2] or its designee, upon Escrowee's demand, *which return shall be made in Escrowee's sole and absolute discretion*, in accordance [with] paragraph 5 of this Escrow Agreement" (emphasis added). Paragraph 5 provides that Graubard "shall" return an Escrow Deposit by wire transfer *within two business days* of each escrowee's request by email for such return.

43.     Other provisions of the Escrow Agreements further cement each depositor's absolute control over and right to such depositor's Escrow Deposits. Under Paragraph 6, Graubard expressly agreed "to release and return the Deposit or any part thereof as the case may be, pursuant to and in strict accordance with all of the terms and conditions of this Escrow Agreement," and further "warrant[ed] and agree[d] that *only the Escrowee has any right to recover or direct the payment or distribution of the Escrow Amount or any part thereof*" (emphasis added).

44.     In Paragraph 7, Graubard further expressly "acknowledge[d], warrant[ed] and agree[d] that [he] has no right to, and shall not release, distribute, pledge, deposit or hypothecate any part of the Escrow Deposit for any reason or in any way whatsoever without the express prior written permission and consent of Escrowee."

45.     On December 5, 2024, and pursuant to Paragraph 2 of its respective Escrow Agreement, Pertshire wired $1,000,000 from a trust account at Citibank, in New York, to Graubard's

---

[2] Although the terms "escrow agent" and "escrowee" are typically used interchangeably to refer to the third-party depositary of an escrow, each Escrow Agreement expressly defines its *beneficiary* as "Escrowee" and defines Graubard as "Escrow Agent." Accordingly, where quoted provisions of the Escrow Agreements refer to "Escrowee," they should be understood to mean the beneficiary of such Escrow Agreement, *i.e.*, one of Plaintiffs, Maamari, or El-Khoury.

"attorney trust" account ending in -1102 at Valley National Bank. The wire made clear that it was a "transfer to an escrow account."

46.    On December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, Metaxas wired $1,000,000 from his account at Banque Pictet, in Geneva, Switzerland, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Metaxas made clear that the deposit was for the "Surf 9 Olden Group Deal."

47.    The same day, and pursuant to Paragraph 2 of his respective Escrow Agreement, Maamari wired $1,000,000 from his account at Banque Lombard Odier, in Geneva, Switzerland, to Graubard's "attorney trust account" ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Maamari made clear that the deposit was for "payment into escrow account."

48.    Also on December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, El-Khoury wired $250,000 from his account at Interaudi Bank, in New York, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. The payment purpose indicated that the funds were to be placed "in an escrow account."

### D.    Plaintiffs Demand the Return of Their Escrow Deposits, but Graubard Conspires with Sprei and Others to Withhold Plaintiffs' Funds

49.    In early January 2025, after completing a month's long due diligence on the Potential Investment, Plaintiffs, Maamari, and El-Khoury decided not to pursue the Potential Investment.

50.    On January 9 and 10, 2025, in compliance with Paragraph 4 of each Escrow Agreement, Plaintiffs, Maamari, and El-Khoury (or their designee) sent Graubard an email (together, the "Demands") demanding the return of their respective Escrow Deposits by January 15, 2025, and providing individualized instructions for the return wire transfers, thereby performing all of their obligations under the Escrow Agreement.

11

51. Under Paragraphs 4 and 5 of the Escrow Agreements, nothing more was required from Plaintiffs to trigger Graubard's unqualified obligation to return the Escrow Deposits.

52. On January 15, 2025, Graubard acknowledged receipt of each of Plaintiffs' Demands (as well as those of Maamari and El-Khoury), writing, "All of your various emails about return of funds have been received." Graubard raised no issue or concern with his obligation to return the Escrow Deposits.

53. Instead of complying with his unqualified contractual obligations to return the Escrow Deposits, however, over the course of the next two weeks, Graubard repeatedly made false statements to Plaintiffs regarding the return of their funds because, on information and belief, Graubard had unlawfully transferred the Escrow Deposits out of his IOLA to Sprei or one of his associates.

54. When their funds were not returned on January 15, 2025, Plaintiffs reiterated their Demands for the return of their Escrow Deposits on January 16, 2025. In response, Graubard falsely blamed a "computer problem" at Valley National Bank for the delay, writing, "Unfortunately, some of the New York banks have been hit with a computer problem that has shut down operations. We are working to see what else can be done to get wires out."

55. When Macaya emailed Graubard the next day, on January 17, 2025, to "confirm that the funds ha[d] been wired," *Sprei* responded, falsely, "Bank is still down." After Macaya responded to both Sprei and Graubard, "copying Paul Montclare" on the email given that Montcare had referred Plaintiffs to Sprei and Graubard, Sprei replied, "Tell us what more we can do." Sprei's use of "we" was the first indication of his involvement in Graubard's failure to return the Escrow Deposits.

12

56.     After Macaya responded to Sprei's email demanding that Graubard immediately comply with his contractual obligations to return the Escrow Deposits, Sprei added Wachtler, *Montclare's wife*, to the email thread. Unbeknownst to Plaintiffs at the time, Wachtler was also working in concert with Graubard, Sprei, and others to divert millions of dollars in escrow deposits from another victim.[3]

57.     Once added to Plaintiffs' communications with Graubard, Sprei, Montclare, and others, Wachtler responded to Macaya with an apparent attempt to cover Sprei's and Graubard's misconduct. She wrote, "I want you to be assured that this is not any 'hold up' of any kind whatsoever," and proceeded to describe a technical failure affecting New York banks that had purportedly begun *on January 16, 2025*.

58.     Neither Graubard nor Sprei (nor Wachtler or Montclare) gave any explanation for why Graubard had failed to return the Escrow Deposits by January 15, 2025, as required by the plain terms of the Escrow Agreements and before the alleged technical failures at the banks began. Nor did Wachtler explain when and why she became involved in the return of Plaintiffs' Escrow Deposits.

59.     After four more days elapsed without the return of Plaintiffs' funds, Macaya emailed Graubard on January 21, 2025, again demanding the return of Pertshire's Escrow Deposit. Graubard responded the same day acknowledging his obligation to return Plaintiffs' Escrow Deposits and representing that he would "send the confirmation as soon as it is done." On January 21, 22, and 23, Graubard and his agent, non-party Chaskel Frankel, falsely represented to Plaintiffs, as well as Maamari and El-Khoury, that all of their Escrow Deposits had been returned by

---

[3] That other scheme gave rise to an ongoing lawsuit against Wachtler, Graubard, Seddio, and others captioned *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025 (Nassau Cty. Sup. Ct.).

wire transfer, when in fact only $400,000 of Maamari's $1 million Escrow Deposit had been returned, by wire transfer dated January 23, 2025. Even though the remaining $2.85 million in Escrow Deposits remained outstanding as of January 23, 2025, Graubard, through his agent Frankel, provided Metaxas with a fictitious "Fed ref" or federal reference number which he purported to represent the return wire of Metaxas' funds.

60.    When Metaxas followed up on January 24, 2025, saying his bank could not trace the federal reference number Graubard's agent provided and requesting "a copy of the Swift that will show the date of transfer as well as the USD correspondent bank used to effect it," Graubard's agent falsely stated, "Yes will do", but ultimately provided no Swift or other proof of transfer.

61.    On the morning of January 27, 2025, Metaxas again emailed Graubard for an update on the return of his Escrow Deposit. In response, Graubard's agent Frankel falsely represented that the wire would be "out today."

62.    Graubard was copied on all of his agent Frankel's emails to Plaintiffs but did nothing to correct the false and misleading statements.

63.    Not once in Graubard's interactions with Plaintiffs between January 9 through January 27, 2025 did Graubard contest his contractual obligation to return the Escrow Deposits to Plaintiffs or suggest that any third party had any right to interfere with the return of Plaintiffs' funds. Instead, Graubard repeatedly committed and claimed to return Plaintiffs' Escrow Deposits.

64.    After two weeks of false representations regarding the return of their Escrow Deposits, Plaintiffs retained the undersigned counsel, who sent Graubard a letter on January 27, 2025, demanding the immediate return of each Escrow Deposit in full, with interest at the New York statutory rate of 9% annually from January 15, 2025, and documentation establishing that the Escrow Deposits were still held, in full, in Graubard's IOLA as required by the Escrow Agreements.

14

65.     That evening, Maamari and El-Khoury's Escrow Deposits were returned in full, though without any interest reflecting the unauthorized twelve-day delay in repayment.

66.     The $2 million belonging to Plaintiffs, however, remains outstanding. To date, Graubard has provided no explanation for his decision to return Maamari's and El-Khoury's Escrow Deposits but not those of Plaintiffs. Graubard has also continually refused to provide any proof whatsoever that Plaintiffs' funds remain intact in his IOLA despite Plaintiffs' repeated requests.

**E.     Graubard and Sprei Admit to Holding Plaintiffs' Escrow Deposits Hostage and Demand Releases from Liability for Their Misconduct**

67.     On January 29, 2025, two days after returning Maamari's and El-Khoury's Escrow Deposits and receiving the demand letter from Plaintiffs' counsel, Graubard made an about-face. After two weeks of repeatedly promising to return Plaintiffs' funds, Graubard stated that he would not return Plaintiffs' Escrow Deposits. Rather than acknowledging his contractual and fiduciary duties to *Plaintiffs* as their escrow agent, Graubard claimed *for the first time* to be representing *his* "client," later revealed to be Sprei, who purportedly "require[d] a general release" of liability from Plaintiffs before Graubard would fulfill his legal obligation to return the Escrow Deposits. At no point in Plaintiffs' prior dealings with Graubard and Sprei did either of them indicate that Graubard served as Sprei's counsel, let alone that Graubard would put Sprei's interests ahead of his contractual and fiduciary duties to Plaintiffs as their escrow agent.

68.     In subsequent correspondence the same day, Graubard ignored Plaintiffs' counsel's repeated requests to provide proof that the Escrow Deposits were in fact being held in his IOLA. Instead, Graubard continued to stall, writing, "I am asking you to indulge me another day[] to deal with both my client's release issue and the funds transfer."

15

69.     On January 30, 2025, despite having no previous contact with Sprei, Plaintiffs' counsel received a letter from Ethan A. Kobre, Esq., who represented himself to be Sprei's "litigation counsel." In that letter, attached as Exhibit 5, Kobre acknowledged Graubard owed fiduciary duties to Plaintiffs as their escrow agent. He also stated that Sprei had "instructed Mr. Graubard not to release the escrowed funds"—further establishing Graubard's collusion with Sprei and Sprei's affirmative interference with Plaintiffs' contractual rights. Kobre reiterated Graubard's proposed hostage deal: "Your clients want the escrowed funds. My client wants certainty that your clients will not pursue meritless claims against him. All that's needed for everyone's satisfaction is a release in my client's favor."

70.     Plaintiffs responded to Kobre's letter on January 31, 2025, reiterating Graubard's unqualified duty to return the Escrow Deposits under the Escrow Agreements, highlighting Sprei's interference with that duty, noting Graubard's repeated refusal to provide proof that the funds remained in his IOLA, demanding such proof from Sprei, and raising the impropriety of Graubard's and Sprei's conditioning the return of funds on any release.

71.     Plaintiffs have since learned that Sprei's conduct in the instant matter fits his *modus operandi* of ensnaring potential investors into fraudulent investment schemes. Other cases involving allegations of similar misconduct by Sprei and those working in concert with him include:

    a.    *Rolnick Investment Holdings et al. v. Edward Harold King et al.*, Index No. 611100/2025, pending in the Nassau County Supreme Court;

    b.    *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, pending in the Nassau County Supreme Court;

    c.    *Victor Ferreira v. Solomon Rubin et al.*, Index No. 601008/2025, pending in Nassau County Supreme Court;

    d.    *Shimon Avrahami v. Sam Sprei et al.*, Index No. 506581/2025, pending in the Kings County Supreme Court;

e.   *Ira Russack v. Queen Equities LLC et al.*, Index No. 717729/2025, pending in Queens County Supreme Court;

f.   *TD Bank, N.A. v. Edward Harold King*, No. 25-cv-3574, pending in this Court;

g.   *Jetro Cash & Carry Enterps., LLC v. Olden Equities, L.L.C. et al.*, Index No. 605680/2024, pending in the Nassau County Supreme Court;

h.   *Jest Holdings LLC v. Anhui Edgewater St. Realty LLC et al.*, Index No. 727110/2024, pending in the Queens County Supreme Court; and

i.   *Edgewater Property Equity LLC v. Anhui Edgewater St. Realty LLC et al.*, Index No. 151734/2021, pending in the Richmond County Supreme Court.

**F.     After Plaintiffs Contact Law Enforcement, Defendants Commence a Sham Litigation to Provide Cover for Graubard's and Sprei's Misconduct**

72.     Plaintiffs refused to give in to Graubard's and Sprei's improper demands and, convinced that criminal conduct was afoot, reported the misconduct to law enforcement authorities on January 31, 2025.

73.     On or about February 12, 2025, when on information and belief Graubard and Sprei learned that law enforcement had been contacted, Sprei's attorney Kobre contacted Plaintiffs in yet another attempt to extort them. Notably, in his letter, *Sprei's counsel* made representations on Graubard's behalf. Kobre wrote, "Mr. Graubard no longer wishes to hold the escrowed funds. As such, my client [Sprei] will move tomorrow to deposit the money into the court. My client remains willing to have the escrowed funds sent to you or your client upon receipt of a release. The choice is yours." Kobre's letter again established Sprei's collusion with Graubard and control over the Escrow Deposits. Plaintiffs declined Kobre's extortionate and illusory offer.

74.     On February 19, 2025, just a week after Plaintiffs rejected Kobre's unlawful demand, a civil action was filed against Plaintiffs, but not by Graubard, or even Sprei. Instead, Seddio, Sprei's longtime co-conspirator, commenced a civil action against Plaintiffs in Kings

County Supreme Court on behalf of Olden LLC, an apparently fictitious entity purportedly managed by Rubin. On information and belief, Rubin is an associate of Sprei.

75.    The case is captioned *Olden LLC v. Metaxas et al.*, Index No. 505819/2025, and names both Plaintiffs as defendants, as well as Graubard as a nominal defendant.[4] Although styled as a commercial contract dispute, Olden LLC is not a party to or third-party beneficiary of any contracts with either Plaintiff. Indeed, neither Olden LLC nor Rubin were known to either Plaintiff before the case was filed.

76.    Nor did Seddio commence Olden LLC's action by filing a complaint. Instead, Seddio took advantage of a procedural mechanism that has become his *modus operandi* in abusing judicial process. Under CPLR § 305(b), a plaintiff may commence a civil action by simple summons with "a notice stating the nature of the action and the relief sought, and, except in an action for medical malpractice, the sum of money for which judgment may be taken in case of default." Under CPLR § 3012(b), a complaint must be served within 20 days of the defendant's demand or notice of appearance in the action. As detailed below, to this day—almost eight months after initiating the State Court Action—Seddio has not served a complaint in that action.

77.    The notice drafted and filed by Seddio on behalf of Olden LLC falsely states, in its entirety, "This action seeks a judicial declaration and injunctive relief as to escrow funds held by the Nominal Defendants [*sic*], as to which the parties have competing claims."

78.    On information and belief, when Seddio filed the summons with notice in Olden LLC's action against Plaintiffs (and parallel request for a TRO), he knew that Olden LLC had no claims to Plaintiffs' Escrow Deposits, had no contractual or other relationship with either Plaintiff,

---

[4] On information and belief, Seddio intentionally misspelled Graubard's name as "Graubart" in his State Court Action filings to make it more difficult for the public to connect the litigation to Graubard.

18

and was not, in fact, a legal entity. Seddio commenced the State Court Action not to vindicate the rights of his client(s)—as neither Olden LLC, a fictitious entity, nor Rubin, who has never met or interacted with Plaintiffs, has any claim to the Escrow Deposits.

79.     On information and belief, Seddio commenced the State Court Action in coordination with Graubard, Sprei, and Rubin, but brought the action on behalf of Olden LLC to conceal Sprei's involvement in the underlying misconduct and create the appearance that Sprei and Seddio do not control Graubard or the Escrow Deposits. Indeed, in subsequent correspondence with Plaintiffs' counsel regarding a potential settlement of the State Court Action, Seddio expressly referred to Sprei's self-described litigation counsel, Kobre, as *Seddio's* "co-counsel," highlighting Seddio's coordination with Sprei.

### G.     Seddio and Rubin Obtain a Temporary Restraining Order Based on False Statements to Improperly Restrain Plaintiffs from Recovering Their Escrow Deposits and to Hide Sprei's and Graubard's Misconduct

80.     On information and belief, the true purpose of Seddio's and Rubin's sham preliminary injunction motion was to obtain a TRO which would prevent Plaintiffs from taking affirmative steps to obtain their Escrow Deposits, give Graubard and Sprei the ability to point to an ongoing civil action in the event they were questioned by law enforcement, and buy Graubard and Sprei time to replenish Plaintiffs' funds, which they or their associates had illegally dissipated.

81.     To that end, on February 19, 2025, Seddio filed, alongside a supporting declaration from Rubin, an "emergency" motion, by order to show cause, seeking the *ex parte* entry of a TRO enjoining Graubard "from releasing the Escrowed Funds to any party"; directing Graubard "to continue to hold the Escrowed Funds in his escrow account (or deposit the Escrowed Funds with the Court) pending further order of this Court or agreement of the parties"; and enjoining Plaintiffs and all other parties to the action "from taking any steps to transfer, encumber, sell, or otherwise dispose of the subject property" pending the hearing on and resolution of Olden LLC's preliminary

injunction motion, which requested that the court order Graubard to deposit the Escrow Deposits with the Kings County Supreme Court Clerk's office.

82. To obtain *ex parte* relief, Seddio filed an "emergency" affirmation swearing, under penalty of perjury, that Olden LLC "could not give notice of this application because, if notice were given of this action, [Plaintiffs] would take steps to further harass and intimidate and bully the Nominal Defendant escrow agent [Graubard] to released [*sic*] the disputed funds before the Court could even hear this matter." On information and belief, Seddio knew his basis for seeking *ex parte* relief was legally insufficient (a purported risk of "intimid[ation]" and "bully[ing]" is not a basis for an *ex parte* application for a preliminary injunction) and pretextual: the sole reason he filed an *ex parte* application was to prevent Plaintiffs from contesting his completely meritless request.

83. Seddio also filed a sworn affirmation from Rubin setting forth purported facts supporting Olden LLC's request for a TRO. In it, Rubin perjured himself by making several knowingly false statements of fact:

a. Rubin falsely stated that Olden LLC and Plaintiffs "entered into negotiations to invest and jointly purchase a certain non-party company." That is categorically false. Before Olden LLC commenced its sham litigation against Plaintiffs on February 19, 2025, Plaintiffs had never even heard of or interacted with the company, which is not a legal entity.

b. Rubin falsely stated that, after "disputes arose between the parties," Plaintiffs "level[ed] very serious but frivolous claims against [Olden LLC] and against [Rubin] personally." That, too, is false. Again, Plaintiffs had never interacted with either Olden LLC or Rubin prior to the initiation of Olden LLC's sham State Court Action.

c. Rubin falsely stated that *he* "explained to [Plaintiffs] (through counsel) that [Rubin] would have no objection to the release of the Escrowed Funds if only [Plaintiffs] released [Rubin] from their unfounded bullying claims," and Rubin claimed that "[a] copy of just one such correspondence through counsel" was exhibited to his affirmation. Each of those statements was also false. Plaintiffs have never had any communication with Rubin, and the

20

letter attached to Rubin's affirmation was the January 30, 2025 letter from *Sprei's* litigation counsel Ethan A. Kobre.

84. On information and belief, Seddio and Rubin both knew that Rubin's sworn affirmation contained false statements of material fact at the time they filed Rubin's affirmation in the State Court Action. The January 30, 2025 letter from Kobre was also attached to Rubin's affirmation, establishing that Seddio and Rubin were aware of Graubard's fiduciary duties to Plaintiffs and intentionally commenced the State Court Action to interfere with those duties.

85. Less than three hours after Seddio filed the motion on behalf of Rubin's purported company Olden LLC, and despite the glaring deficiencies in the supporting papers, Kings County Supreme Court Justice Steven Z. Mostofsky granted the motion *ex parte* and granted the TRO in substantially the same form requested by Seddio. Justice Mostofsky, as the *ex parte* judge on duty, scheduled the preliminary injunction hearing for April 23, 2025, before the assigned judge: Hon. Katherine Levine. The order further directed that Olden LLC complete "personal service" of the order and all supporting papers on all parties by March 7, 2025.

**H. Seddio, Rubin, and Graubard Take Affirmative Steps to Impede the State Court Action**

**1. Seddio And Rubin Choose Not to Serve Graubard or File a Complaint and Seddio Repeatedly Delays the Preliminary Injunction Hearing He Requested**

86. While Seddio promptly served Plaintiffs with copies of the TRO and supporting papers on February 20, 2025, the day after the TRO was issued, Seddio *never* served Graubard with the same papers even though (a) Graubard is the party against whom Seddio sought the TRO to purportedly prevent Graubard from returning the Escrow Deposits to Plaintiffs and (b) Justice Mostofsky ordered Seddio to personally serve Graubard with the TRO and its supporting papers by March 7, 2025.

21

87.     Instead, when almost two months elapsed without Seddio's filing on the docket a certificate of service on Graubard, and after Seddio and Graubard repeatedly refused to disclose to Plaintiffs whether Seddio had served Graubard with the TRO, *Plaintiffs* served Graubard with the TRO and supporting papers on April 18, 2025.

88.     Had Seddio sought and obtained the TRO for legitimate purposes, he would have served its primary target, Graubard, who purportedly held the Escrow Deposits at issue. Seddio's choice not to serve Graubard evidenced his malicious intent to use the TRO solely for the improper purpose of interfering with Plaintiffs' exclusive and unqualified contractual rights to recover their Escrow Deposits. On information and belief, Seddio knew there was no need to serve Graubard with the TRO because Seddio, Graubard, Rubin, and Sprei had worked in concert to initiate the illegitimate State Court Action to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their agents had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

89.     In addition, despite having caused Olden LLC (as its attorney and purported manager) to commence the State Court Action by simple summons with notice, to date, Seddio and Rubin have chosen not to file a complaint asserting any legal claim to the Escrow Deposits, as required under CPLR § 3012(b).

90.     On information and belief, Rubin (on behalf of Olden LLC) and Seddio have not filed a complaint in the State Court Action because they know they have no legal right, whatsoever, to Plaintiffs' Escrow Deposits. Rubin's and Seddio's choice not to advance any actual claims by Olden LLC to the Escrow Deposits evidences their malicious intent to use the TRO to (1) interfere with Plaintiffs' exclusive and unqualified rights to the Escrow Deposits under the Escrow

Agreements (each of which Plaintiffs filed on the docket in the State Court Action), and (2) give Graubard and Sprei cover to continue misappropriating Plaintiffs' Escrow Deposits.

91.    Seddio also engaged in repeated delay tactics aimed at impeding and delaying the State Court Action *he initiated* and through which he requested *emergency relief*.

92.    On April 17, 2025, just five days before the originally scheduled preliminary injunction hearing—which had been scheduled since February 19, 2025—Seddio requested an adjournment via email to chambers due to an unspecified "schedule conflict" and stated that he was "not available till may [sic]." After a week of back and forth with chambers, during which Seddio would offer his available dates and then retract them once they were agreed to, Justice Levine rescheduled the hearing for Monday, May 12, 2025.

93.    On the afternoon of Friday, May 9, 2025, however, just one business day before the scheduled hearing and after presiding over the case for approximately three months, Justice Levine recused herself *sua sponte* "in order to avoid any potential appearance of impropriety or partiality with respect to a party in this proceeding." On information and belief, Justice Levine's recusal was due to her personal and professional relationship with Seddio, who chaired the Kings County Democratic Committee when Justice Levine ran for and won her Kings County Supreme Court judgeship as a Democrat in 2016.

94.    The State Court Action was reassigned to Justice Mostofsky, who had issued the initial TRO.

### 2.    Graubard Impedes the State Court Action by Refusing for Months to Appear in the Action and Making False Representations to the Court

95.    For his part, Graubard also took actions and omissions for the purpose of impeding and obstructing the State Court Action. Despite Plaintiffs serving Graubard with the TRO and its

supporting papers on April 18, 2025, Graubard refused for months to make any appearance in the State Court Action.

96. Only after Plaintiffs refused to consent to yet another request by Seddio to adjourn the preliminary injunction hearing, which Judge Mostofsky rescheduled for July 17, 2025, did Graubard engage attorney Yeshaya Gorkin, Esq. to represent him. On information and belief, Graubard directed Gorkin to enter an appearance on the evening of July 16, 2025, mere hours before the July 17 preliminary injunction hearing, and solely to request an eleventh-hour adjournment of the hearing, despite Graubard's having been on notice of the hearing date for months.

97. In addition, Graubard permitted Gorkin to falsely represent to the state court in his eleventh-hour adjournment request that Graubard was "willing to release the funds at issue, provided the parties execute a mutual release and consent order." During a subsequent hearing on potential attorney sanctions, described in Section I, *infra*, Gorkin's own attorney was forced "to correct the record" by retracting Gorkin's prior representation because Gorkin "no longer represents [Graubard's July 16, 2025 statement as true], he now has doubts about that."

98. On information and belief, the primary purpose of Graubard's delay tactics, in which he engaged in concert with Seddio, was to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their agents had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

**I.  The State Court Issues an Order Requiring Graubard to Deposit the Escrow Deposits With the Court, and Seddio and Graubard Work in Concert to Thwart the Order**

99. The July 17, 2025, hearing on Seddio's and Rubin's motion for a preliminary injunction, which Plaintiffs did not oppose, proceeded as scheduled. Neither Graubard nor his then-counsel Gorkin appeared.

24

100. Seddio, too, failed to appear in person, though he sent an agent to represent the plaintiff, Rubin's purported company Olden LLC.

101. At the conclusion of the hearing, Justice Mostofsky issued an order (the "Deposit Order") requiring Graubard to deposit Plaintiffs' $2 million in Escrow Deposits by 5 p.m. on July 21, 2025. Plaintiffs served the Deposit Order on Seddio and Graubard (through Gorkin) within a half-hour of its filing on Thursday, July 17, 2025.

102. That evening, Seddio emailed counsel for Plaintiffs stating that his "Client would like to know if [Plaintiffs] would accept $2M plus additional $35k to settle this matter. So we can be done with this case." Seddio's email illustrates that Seddio, Rubin, and/or Sprei, in fact control Plaintiffs' Escrow Deposits, contrary to the representations made by Seddio and Rubin in their State Court Action filings that Graubard maintained exclusive control of the Escrow Deposits.

103. On information and belief, Seddio's settlement offer was illusory and Seddio made the offer in concert with Sprei, Graubard, and Rubin as a means of delaying justice in the State Court Action, as they knew that Plaintiffs' Escrow Deposits had already been dissipated and thus Graubard would not deposit Plaintiffs' Escrow Deposits with the clerk of the court as required by the Deposit Order.

104. After Plaintiffs' counsel informed Seddio that Plaintiffs would only consider settlement discussions after their funds were deposited with the court, Seddio and Graubard schemed to further impede the State Court Action, in direct violation of the Deposit Order.

105. At 3:01 p.m. on Monday, July 21, 2025, less than two hours before the 5 p.m. deadline under the Deposit Order, Seddio and Graubard (through his then-counsel Gorkin) filed a stipulation purporting to unilaterally extend the Deposit Order's deadline until Thursday, July 24, 2025. Plaintiffs opposed any extension and requested that Justice Mostofsky disregard the

25

stipulation. But despite Seddio and Graubard's unilateral grant of a three-day extension of time to fulfil the court's mandate, Graubard still failed to deposit the funds with the clerk's office by July 24.

106.    On Friday, July 25, 2025, in response to an inquiry from Justice Mostofsky's principal law clerk regarding the status of the Escrow Deposits, Seddio effectively admitted that he had directed Graubard to violate the Deposit Order. Seddio wrote, "Given the amount at issue, I intended to personally oversee the deposit to ensure proper compliance. However, I was unable to make it to the courthouse before, and did not feel it appropriate for the nominal defendant to deposit the funds in my absence."

107.    Although Seddio also stated in his July 25, 2025 email that he would "ensure the deposit is made promptly next week," again establishing Seddio's control over Graubard and the Escrow Deposits, that statement was false as no deposit was made the following week. Instead, on information and belief, when Seddio made that representation to the court, he had no intention of ensuring that the deposit was made at all, but rather made the statement to secure a further delay of justice in the State Court Action. Indeed, to this day, Plaintiffs' Escrow Funds have not been deposited with the clerk of the Kings County Supreme Court of Brooklyn.

108.    On July 28, 2025, Judge Mostofsky scheduled, *sua sponte*, an attorney sanction hearing regarding the continued violation of the Deposit Order.

109.    On July 29, 2025, Plaintiffs moved to hold Graubard, Seddio, and Gorkin in contempt of the Deposit Order.

110.    After Judge Mostofsky denied Gorkin's repeated requests to adjourn the attorney sanctions hearing, Gorkin moved on July 30, 2025—the day before the hearing—to withdraw as Graubard's counsel. The next day, less than an hour before the scheduled hearing, Graubard

noticed the substitution of non-party Israel Goldberg, Esq., as his new counsel in place of Gorkin. On information and belief, Seddio knew that Goldberg, also one of Sprei's and Seddio's longtime associates, had a personal relationship with Justice Mostofsky and coordinated Graubard's retention of Goldberg for the purposes of compelling Justice Mostofsky to recuse himself due to his personal relationship with Goldberg.

111.    On July 31, 2025, Justice Mostofsky held a video conference hearing on possible attorney sanctions against Graubard. Seddio, Gorkin, and Gorkin's law firm partner Geoffrey Bowser, Esq. appeared. Graubard and his new attorney, Goldberg, were not present.

112.    During the hearing, Gorkin's attorney, Bowser, stated that, while Gorkin previously "understood that his client [Graubard] was willing to pay the money into the court[,] … he no longer represents that, he now has doubts about that."

113.    Justice Mostofsky responded, "There is only one reason why the money isn't paid into court and that's because the escrowee [*i.e.*, Graubard] doesn't have it. And that's the problem that we are all putting the escrowee into because you are leaving me with the only option I have, which is to believe that the escrowee is not holding the $2 million dollars that was represented to me in court."

114.    For his part, Seddio repeatedly admitted to communicating directly with Graubard, and made several representations on his behalf, despite the fact that Graubard is a named party to the State Court Action and is represented by counsel. Seddio stated that "[t]he last contact [Seddio] had with [Graubard] is he was hiring Izzy Goldberg to represent him," which, on information and belief, Seddio and Graubard had arranged for the purpose of creating a conflict with Judge Mostofsky. Seddio further stated that Graubard "was looking for some kind of a guarantee that he wasn't going to be included in any future lawsuits once the money was turned in."

115.    In light of Seddio's and Gorkin's admissions during the hearing and their conduct to date, Plaintiffs made an oral motion for sanctions against both attorneys pursuant to 22 NYCRR § 130-1.1. Judge Mostofsky reserved ruling on Plaintiffs' motion.

116.    Despite reserving ruling on sanctions against Seddio and Gorkin, and his statements during the attorney sanctions hearing regarding the likely dissipation of Plaintiffs' Escrow Deposits, the very next morning, Judge Mostofsky recused himself *sua sponte* "due to personal relationship with" Graubard's replacement counsel Goldberg, just as Seddio and Graubard had intended.

117.    The State Court Action has since been assigned to a third judge in the Kings County Supreme Court, Hon. Richard J. Montelione, who has scheduled a hearing on Plaintiffs' contempt motion on November 5, 2025. Plaintiffs have requested that Justice Montelione address Plaintiffs' motion for attorney sanctions on which Justice Mostofsky reserved decision before his recusal.

## J.      Seddio's Conduct in the State Court Action Fits His Pattern of Deceitful Litigation Conduct in Other Actions

118.    Seddio's tactic of submitting false statements to seek a purportedly emergency TRO on an *ex parte* basis and for an improper purpose is one he has employed and continues to employ in multiple actions across New York.

119.    For example, after Seddio, Graubard, Wachtler, and others were sued in New York County for conversion, fraud, and deceit in connection with $7 million in escrow deposits that were never returned, in a case commenced on April 4, 2025, and captioned *317 Oakford LLC v. Lauren J. Wachtler et al.*, Index No. 652253/2025 (N.Y. Cty. Sup. Ct.) (the "*Oakford* Manhattan Action"), Seddio filed *three* separate special proceedings in *Kings County* Supreme Court seeking emergency TROs on an *ex parte* basis to enjoin and stay the *Oakford* Manhattan Action based on an underlying agreement signed by *Sprei* on behalf of his company "Olden Group."

120. In Seddio's first two proceedings, commenced on April 11 and 18, 2025, and both captioned *WHP Equities LLC v. Bruce Orlovsky et al.*, Index Nos. 512289/2025 and 512855/2025 (Kings Cty. Sup. Ct.), both seeking identical injunctive relief against the *Oakford* Manhattan Action, Seddio falsely claimed that the petitioner, WHP Equities LLC, a New Jersey company *registered to Defendant Rubin*, was a party to Sprei's underlying agreement. In his supporting affirmation in the second-filed proceeding, Seddio also falsely stated that "[n]o prior request for this relief has been made to this or any other Court." After the respondents pointed out that WHP Equities LLC was not a party to the purported arbitration agreement, is a New Jersey company not authorized to do business in New York, *and is registered to Defendant Rubin*, Seddio voluntarily discontinued the two proceedings he brought on behalf of Rubin's company.

121. On April 21, 2025, Seddio commenced a *third* special proceeding, captioned *Ollden* [sic] *Group LLC v. Bruce Orlofsky et al.*, Index No. 513196/2025 (Kings Cty. Sup. Ct.), seeking the same injunctive relief as he had in the two prior proceedings. In his sworn affirmation in support of an *ex parte* TRO, Seddio again falsely stated that "no prior request for this relief has been made to this or any other Court." Moreover, the amended Verified Petition signed by Sprei and filed by Seddio on April 21, 2025, again falsely alleged that "WHP EQUITIES LLC" was a party to Sprei's underlying agreement.

122. On May 20, 2025, the plaintiff in the *Oakford* Manhattan Action voluntarily dismissed the action and commenced a new action based on the same underlying conduct, captioned *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, in Nassau County Supreme Court (the "*Oakford* Nassau Action"). Unlike the *Oakford* Manhattan Action, however, the *Oakford* Nassau Action asserts a claim against Seddio personally for deceit and collusion in violation of Judiciary Law § 487 for his misrepresentations to the courts in his three

29

earlier proceedings. After defaulting on his obligation to answer the complaint in the *Oakford Nassau Action*, and despite facing personal liability as a named defendant, Seddio again abused process by turning to the Kings County Supreme Court and his connections there to file a *fourth* special proceeding on August 11, 2025, captioned *Olden Group LLC v. Bruce Orlofsky et al.*, Index No. 527117/2025, in which he sought the same *ex parte* TRO he requested and failed to obtain in the prior three proceedings. The TRO was granted on August 19, 2025, enjoining the *Oakford Nassau Action*, and a hearing on broader relief was scheduled for September 17, 2025.

123.    The above examples (which, on information and belief, are a few of many) show that Seddio has a history of abusing and manipulating the judicial system, including by submitting knowingly false sworn statements to obtain *ex parte* injunctive relief for collateral ends and engaging in blatant forum and judge shopping through which he can utilize his political influence, stemming from his role as the former chair of the Kings County Democratic Committee, in service of Sprei's schemes.

**K.      Plaintiffs' Injuries Are Ongoing**

124.    Graubard's ongoing refusal, in coordination with Seddio, Rubin, and Sprei, to return the $2 million in Escrow Deposits that unquestionably belong to Plaintiffs has caused, and continues to cause, significant financial injuries, including the $2 million principal, tens of thousands of dollars (and counting) in foregone interest payments that Plaintiffs would have received by holding the $2 million in a savings account, lost opportunities to obtain investment returns above and beyond simple interest in an amount to be determined at trial, and hundreds of thousands of dollars (and counting) in legal expenses to defend against the sham State Court Action and prosecute this action.

125.    In addition, Defendants' misconduct has had the effect of tarnishing the reputation of the American judicial system in the eyes of foreign investors like Plaintiffs, who previously

30

admired American courts' commitment to the rule of law. Defendants' seeming ability to get away with a heist of $2 million in broad daylight, through transparent lies and abuses of legal process, makes a mockery of those ideals. It must be stopped.

## CAUSES OF ACTION

### COUNT 1
### Declaratory Judgment
### 28 U.S.C. § 2201
### (Against Graubard, Rubin, and Sprei)

126. Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

127. Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), [i]n a case of actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration," and "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

128. Here, an actual and substantial controversy exists among Plaintiffs, Graubard, Rubin, and Sprei concerning the scope and extent of Plaintiffs' rights to the $2 million Escrow Deposits held by Graubard.

129. Plaintiffs' interests in the Escrow Deposits are real and adverse to the purported interests of Graubard, Rubin, and Sprei.

130. This controversy is ripe for adjudication because Graubard, Rubin, and Sprei are continuing to repudiate and interfere with Plaintiffs' rights to the Escrow Deposits, and Plaintiffs' injuries are ongoing.

131. Accordingly, Plaintiffs are entitled to a declaratory judgment that the Escrow Agreements grant Plaintiffs exclusive and preclusive rights to obtain the return of the Escrow Deposits, the Escrow Agreements require Graubard to unconditionally return the Escrow Deposits to

Plaintiffs immediately, and Plaintiffs' rights to recover the Escrow Deposits are superior to any interests that Graubard, Rubin, or Sprei may claim to have in preventing their recovery.

## COUNT 2
### Breach of Contract
### (Against Graubard)

132. Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

133. Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

134. Plaintiffs performed all of their obligations under the Escrow Agreements.

135. Graubard failed to perform his unqualified obligation to return Plaintiffs' Escrow Deposits upon their demand pursuant to Paragraph 4 of the Escrow Agreements.

136. As a direct and proximate result of Graubard's breach of the Escrow Agreements, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

## COUNT 3
### Tortious Interference with Contract
### (Against Sprei, Seddio, and Rubin)

137. Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

138. Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

139. Sprei, Seddio, and Rubin have knowledge of the Escrow Agreements.

140. Sprei intentionally and improperly procured a breach of the Escrow Agreement by instructing Graubard not to release the Escrow Deposits to Plaintiffs and by working in concert with Seddio and Rubin to initiate and prosecute the sham State Court Action under false pretenses and for improper collateral purposes.

141.   Seddio and Rubin intentionally and improperly procured a breach of the Escrow Agreements by initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and assisting Graubard's contempt of the Deposit Order.

142.   As a direct and proximate result of Sprei's, Seddio's, and Rubin's misconduct, Graubard breached the Escrow Agreements, and Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

143.   Because Sprei, Seddio, and Rubin acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 4
### Breach of Fiduciary Duty
### (Against Graubard)

144.   Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

145.   Graubard owes Plaintiffs fiduciary duties in his capacity as their escrow agent, including a strict obligation to protect Plaintiffs' rights in connection with their Escrow Deposits and a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

146.   Graubard breached his fiduciary duties to Plaintiffs by placing interests of others above Plaintiffs' exclusive rights to their Escrow Deposits.

147.   Graubard further breached his fiduciary duties to Plaintiffs by refusing to return the Escrow Deposits to Plaintiffs in strict compliance with his unqualified obligations under the Escrow Agreements.

148.   Graubard further breached his fiduciary duties to Plaintiffs by, on information and belief, dissipating their Escrow Deposits and/or transferring them to one or more third parties.

33

149.    As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

150.    Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 5
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Sprei, Seddio, and Rubin)

151.    Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

152.    As alleged in Count 4, Graubard breached his fiduciary duties to Plaintiffs.

153.    Sprei, Seddio, and Rubin each have actual knowledge of Graubard's fiduciary duties to Plaintiffs in his capacity as their escrow agent, including a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

154.    By directing Graubard not to return the Escrow Deposits to Plaintiffs as well as working in concert with Seddio, Rubin, and Graubard to initiate and prosecute the sham State Court Action to give cover to and allow the continuation of Graubard's breach, Sprei substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

155.    By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and assisting Graubard's contempt of the Deposit Order, Seddio and Rubin substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

156.    As a direct and proximate result of Sprei's, Seddio's, and Rubin's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

157.    Because Sprei, Seddio, and Rubin each acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

34

## COUNT 6
### Abuse of Process
### (Against Seddio and Rubin)

158.    Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

159.    On February 19, 2025, Seddio and Rubin together obtained and employed regularly issued process in the State Court Action, namely the TRO, compelling Graubard not to return Plaintiffs' Escrow Deposits and Plaintiffs to forbear from obtaining the return of their Escrow Deposits.

160.    On information and belief, and as evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, both Seddio and Rubin intended to harm Plaintiffs' exclusive rights to their Escrow Deposits without justification.

161.    On information and belief, and as evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, Seddio and Rubin employed the TRO to obtain a collateral objective outside the legitimate ends of the process, namely to give the false appearance of legality to the misappropriation of Plaintiffs' funds by Graubard, Sprei, and those working in concert with them, to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their associates had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

162.    Seddio and Rubin's actions demonstrate a perversion of the legal process for a purpose not justified by the nature of the process at issue.

163.    As a direct and proximate result of Seddio and Rubin's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate the sham State Court Action, in an amount to be determined at trial.

164.    Because Seddio and Rubin acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 7
### Attorney Deceit and Collusion
### N.Y. Judiciary Law § 487
### (Against Seddio)

165.    Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

166.    New York Judiciary Law § 487(1) provides that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

167.    Seddio is an attorney admitted to practice in New York.

168.    In connection with the State Court Action, Seddio engaged in and consented to numerous acts of deceitful conduct, with the intention of deceiving the court and other parties, including, but not limited to, (a) misrepresenting that Olden LLC's motion for a TRO had to be heard on an emergency, *ex parte* basis; (b) submitting a knowingly false and fraudulent affidavit from Rubin in support of the TRO and preliminary injunction; (c) purporting to unilaterally extend the state court's Deposit Order deadline before directing Graubard not to deposit the funds, in violation of the Deposit Order; and (e) apparently orchestrating the recusal of at least one judge in the State Court Action.

169.    As a direct and proximate result of Seddio's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and this action, in an amount to be determined at trial.

170.    Plaintiffs are entitled to treble damages.

### COUNT 8
### Conversion
### (Against Graubard)

171.   This claim is brought in the alternative to Count 2 (breach of contract), in the event the Escrow Agreements are deemed invalid or otherwise unenforceable.

172.   Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

173.   The Escrow Deposits constitute identifiable funds of money belonging to Plaintiffs alone.

174.   Graubard has exercised dominion, ownership, and control of the Escrow Deposits without legal authorization.

175.   Plaintiffs made repeated demands to Graubard for the immediate return of the Escrow Deposits.

176.   Graubard refuses to return the Escrow Deposits to Plaintiffs.

177.   As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

178.   Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

### COUNT 9
### Aiding and Abetting Conversion
### (Against Sprei, Seddio, and Rubin)

179.   This claim is brought in the alternative to Count 3 (tortious interference), in the event the Escrow Agreements are deemed invalid or otherwise unenforceable.

180.   Plaintiffs restate and reallege paragraphs 1–122 as if fully set forth herein.

181.   As alleged in Count 8, Graubard unlawfully converted Plaintiffs' Escrow Deposits.

182.   Sprei, Seddio, and Rubin each have actual knowledge of Graubard's conversion of Plaintiffs' funds.

37

183.    By directing Graubard not to return the Escrow Deposits and by working in concert with Seddio and Rubin to initiate the sham State Court Action under false pretenses and for improper collateral purposes, Sprei substantially assisted Graubard's conversion of Plaintiffs' Escrow Deposits.

184.    By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and unilaterally extending the deadline for, then coordinating Graubard's violation of, the state court's Deposit Order, Seddio and Rubin substantially assisted in Graubard's conversion of Plaintiff's Escrow Deposits.

185.    As a direct and proximate result of Sprei's, Seddio's, and Rubin's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

186.    Because Sprei, Seddio, and Rubin each acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.    an order declaring that Plaintiffs have exclusive rights to the Escrow Deposits, that Defendants' actions, as set forth above, constitute violations of the common law set forth above, and that Defendants are liable to Plaintiffs, as described herein, for damages arising therefrom;

B.    a judgment awarding Plaintiffs all appropriate actual damages permitted by law, in an amount to be determined at trial, but no less than $2 million;

C.    a judgment awarding Plaintiffs exemplary, punitive, and/or treble damages, as permitted by law;

D.     a judgment awarding Plaintiffs equitable, injunctive, and/or declaratory relief as may be appropriate, including, but not limited to, specific performance, rescission, restitution, and disgorgement;

E.     a judgment awarding Plaintiffs pre- and post-judgment interest, as permitted by law;

F.     a judgment awarding Plaintiffs costs and fees, including attorneys' fees, as permitted by law; and

G.     such other legal, equitable, or further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all issues so triable as a matter of right.

Dated:   New York, NY
         October 17, 2025

Respectfully submitted,

SELENDY GAY PLLC

By:     /s/     *Lauren J. Zimmerman*

Jennifer M. Selendy
Lauren J. Zimmerman
Babak Ghafarzade
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
jselendy@selendygay.com
lzimmerman@selendygay.com
bghafarzade@selendygay.com

*Attorneys for Plaintiffs Angelos Metaxas and Pertshire Investments LP*

39