# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANGELOS METAXAS and PERTSHIRE INVEST-MENTS LP,

Plaintiff,

v.

MARK DAVID GRAUBARD, ESQ. d/b/a M. DA-VID GRAUBARD, YESCHIEL SHIMON "SAM" SPREI, FRANK R. SEDDIO, ESQ., and JONA-THAN RUBIN,

Defendants,

v.

CHASKEL FRANKL a/k/a CHASKEL FRANKEL,

Third-Party Defendant.

Case No. 1:25-cv-05844-EK-PCG

Jury Demanded

### AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs Angelos Metaxas and Pertshire Investments LP, through their undersigned attorneys, for their Amended and Supplemental Complaint against Mark David Graubard, Esq. d/b/a M. David Graubard, Esq. ("Graubard"), Yeschiel Shimon "Sam" Sprei ("Sprei"), Frank R. Seddio, Esq. ("Seddio"), Jonathan Rubin ("Rubin"), and Chaskel Frankl a/k/a Chaskel Frankel ("Frankl"), allege as follows:

### NATURE OF THE ACTION

1. This case is about the ongoing theft of $2 million by a group of con artists, including New York lawyers, and their subsequent abuse of the state and federal judicial systems to create a smokescreen for their brazen illegality.

2. In connection with a potential investment opportunity with Defendant Sprei, whom Plaintiffs were falsely led to believe was an honest and successful businessman, in December 2024,

28937426 v1

Plaintiffs placed $2 million in escrow (the "Escrow Deposits") with Defendant Graubard, an attorney barred in the state of New York, for the sole purpose of demonstrating their financial ability to pursue the investment.

3.     Unbeknownst to Plaintiffs, Graubard was not an independent, professionally responsible attorney, but a longtime associate of Sprei with whom, on information and belief, Defendants Graubard, Seddio, Rubin, Frankl, and others have, on multiple occasions, worked together to steal money from and engage in abuse of process and judicial deceit against innocent would-be investors.

4.     Despite their unwitting entrance into a scheme to steal their funds, Plaintiffs' Escrow Deposits were supposed to be protected by airtight escrow agreements (each an "Escrow Agreement") with Graubard through which Graubard covenanted that no one, other than Plaintiffs and their assigns, would have the right to the Escrow Deposits and which provide Plaintiffs with the unfettered ability to demand the return of their Escrow Deposits for any reason and at any time.

5.     Despite his unambiguous and unqualified legal obligations to maintain and preserve the Escrow Deposits unless and until instructed otherwise by Plaintiffs, Graubard transferred the Escrow Deposits to a third party at the instruction of Sprei and Frankl almost immediately after receiving them. Graubard did not seek the approval of or provide notice to Plaintiffs before transferring their Escrow Deposits.

6.     Approximately one month later, Plaintiffs completed their due diligence on the potential investment, decided not to pursue the venture with Sprei, and demanded the return of their deposits pursuant to their unqualified contractual right to do so.

7.     Despite acknowledging Plaintiffs' demands, for weeks, Graubard stalled in fulfilling his obligation to return the Escrow Deposits, including by blaming his bank for the delay.

2

In an attempt to conceal the unlawful dissipation and transfer of the Escrow Deposits, Frankl, whom Graubard held out to Plaintiffs as *his* agent, aided in Graubard's stall tactics by providing a false federal wire identification number to Plaintiffs as "proof" that Graubard had returned their funds when, in fact, he had not.

8.    After weeks of receiving blatant falsehoods regarding the return of their funds, Plaintiffs engaged counsel who sent a demand letter to Graubard requesting the return of their funds pursuant to the plain language of the Escrow Agreements as well as proof that their Escrow Deposits remained in Graubard's attorney interest on lawyer account ("IOLA"),[1] as required by the Escrow Agreements.

9.    In response, Graubard falsely represented to Plaintiffs' counsel that he was *with-holding* Plaintiffs' $2 million at Sprei's direction. For the first time, Graubard now claimed that Sprei was his own client and was owed a competing fiduciary obligation by Graubard. The truth, as Plaintiffs learned much later, was that Graubard no longer possessed the Escrow Deposits and was frantically pressuring Sprei to obtain replacement funds from another source.

10.    Graubard and Sprei then attempted, in concert, to delay and extort Plaintiffs by conditioning the purported return of their Escrow Deposits on Plaintiffs' execution of a legal agree-ment releasing Sprei from any potential claims. Even that ploy was a sham, as Graubard and Sprei did not at that time have $2 million in their possession to repay Plaintiffs.

11.    When Plaintiffs refused to be extorted and reported Sprei and Graubard's illegal conduct to law enforcement, Sprei, Seddio, Graubard, and Rubin worked in concert to commence a sham action in Kings County Supreme Court (the "State Court Action") claiming that there was

---

[1] IOLAs are a type of attorney escrow account required to hold certain client funds pursuant to N.Y. Judiciary Law § 497 and regulations promulgated thereunder.

a dispute as to the proper ownership of the Escrow Deposits despite these Defendants' actual or constructive knowledge that only Plaintiffs had any right to the Escrow Deposits and that the Escrow Deposits had already been unlawfully dissipated. The purpose of the State Court Action was to give cover to the ongoing theft of the Escrow Deposits and buy time for Sprei and Graubard to come up with replacement funds and interfere with Plaintiffs' ability to pursue relief.

12. Although the initial drafts of the case-initiation papers—prepared by Ethan A. Kobre ("Kobre"), one of Sprei's many attorneys—correctly named Sprei's company Olden Group LLC as the plaintiff, identified Sprei as the supporting affiant, and correctly spelled Graubard's name, Sprei and Seddio chose to falsify those papers to mislead the court, Plaintiffs, and the public.

13. Together, Sprei and Seddio altered the name of the purported plaintiff to "Olden LLC," a fictitious company, revised the affirmation to be under Rubin's name, intentionally misspelled Rubin's first name as "Johnathan," affixed a legally defective electronic /s/ signature to Rubin's purported affirmation instead of a hand-drawn signature, and intentionally misspelled Graubard's name as "Graubart."

14. Rubin and Graubard knew the case-initiation papers were fraudulent and either approved of them anyway or did nothing to correct the falsehoods therein.

15. Indeed, Sprei informed Rubin that he did not want the filings to accurately identify Sprei or his company Olden Group LLC because he was concerned the dispute would interfere with another pending case, captioned *Olden Group LLC v. Body Glove International Inc. et al.*, Index No. 533445/2024, that Seddio had commenced on Sprei's behalf in Kings County Supreme Court in December 2024. Sprei also told Rubin that he believed no one would be "dumb enough" to believe that Rubin himself signed a document misspelling his own name—on information and

4

belief, a cover Rubin could (and did) later use in an attempt to dispel any liability for the fraudulent filings.

16.     In initiating the sham State Court Action, Seddio—acting as counsel to Sprei and Rubin and working in concert with them—abused process to unlawfully obtain a temporary restraining order ("TRO") directing Graubard to either continue holding Plaintiffs' Escrow Deposits or deposit the funds with the clerk of court—acts which Seddio, Sprei, Rubin, and Graubard knew or constructively knew Graubard could not complete, and barring Plaintiffs from taking any action to recover their Escrow Deposits pending a preliminary-injunction hearing.

17.     Despite his claimed need for emergency relief, Seddio—acting in concert with at least Sprei, Graubard, and Rubin—spent the next nine months delaying, through false representations, frivolous filings, and repeated eleventh hour stall tactics, the adjudication of the State Court Action *they* initiated for the sole purpose of concealing the theft of Plaintiffs' Escrow Deposits. And at no point during their over nine-month prosecution of the action did Graubard, Sprei, Seddio, or Rubin notify the Court that the Escrow Deposits had been unlawfully dissipated before the State Court Action was commenced.

18.     Indeed, every time Plaintiffs caught a glimmer of justice in the State Court Action, Seddio, Sprei, and Graubard took steps to manipulate the proceedings in their favor.

19.     After obtaining an order from the court granting Seddio's preliminary injunction and ordering Graubard to deposit Plaintiffs' Escrow Deposits with the clerk of the Court by July 21, 2025, Graubard, Sprei, and Seddio worked in concert to file a bogus stipulation extending the court ordered deadline for Graubard's deposit of Plaintiffs' funds. When the court asked why the funds had not been deposited in accordance with its July 17, 2025 order, Sprei, Seddio, and Grau-

bard provided a false excuse for the delay claiming that the money had not been deposited because Seddio intended to oversee the process but was unavailable to do so on the court-ordered date.

20.     On July 31, 2025, the same day that the presiding judge held a sanctions hearing regarding Graubard's failure to submit the Escrow Deposits to the clerk of the court, Sprei, Graubard, and on information and belief Seddio conspired to substitute Graubard's then-counsel of record for a new attorney, previously unknown to Graubard but well known to Sprei and Seddio, whose longstanding friendship with the presiding judge Sprei, Seddio, and Graubard believed would cause his immediate recusal. Their plot was successful: the presiding judge recused himself within twenty-four hours of the substitution and before he could issue a ruling.

21.     On November 6, 2025, the day after the third presiding judge found Graubard in contempt of court for his failure to submit the Escrow Deposits into court, Seddio, Sprei, and Graubard worked in concert to discontinue the claims in the State Court Action, with the aim of depriving the court of jurisdiction to enforce its contempt order or at least further delaying the proceedings. The State Court, however, rejected Seddio, Sprei, and Graubard's frivolous argument that the court could not punish pre-discontinuance conduct.

22.     On December 15, 2025, in an effort to derail enforcement of the contempt order's requirement that Graubard file his IOLA records showing the treatment and status of the Escrow Deposits, Seddio, Sprei, and Graubard conspired to bring a new law firm, Aidala Bertuna & Kamins P.C. ("ABK"), into the State Court Action with the aim of causing the third presiding judge's recusal because ABK was representing that judge in a separate, unrelated litigation. This egregious gambit was also successful, as the judge immediately recused himself in response to a letter Seddio filed falsely informing the court that Seddio had retained ABK to represent him in a sanctions motion returnable months later.

6

23.     It was only on January 14, 2026, when faced with the prospect of his immediate civil commitment for disobeying the state court's order to file bank records, that Graubard finally admitted, in open court, to having transferred the Escrow Deposits out of his IOLA in December 2024 at Sprei's instruction and never having been in possession of the funds during the pendency of the State Court Action.

24.     To this day, Plaintiffs' Escrow Deposits have not been returned to them.

25.     And as a direct result of Defendants' intentional, deliberate, and outrageous misconduct, Plaintiffs have not only been deprived of their $2 million Escrow Deposits, plus interest, for eighteen months and counting, but they have also been forced to incur millions of dollars in legal fees to litigate the State Court Action and this action to enforce their rights.

## THE PARTIES

26.     Plaintiff Metaxas is a resident of Switzerland.

27.     Plaintiff Pertshire is a limited partnership organized under the laws of New Zealand and a citizen of New Zealand and Italy for purposes of 28 U.S.C. § 1332.

28.     Defendant Graubard is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

29.     Defendant Seddio is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

30.     Defendant Rubin is a citizen and resident of New Jersey.

31.     Defendant Sprei is a citizen of New York, resides in this judicial district, and serves as the managing member of non-party Olden Group LLC ("Olden Group"), a limited liability company organized under the laws of New York and headquartered in this judicial district.

32.     Third-Party Defendant Frankl is a citizen and resident of New York.

## JURISDICTION AND VENUE

33.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because this action is between citizens of New York and New Jersey (all Defendants) and citizens of a foreign state (all Plaintiffs), who are not lawfully admitted for permanent residence in the United States and are not domiciled in New York, and the amount in controversy exceeds $75,000.

34.    This Court has general personal jurisdiction over Defendants Graubard, Seddio, Sprei, and Frankl because they are each domiciled in New York.

35.    The Court has specific personal jurisdiction over Defendant Rubin pursuant to CPLR § 302(a)(2) because Plaintiffs' claims against Rubin arise out of his tortious acts committed in New York, particularly in this judicial district.

36.    The Court also has specific personal jurisdiction over Rubin by virtue of his participation in this Action, including substantial discovery, since it was commenced on October 17, 2025, without any objection to the Court's exercise of jurisdiction over him.

37.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, as well as because a substantial part of the property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

**A.    Sprei Induces Plaintiffs to Put Substantial Funds in Escrow By Falsely Claiming He Needs Proof of Their Liquidity**

38.    In or around November 2024, an advisor to Plaintiff Pertshire, non-party Javier Macaya ("Macaya"), was introduced to Sprei by Paul Montclare ("Montclare"), an attorney who had done work for both Macaya and Sprei in the past. Montclare represented that he "personally ha[d] represented Sam [Sprei] in business transactions," and that Montclare's wife, Lauren Wacht-

8

ler ("Wachtler"), was Sprei's "trusted advisor on many of his business deals." Montclare described Sprei as "honest and true to his word," and as being "very successful."

39.    During a conversation on or around November 15, 2024, Sprei proposed to Macaya that he consider a potential investment opportunity with Sprei, through Sprei's company Olden Group, in the outdoor and sports equipment company Surf 9 LLC ("Surf 9," or the "Potential Investment").

40.    After meeting Sprei, Macaya expressly asked Montclare whether he would say, based on his knowledge of Sprei as well as Wachtler's work with Sprei, that Sprei was "a careful manager of his investment portfolio and an honest partner to his co-investing partners?" Montclare responded, "Absolutely."

41.    Contrary to Montclare's representations, however, Sprei is neither honest nor successful.

42.    For example, in a sworn affidavit filed in connection with a separate lawsuit against him, captioned *Shimon Avrahami v. Sam Sprei et al.*, Index No. 506581/2025 (N.Y. Sup. Ct. Kings Cty.), Sprei admitted that, in November and December 2019, he induced the plaintiff in that matter to invest $1.1 million into two separate real-estate transactions, in Brooklyn and in New Jersey, but kept the money for himself instead. Sprei admits that he improperly "retained [Avrahami's] investment without legal basis or authorization." A copy of Sprei's affidavit is attached hereto as Exhibit 1. That lawsuit resulted in a $560,000 money judgment against Sprei.

43.    In another action, *Randy Chang et al. v. Sam Sprei*, Index No. 523209/2016 (N.Y. Sup. Ct. Kings Cty.), Sprei similarly admitted in a sworn affirmation confessing judgment that he had defaulted on his promise to repay $941,000 that he borrowed in 2014 from non-parties Randy

9

Chang and Ann Hsiung. A copy of Sprei's affirmation is attached hereto as Exhibit 2. The litigation resulted in a money judgment of $871,225 against Sprei.

44.    While Montclare's description of Sprei as honest and successful was inaccurate, Montclare accurately described Sprei as "politically well-connected in Brooklyn[]"—to Defendant Frank Seddio, the former chair of the Kings County Democratic Committee, who served as Sprei's ongoing litigation counsel for years in exchange for a retainer of $5,000 to $10,000 per week, depending on the workload. Seddio is also dependent on Sprei, whose cases account for approximately 80% of Seddio's litigation work and whose payments accounted for up to 40% of Seddio's law firm revenues.

45.    Based on Montclare's inaccurate representations about Sprei's character for honesty and fair dealing, Macaya informed Plaintiff Metaxas and three business associates, non-parties Reda Maamari ("Maamari"), Phillip Elias Farid El-Khoury ("El-Khoury"), and Karim Gargour ("K. Gargour") about the Potential Investment, which Plaintiffs, Maamari, El-Khoury, and K. Gargour (together, the "Potential Investors") decided to explore.

46.    Before sharing substantive information about the Potential Investment, however, Sprei insisted that Plaintiffs, Maamari, El-Khoury, and K. Gargour deposit "soft money in escrow" to demonstrate they were bona fide investors with sufficient liquidity to complete the Potential Investment, if they so chose.

47.    Having no issue with simply displaying their liquidity, Plaintiffs agreed in principle with Sprei's proposed approach, so long as the deposits were made pursuant to escrow agreements confirming Plaintiffs' and their co-investors' unconditional rights to obtain the return of their respective deposits upon demand.

48.     On or about December 3, 2024, Sprei emailed to Montclare and Macaya an initial draft escrow agreement that appointed Graubard as the escrow agent. Montclare then sent a revised draft escrow agreement to Sprei and Macaya, with Graubard remaining as the draft's identified escrow agent. Montclare expressly acknowledged to Macaya that these funds would be just for escrow and not for investment.

49.     Upon seeing Graubard's name in the draft escrow agreement, Macaya asked Montclare whether Graubard worked for him and whether Montclare trusted Graubard. In response, Montclare made clear that it was *Sprei* who hand-picked Graubard to serve as Plaintiffs' escrow agent.

**B.      Plaintiffs Execute Legal Agreements with Graubard Requiring Him to Hold $2 Million in Escrow for Plaintiffs' Sole and Exclusive Benefit and to Promptly Return the Escrow Deposits upon Plaintiffs' Demand**

50.     Based on Montclare's representations about Graubard, which turned out to be false, Plaintiffs (as well as their co-investors Maamari, El-Khoury, and K. Gargour's relative, Toufick Gargour ("T. Gargour")) each executed a materially identical Escrow Agreement with Graubard, each governed by New York law.

51.     Plaintiffs' valid and enforceable Escrow Agreements, as executed on December 5, 2024, are attached as Exhibits 3 and 4.

52.     Sprei received a fully executed copy of Plaintiff Metaxas's Escrow Agreement with Graubard on December 5, 2025. And Sprei was aware that Pertshire had executed an identical Escrow Agreement with Graubard.

53.     Pursuant to Paragraph 2 of each Escrow Agreement, each depositor agreed to deposit funds into Graubard's IOLA ending in -1102 at the Valley National Bank branch located at 2054 86th Street, Brooklyn, NY 11214.

11

54.      Pursuant to Paragraph 3 of each Escrow Agreement, the "sole purpose" of the Escrow Deposits was to "establish" that each depositor "ha[d] available cash equal to" the amount of the Escrow Deposit. Paragraph 3 further provides, in bold capital letters, "**NOTHING IN THIS ESCROW AGREEMENT NOR THE DEPOSITING OF THE ESCROW AMOUNT SHALL BE CONSTRUED AS AN AGREEMENT OF ANY KIND MADE BY THE ESCROWEE IN CONNECTION WITH ANY ACTUAL OR POTENTIAL SURF 9 TRANSACTION OR ANY OTHER TRANSACTION.**"

55.      The Escrow Agreements expressly grant each depositor the unconditional right to have their Escrow Deposits returned upon demand. Paragraph 4 of each Escrow Agreement provides, in bold capital letters, "**THE ESCROW AMOUNT WILL BE RETURNED TO THE ESCROWEE,[2] OR ITS DESIGNEE, UPON ESCROWEE'S DEMAND, *WHICH RETURN SHALL BE MADE IN ESCROWEE'S SOLE AND ABSOLUTE DISCRETION*, IN ACCORDANCE [WITH] PARAGRAPH 5 OF THIS ESCROW AGREEMENT**" (italics added). Paragraph 5 provides that Graubard "shall" return an Escrow Deposit by wire transfer *within two business days* of each escrowee's request by email for such return.

56.      Other provisions of the Escrow Agreements further cement each depositor's absolute control over and right to such depositor's Escrow Deposits. Under Paragraph 6, Graubard expressly agreed "to release and return the Deposit or any part thereof as the case may be, pursuant to and in strict accordance with all of the terms and conditions of this Escrow Agreement," and

---

[2] Although the terms "escrow agent" and "escrowee" are typically used interchangeably to refer to the third-party depositary of an escrow, each Escrow Agreement expressly defines its *beneficiary* as "Escrowee" and defines Graubard as "Escrow Agent." Accordingly, where quoted provisions of the Escrow Agreements refer to "Escrowee," they should be understood to mean the beneficiary of such Escrow Agreement, *i.e.*, one of Plaintiffs, Maamari, El-Khoury, or T. Gargour.

12

further "warrant[ed] and agree[d] that *only the Escrowee has any right to recover or direct the payment or distribution of the Escrow Amount or any part thereof*" (emphasis added).

57.    In Paragraph 7, Graubard further expressly "acknowledge[d], warrant[ed] and agree[d] that [he] has no right to, and shall not release, distribute, pledge, deposit or hypothecate any part of the Escrow Deposit for any reason or in any way whatsoever without the express prior written permission and consent of Escrowee."

58.    On December 5, 2024, and pursuant to Paragraph 2 of its respective Escrow Agreement, Pertshire wired $1,000,000 from a trust account at Citibank, in New York, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. The wire made clear that it was a "transfer to an escrow account."

59.    On December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, Metaxas wired $1,000,000 from his account at Banque Pictet, in Geneva, Switzerland, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Metaxas made clear that the deposit was for the "Surf 9 Olden Group Deal."

60.    The same day, and pursuant to Paragraph 2 of his respective Escrow Agreement, Maamari wired $1,000,000 from his account at Banque Lombard Odier, in Geneva, Switzerland, to Graubard's "attorney trust account" ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Maamari made clear that the deposit was for "payment into escrow account."

61.    Also on December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, El-Khoury wired $250,000 from his account at Interaudi Bank, in New York, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. The payment purpose indicated that the funds were to be placed "in an escrow account."

62.     On December 12, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, T. Gargour wired $250,000 from his account at UBS, in Zurich, Switzerland, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. In the memo line of the wire transfer, T. Gargour made clear that the deposit was made "as per escrow agreement."

63.     Together, the Potential Investors entrusted Graubard with a total of $3,500,000, all of which was wired to Graubard's IOLA pursuant to the Escrow Agreements.

64.     $2,000,000 of the $3,500,000 constituted Plaintiffs' Escrow Deposits.

**C.    Working in Concert, Graubard, Sprei, Rubin, and Frankl Immediately Dissipate Plaintiffs' Escrow Deposits**

65.     Sprei received actual, contemporaneous notice of each of the Potential Investors' wire transfers detailed above.

66.     On information and belief, Frankl and Rubin were also aware of the Escrow Agreements and that the Potential Investors had, on December 5 and 6, 2024, wired their funds to Graubard to hold in escrow pursuant to such agreements.

67.     Immediately after the Potential Investors wired their escrow funds to Graubard, Graubard, Sprei, Rubin, Frankl, and their agents worked in concert to convert the Potential Investors' $3,500,00 in escrowed funds, including Plaintiffs' Escrow Deposits.

68.     At no point in time did Plaintiffs authorize Frankl to act on their behalf in any context. In fact, before Graubard held Frankl out as his agent in response to Plaintiffs' demand for the return of the Escrow Deposits in January 2025, Plaintiffs had never even heard of Frankl. And at all times, Graubard, Sprei, and Rubin knew that Frankl, their associate, was not an agent of or authorized to act on behalf of Plaintiffs. And Frankl of course knew it too—having never met, spoken, or even corresponded by email with Plaintiffs as of December 2024.

69.     In accordance with Sprei, Graubard, Rubin, and Frankl's scheme to convert the Potential Investors' funds, on December 6, 2024, without authorization from Plaintiffs or any of the other Potential Investors, Frankl instructed Graubard to transfer $2,850,000 of the escrowed funds Graubard had received from the Potential Investors to Sprei "for Surf 9."

70.     The same day (December 6), Sprei directed Graubard to immediately distribute the funds as reimbursements to two entities that had previously funded Sprei's investments: $2.5 million to 536 Holdings LLC ("536 Holdings") and $350,000 to Queen Equities LLC ("Queen Equities").

71.     Sprei was so insistent about the transfers that he accompanied Graubard to the bank to ensure that Graubard wire the $2.5 million to 536 Holdings, which Graubard did on December 6. Graubard also followed Sprei's direction and issued a $350,000 check to Queen Equities on December 6.

72.     536 Holdings is wholly owned and controlled by Jacob Jacobowitz.

73.     Queen Equities is wholly controlled by Defendant Rubin, who is the entity's sole manager. Rubin holds a ninety-nine percent interest in Queen Equities and is singularly responsible for all of Queen Equities' operations. At all relevant times, Rubin exercised exclusive and unilateral control over Queen Equities' bank accounts and finances. Defendant Rubin's wife, Malka Rubin, holds the remaining one percent interest in Queen Equities. Queen Equites' operating agreement specifically provides, however, that Defendant Rubin may individually sign documents on behalf of Queen Equities without the separate co-signature and/or authorization of Malka Rubin.

74.     Rubin used Queen Equities as a vehicle to direct funds for Sprei's benefit. On many occasions, Rubin, via Queen Equities, moved funds on Sprei's behalf without any formal loan

15

agreement, accounting records, or other formal documentation. In some instances, Rubin received a personal benefit from the transactions he completed for Sprei through Queen Equities in the form of an interest or other payment to Rubin, while in other instances Rubin completed these transactions through Queen Equities as a personal favor to Sprei.

75.     In December 2024, both 536 Holdings and Queen Equities engaged in several additional transactions worth millions of dollars with Montclare and Wachtler's law firm Montclare & Wachtler LLP ("M&W"), by wire transfers and paper checks and in connection with Sprei's investment in Surf 9.

76.     On December 11, 2024, five days *after* working in concert to disburse Plaintiffs' Escrow Deposits, Graubard, Frankl, and Sprei conspired to create a false paper trail to justify Graubard's unlawful disbursement of Plaintiffs' Escrow Deposits in violation of Graubard's fiduciary and contractual obligations.

77.     To accomplish this goal, Sprei directed Graubard to fabricate an authorization letter (the "Fabricated Authorization"), purporting to have been authored and sent by Frankl, confirming Frankl's previous instructions to Graubard to transfer the Escrow Deposits and falsely stating that Frankl had authority to issue such instructions. Graubard then sent the Fabricated Authorization, which purported to be a letter from Frankl to Graubard, to Frankl for his signature, which Frankl executed and returned to Graubard on December 12, nearly a week after $2.85 million of the Potential Investors' $3.5 million in escrow funds had already been disbursed to 536 Holdings and Queen Equities without authorization.

78.     The Fabricated Authorization Graubard authored falsely stated as follows: "Dear Mr. Graubard: This confirms my prior email instructions to you with regard to the escrow deposits sent to you from various investors originating overseas, including and associated with Javiar

16

Macaya, which so far have totaled $3,250,000; that I have the right and authorization to direct the disposition of those deposits. Further, those instructions for disposition shall be in writing, including without limitation, by email. Thank you. Sincerely yours, Chaskel Frankl."

79.    Graubard, Frankl, and Sprei intended the Fabricated Authorization to retroactively create the impression that Graubard had properly transferred Plaintiffs' Escrow Deposits in accordance with Paragraph 5 of the Escrow Agreements. On information and belief, Graubard wanted this false record to create a cover for his misconduct in the event his unauthorized disbursements of the Potential Investors' escrowed funds ever came to light. Indeed, Graubard has already pointed to the Fictitious Authorization in the instant litigation as cover for his and other Defendants' unlawful dissipation of Plaintiffs' funds.

80.    Frankl's representation that he had "the right and authorization to direct the disposition of" the Escrow Deposits was at all times patently false. Frankl, Sprei, and Graubard knew that the Potential Investors never gave Frankl such authority because the three were colleagues working in concert to convert Plaintiffs' funds. Indeed, at no point did Graubard reach out to any of the Potential Investors, including Plaintiffs, to confirm that Frankl was their agent or that they had requested the immediate transfer of their funds from his IOLA and on what basis. Graubard also did not send any record of such transfers to any of the Potential Investors. And of course, Plaintiffs never once represented to Graubard, Sprei, or Frankl that Frankl was their agent authorized to act on their behalf.

81.    Frankl's work with Graubard to create the Fictitious Authorization establishes Frankl's knowledge of the Escrow Agreements and Graubard's obligations thereunder.

82.    On December 12, 2024, the same day Frankl signed the Fictitious Authorization, Frankl directed Graubard to disburse most of the Potential Investors' remaining $650,000 in es-

crowed funds as follows: $335,000 to 536 Holdings and $250,000 to Rubin's company Queen Equities. Graubard did so without question, authorization, or notice to the Potential Investors.

83.    On information and belief, Rubin knew that the $600,000 transferred from Graubard's IOLA to Queen Equities in December 2024 were unauthorized distributions from the Potential Investors' escrowed funds.

84.    Graubard depleted the remainder of the Potential Investors' escrowed funds by issuing checks to himself amounting to $65,000 between December 12, 2024, and January 17, 2025.

85.    As of December 31, 2024, the ending balance in Graubard's IOLA was only $44,755.82, in plain violation of Graubard's contractual obligations under the Escrow Agreements, fiduciary duties to the Potential Investors, and regulatory and ethical obligations governing attorney escrow accounts. At that time, Graubard was legally and ethically bound to have no less than $3.5 million preserved in his IOLA, to account for all the Potential Investors' escrow deposits.

**D.    After Plaintiffs Demand the Return of Their Escrow Deposits, Graubard, Sprei, and Frankl Mislead Plaintiffs About the Status of Their Funds**

86.    In early January 2025, after completing a month of diligence on the Potential Investment, Plaintiffs and the other Potential Investors decided not to pursue it and thus to demand the return of their escrow deposits pursuant to their respective Escrow Agreements.

87.    Through K. Gargour, T. Gargour sent Graubard written correspondence on January 4, 2025, receipt of which Graubard acknowledged the next day, demanding the return of his $250,000 escrow deposits.

88.    Frankl followed up via email on January 6, 2025, confirming that "the wire will be sent tomorrow," *i.e.*, January 7, 2025. That was false. Graubard did not and could not return T. Gargour's escrow deposits on January 7, 2025, because the entire balance of Graubard's IOLA on that date was only $42,255.82.

18

89.     Also on January 6, 2025, Rubin's company Queen Equities wired $2,450,000 to M&W in connection with Sprei's Surf 9 transaction. The funds reflected $2,551,111.11 that had been transferred to Queen Equities at Sprei's direction from Express Trade Capital, Inc., a company involved in Surf 9, minus more than $100,000 that Rubin kept as payment from Sprei.

90.     On January 8, 2025, M&W wired $250,000 to Graubard's IOLA, on information and belief at Sprei's direction and for the purpose of repaying T. Gargour for his $250,000 that had been dissipated.

91.     The next day, January 9, 2025, Graubard wired $250,000 to T. Gargour with the false memo line "REAL ESTATE INVESTMENT." In reality, the wire was the return of T. Gargour's escrow deposits pursuant to his Escrow Agreement with Graubard.

92.     On January 9 and 10, 2025, in compliance with Paragraph 4 of each Escrow Agreement, each of Plaintiffs, Maamari, and El-Khoury (or their designee) sent Graubard an email (together, the "Demands") demanding the return of their respective Escrow Deposits by January 15, 2025, and providing individualized instructions for the return wire transfers, thereby performing all of their obligations under the Escrow Agreements.

93.     Under Paragraphs 4 and 5 of the Escrow Agreements, nothing more was required from Plaintiffs to trigger Graubard's unqualified obligation to return the Escrow Deposits to each of Plaintiffs, Maamari, and El-Khoury.

94.     That same day, on January 9, Graubard forwarded some of the Demands to Sprei and Frankl, writing, "Here are the two request for return of funds I received this morning $250K for Khoury and $1 million for Metaxa [sic]."

19

95.    On January 15, 2025, Graubard acknowledged to Plaintiffs his receipt of each of Plaintiffs' Demands (as well as those of Maamari and El-Khoury), writing, "All of your various emails about return of funds have been received." Frankl was copied on Graubard's email.

96.    At no point during Graubard's and Frankl's communications with Plaintiffs did Graubard state that he had, at Frankl and Sprei's direction, transferred Plaintiffs' Escrow Deposits out of Graubard's IOLA. Nor did Frankl, at any point, raise any confusion with Plaintiffs' Demands, nor state that he had directed Graubard to transfer the Escrow Deposits at Plaintiffs' direction. Neither Graubard nor Frankl made such claims because, all along, Frankl, Graubard, Sprei, and their associates, including Rubin, had been working in concert to convert and misappropriate Plaintiffs' funds without their knowledge or authorization.

97.    Rather than confess his inability to return Plaintiffs' Escrow Deposits—because he had already disbursed them without authorization—in response to Plaintiffs' Demands, Graubard falsely represented that he would return Plaintiffs' funds. Over the course of the next two weeks, Graubard, Frankl, and Sprei together made one false statement after another to Plaintiffs regarding the return of their funds to conceal their misconduct and prevent Plaintiffs from taking any legal action to recoup their Escrow Deposits.

98.    For example, when Plaintiffs' funds were not returned on January 15, 2025 as required by the Escrow Agreements, Graubard falsely blamed a "computer problem" at Valley National Bank for the delay, writing, "Unfortunately, some of the New York banks have been hit with a computer problem that has shut down operations. We are working to see what else can be done to get wires out."

99.    After four more days elapsed without the return of Plaintiffs' funds, Macaya emailed Graubard on January 21, 2025, again demanding the return of Pertshire's Escrow Deposit.

20

Graubard responded the same day acknowledging his obligation to return Plaintiffs' Escrow Deposits and representing that he would "send the confirmation as soon as it is done."

100.    On January 22, 2025, M&W wired $425,000 to Graubard's IOLA. On information and belief, M&W made the wire transfer at Sprei's direction for the purpose of repaying a portion of Maamari's escrow deposit.

101.    On January 21, 22, and 23, Frankl and Graubard falsely represented to Plaintiffs, as well as Maamari and El-Khoury, that all of their Escrow Deposits had been returned by wire transfer. In fact, only $400,000 of Maamari's $1 million escrow deposit, all of which had already been unlawfully dissipated, had actually been repaid (by wire transfer dated January 23, 2025).

102.    Even though the Potential Investors' remaining $2.85 million in escrow deposits remained outstanding and had not been repaid as of January 23, 2025, Frankl, whom Graubard represented to Plaintiffs to be his agent, provided Metaxas with a fictitious "Fed ref"—or federal reference—number which Frankl falsely indicated was confirmation of the return wire of Metaxas' funds from Graubard's IOLA.

103.    But when Metaxas followed up on January 24, 2025, saying his bank could not trace the federal reference number Frankl provided and requesting "a copy of the Swift that will show the date of transfer as well as the USD correspondent bank used to effect it," Frankl falsely responded, "Yes will do." Frankl ultimately provided no Swift or other proof of transfer.

104.    On the morning of January 27, 2025, Metaxas again emailed Graubard for an update on the return of his Escrow Deposit. In response, Frankl falsely represented that the wire would be "out today."

105.    Graubard and/or Sprei were copied on all of Frankl's emails to Plaintiffs but did nothing to correct Frankl's false and misleading statements regarding the status of their Escrow

21

Deposits, nor did Graubard provide any indication that he believed Frankl was Plaintiffs' agent who had properly authorized him to transfer the Escrow Deposits out of his IOLA. Instead, Graubard repeatedly held Frankl out to Plaintiffs as his agent and falsely represented his intention to return Plaintiffs' Escrow Deposits in accordance with the Escrow Agreements.

106.    By the same token, at no point in his communications with Plaintiffs, Graubard, and Sprei did Frankl claim to be Plaintiffs' agent authorized to direct the transfer of their Escrow Deposits. Nor did Frankl disclose the fact that he had directed Graubard to transfer Plaintiffs' Escrow Deposits out of his IOLA in December 2024.

107.    Alongside his communications with Plaintiffs, Frankl, and Sprei regarding Plaintiffs' Demands, throughout January 2025, Graubard repeatedly asked Frankl to wire funds to his IOLA to replace the Potential Investors' escrowed funds, including the Escrow Deposits.

108.    Frankl told Graubard, in writing, that he would wire an amount equal to the stolen escrowed funds, including the Escrow Deposits.

109.    After two weeks of false representations regarding the return of their Escrow Deposits, Plaintiffs retained the undersigned counsel, who sent Graubard a letter on January 27, 2025, demanding the immediate return of each Escrow Deposit in full, with interest at the New York statutory rate of 9% annually from January 15, 2025, and documentation establishing that the Escrow Deposits were still held, in full, in Graubard's IOLA as required by the Escrow Agreements.

110.    Sure enough, on January 27, Graubard's IOLA was replenished with wire transfers of $325,000 from M&W and $500,000 from Shefa Holdings LLC. On information and belief, these transfers were made at Sprei's direction and for the purpose of repaying Maamari's and El-Khoury's escrow deposits.

22

111.    That same evening, Maamari's and El-Khoury's escrow deposits were finally re-paid in full, though without any acknowledgment that the deposits had been unlawfully dissipated and without any interest reflecting the unauthorized twelve-day delay in repayment.

112.    The $2 million belonging to Plaintiffs, however, has never been repaid. On infor-mation and belief, Graubard repaid Maamari and El-Khoury for their $1.25 million in total escrow deposits but did not repay Plaintiffs for their $2 million Escrow Deposits because Graubard never received sufficient funds from Sprei, Frankl, or their agents to replenish those Escrow Deposits.

**E.    Graubard and Sprei Falsely Claim to Be Withholding Plaintiffs' Escrow De-posits Until Plaintiffs Release Them from Liability for Their Misconduct**

113.    On January 29, 2025, two days after repaying Maamari and El-Khoury in full and receiving the demand letter from Plaintiffs' counsel, Graubard made an about-face. After two weeks of repeatedly promising to return Plaintiffs' funds, Graubard stated that he would not return Plaintiffs' Escrow Deposits. Rather than acknowledging his contractual and fiduciary duties to *Plaintiffs* as their escrow agent, Graubard claimed *for the first time* to be representing *his* "client," later revealed to be Sprei, who purportedly "require[d] a general release" of liability from Plaintiffs before Graubard would fulfill his legal obligation to return the Escrow Deposits. At no point in Plaintiffs' prior dealings with Graubard and Sprei did either of them indicate that Graubard served as Sprei's counsel, let alone that Graubard would put Sprei's interests ahead of his own contractual, fiduciary, ethical, and regulatory duties to Plaintiffs as their escrow agent.

114.    In subsequent correspondence the same day, Graubard ignored Plaintiffs' counsel's repeated requests to provide proof that the Escrow Deposits were in fact being held in his IOLA. Instead, Graubard continued to stall, writing, "I am asking you to indulge me another day[] to deal with both my client's release issue and the funds transfer."

23

115.    Also on January 29, 2025, Seddio sent a pre-litigation demand email to Graubard, copying Sprei and Kobre, with the subject line "Olden Group v. Surf 9." The email stated:

> Good afternoon,
>
> Please be advised that no funds from your account can be released until you receive a release from the investing group as they have been attacking and threatening my client, Mr. Sprei. Mr. Graubard as soon as you receive a release in escrow you may release the funds. In any event if I do not hear from you by 5pm then we will file an order to show cause in Kings County Supreme to have the funds deposited with the Court.

On information and belief, Seddio sent the email at Sprei's direction for the purpose of giving Graubard apparent legal cover for his about-face to Plaintiffs' counsel.

116.    On January 30, 2025, despite having no previous contact with Sprei, Plaintiffs' counsel received a letter from Kobre, who represented himself to be Sprei's "litigation counsel." In that letter, Kobre acknowledged Graubard owed fiduciary duties to Plaintiffs as their escrow agent. He also stated that Sprei had "instructed Mr. Graubard not to release the escrowed funds"— further establishing Graubard's collusion with Sprei and Sprei's affirmative interference with Plaintiffs' contractual rights. Kobre reiterated Graubard's proposed hostage deal: "Your clients want the escrowed funds. My client wants certainty that your clients will not pursue meritless claims against him. All that's needed for everyone's satisfaction is a release in my client's favor."

117.    Plaintiffs responded to Kobre's letter on January 31, 2025, reiterating Graubard's unqualified duty to return the Escrow Deposits under the Escrow Agreements, highlighting Sprei's interference with that duty, noting Graubard's repeated refusal to provide proof that the funds remained in his IOLA, demanding such proof from Sprei, and raising the impropriety of Graubard's and Sprei's conditioning the return of funds on any release.

24

118. Plaintiffs have since learned that Sprei's conduct in the instant matter fits his *modus operandi* of ensnaring potential investors into fraudulent investment schemes. Other cases involving allegations of similar misconduct by Sprei and those working in concert with him include:

a. *Rolnick Investment Holdings et al. v. Edward Harold King et al.*, Index No. 611100/2025, pending in the Nassau County Supreme Court;

b. *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, pending in the Nassau County Supreme Court;

c. *Ira Russack v. Queen Equities LLC et al.*, Index No. 717729/2025, pending in Queens County Supreme Court;

d. *TD Bank, N.A. v. Edward Harold King*, No. 25-cv-3574, pending in this Court;

e. *Jetro Cash & Carry Enterps., LLC v. Olden Equities, L.L.C. et al.*, Index No. 605680/2024, judgment entered in the Nassau County Supreme Court;

f. *Jest Holdings LLC v. Anhui Edgewater St. Realty LLC et al.*, Index No. 727110/2024, pending in the Queens County Supreme Court; and

**F. After Plaintiffs Contact Law Enforcement, Sprei, Seddio, and Rubin Commence the Sham State Court Action to Conceal the Theft of Plaintiffs' Escrow Deposits and Prevent Plaintiffs from Taking Steps to Obtain Relief**

119. Plaintiffs refused to give in to Graubard's and Sprei's improper demands and, convinced that criminal conduct was afoot, reported the misconduct to law enforcement authorities on January 31, 2025.

120. On or about February 12, 2025, when on information and belief Graubard and Sprei learned that law enforcement had been contacted by Plaintiffs, Sprei's attorney Kobre contacted Plaintiffs in yet another attempt to extort them. Notably, in his letter, *Sprei's counsel* made representations on Graubard's behalf. Kobre wrote, "Mr. Graubard no longer wishes to hold the escrowed funds. As such, my client [Sprei] will move tomorrow to deposit the money into the court. My client remains willing to have the escrowed funds sent to you or your client upon receipt of a

25

release. The choice is yours." Kobre's letter again established Sprei's collusion with Graubard and control over the Escrow Deposits. Plaintiffs declined Kobre's extortionate and illusory offer.

121. On February 19, 2025, just a week after Plaintiffs rejected Kobre's unlawful demand, a civil action was filed against Plaintiffs, but not by Sprei. Instead, Seddio, Sprei's longtime co-conspirator, commenced a civil action against Plaintiffs in Kings County Supreme Court on behalf of the fictitious and non-existent entity called "Olden LLC" that was purportedly managed by Rubin.

122. The case is captioned *Olden LLC v. Metaxas et al.*, Index No. 505819/2025, names Metaxas and Pertshire as defendants, and names Graubard as the nominal defendant, though with an intentionally misspelled version of his name as a means, on information and belief, to conceal Graubard's status as a defendant from the public.

123. Sprei personally directed and controlled Seddio's filing of the State Court Action. Although the action was nominally brought on behalf of Olden LLC and Rubin, Sprei orchestrated the filing as part of his scheme with Graubard, Seddio, and Rubin to obstruct Plaintiffs' recovery of their Escrow Deposits.

124. Although the case was presented as a commercial contract dispute, Olden LLC is not a party to or third-party beneficiary of any contracts with either Plaintiff. Indeed, neither Olden LLC nor Rubin were known to either Plaintiff before the case was filed. And, before filing the action, Seddio did not review the contract on which he purportedly based the dispute.

125. The case-initiation papers for the State Court Action, which were originally drafted by Kobre, identified Sprei's company Olden Group LLC as the plaintiff and Sprei as the affiant in support of emergency injunctive relief, given that Sprei is the manager and sole member of that entity. Kobre's initial draft initiating papers also correctly spelled Graubard's last name.

26

126.   In a brazen and largely successful effort to mislead the Court and Plaintiffs, however, Sprei and Seddio, with and through their agents, falsified the papers before filing to misidentify the plaintiff as the non-existent "Olden LLC," change the manager and affiant's name to "Johnathan Rubin," affix a legally defective electronic /s/ signature to Rubin's purported affirmation instead of a hand-drawn signature, and misspell Graubard's last name as "Graubart."

127.   Sprei told Rubin that Sprei and Seddio, who represents Rubin in several other legal actions, had filed the affirmation under Rubin's name because if Sprei or his company Olden Group LLC were known to be involved in the dispute, issues might arise with another pending case, captioned *Olden Group LLC v. Body Glove International Inc. et al.*, Index No. 533445/2024, that Seddio had commenced on Sprei's behalf in Kings County Supreme Court in December 2024 relating to Sprei's investment in Surf 9. Sprei also told Rubin that he believed no one would be "dumb enough" to believe that Rubin himself signed a document misspelling his own name—on information and belief, a cover Rubin could (and did) later use in an attempt to dispel any liability for the fraudulent filings.

128.   To allow Sprei to further control the State Court Action, Seddio took advantage of a procedural mechanism that has become his *modus operandi* in abusing judicial process. Under CPLR § 305(b), a plaintiff may commence a civil action by simple summons with "a notice stating the nature of the action and the relief sought, and, except in an action for medical malpractice, the sum of money for which judgment may be taken in case of default." Once commenced, the action can be used as a vehicle to obtain emergency injunctive relief, while maintaining optionality to discontinue the action at will because a plaintiff retains the unqualified right to discontinue an action at any time before the filing of responsive pleadings, and responsive pleadings are not permitted in the absence of a complaint.

129.   Under CPLR § 3012(b), a complaint must be served within 20 days of the defendant's demand or notice of appearance in the action. As detailed below, Seddio never served a complaint in that action.

130.   The notice drafted and filed by Seddio in the State Court Action falsely states, in its entirety, "This action seeks a judicial declaration and injunctive relief as to escrow funds held by the Nominal Defendants [*sic*], as to which the parties have competing claims."

131.   When Seddio filed the summons with notice (and parallel request for a TRO) in the State Court Action, he knew that Olden LLC had no claims to Plaintiffs' Escrow Deposits, had no contractual or other relationship with either Plaintiff, and was not, in fact, a legal entity. Seddio commenced the State Court Action not to vindicate the rights of his client(s)—as none of Olden LLC, a fictitious entity, Rubin, who has never met or interacted with Plaintiffs, or even Sprei has any claim to the Escrow Deposits.

132.   At no point did Seddio, Sprei, Rubin, or Olden LLC have probable cause to believe that Olden LLC had any valid claim to Plaintiffs' Escrow Deposits. Olden LLC is not a party to, nor a third-party beneficiary of, the Escrow Agreements. Neither Olden LLC nor Rubin had any prior dealings with Plaintiffs. The State Court Action was commenced not to vindicate any legitimate legal right, but solely to obstruct Plaintiffs' recovery of their property.

133.   Indeed, Seddio has since admitted, under oath, that no one other than Plaintiffs has any rights to the Escrow Deposits.

134.   On information and belief, Seddio, working in concert with Sprei, Rubin, and Graubard, commenced the State Court Action under false pretenses to conceal the fact that the Escrow Deposits had been stolen well before the State Court Action was commenced, and to interfere with Plaintiffs' ability to obtain timely and effective relief.

28

G.    **Seddio and Rubin Obtain a TRO Based on False Statements to Improperly
Restrain Plaintiffs from Recovering Their Escrow Deposits and to Hide
Sprei's and Graubard's Misconduct**

135.    On information and belief, the true purpose of Seddio's and Rubin's sham preliminary injunction motion was to obtain a TRO which would prevent Plaintiffs from taking affirmative steps to obtain their Escrow Deposits, give Graubard and Sprei the ability to point to an ongoing civil action in the event they were questioned by law enforcement, and buy Graubard and Sprei time to replenish Plaintiffs' funds, which they or their associates had illegally dissipated.

136.    To that end, on February 19, 2025, Seddio filed, alongside a supporting declaration from Rubin, an "emergency" motion, by order to show cause, seeking the *ex parte* entry of a TRO enjoining Graubard "from releasing the Escrowed Funds to any party"; directing Graubard "to continue to hold the Escrowed Funds in his escrow account (or deposit the Escrowed Funds with the Court) pending further order of this Court or agreement of the parties"; and enjoining Plaintiffs and all other parties to the action "from taking any steps to transfer, encumber, sell, or otherwise dispose of the subject property" pending the hearing on and resolution of Olden LLC's preliminary injunction motion, which requested that the court order Graubard to deposit the Escrow Deposits with the Kings County Supreme Court Clerk's office.

137.    To obtain *ex parte* relief, Seddio filed an "emergency" affirmation swearing, under penalty of perjury, that Olden LLC "could not give notice of this application because, if notice were given of this action, [Plaintiffs] would take steps to further harass and intimidate and bully the Nominal Defendant escrow agent [Graubard] to released [*sic*] the disputed funds before the Court could even hear this matter." On information and belief, Seddio knew his basis for seeking *ex parte* relief was legally insufficient (a purported risk of "intimid[ation]" and "bully[ing]" is not a basis for an *ex parte* application for a preliminary injunction) and pretextual: the sole reason he

29

filed an *ex parte* application was to prevent Plaintiffs from contesting his completely meritless request.

138.    Seddio also filed a sworn affirmation from Rubin setting forth purported facts supporting Olden LLC's request for a TRO. In it, Rubin perjured himself by making several knowingly false statements of fact:

   a.    Rubin falsely represented that he was "the manager of Plaintiff in this action," *i.e.*, Olden LLC. That was false because Olden LLC did not exist and, to the extent that he was referring to Olden *Group* LLC, that entity's sole member and manager is Sprei.

   b.    Rubin falsely stated that Olden LLC and Plaintiffs "entered into negotiations to invest and jointly purchase a certain non-party company." That is categorically false. Before Olden LLC commenced its sham litigation against Plaintiffs on February 19, 2025, Plaintiffs had never even heard of or interacted with the company, which is not a legal entity.

   c.    Rubin falsely stated that, after "disputes arose between the parties," Plaintiffs "level[ed] very serious but frivolous claims against [Olden LLC] and against [Rubin] personally." That, too, is false. Again, Plaintiffs had never interacted with either Olden LLC or Rubin prior to the initiation of Olden LLC's sham State Court Action.

   d.    Rubin falsely stated that *he* "explained to [Plaintiffs] (through counsel) that [Rubin] would have no objection to the release of the Escrowed Funds if only [Plaintiffs] released [Rubin] from their unfounded bullying claims," and Rubin claimed that "[a] copy of just one such correspondence through counsel" was exhibited to his affirmation. Each of those statements was also false. Plaintiffs have never had any communication with Rubin, and the letter attached to Rubin's affirmation was the January 30, 2025 letter from *Sprei's* litigation counsel Ethan A. Kobre.

139.    To this day, neither Rubin nor Seddio have withdrawn Rubin's affirmation or requested leave of the court to correct any statements therein.

140.    On information and belief, Seddio and Rubin both knew that Rubin's sworn affirmation contained false statements of material fact at the time they filed Rubin's affirmation in the State Court Action. The January 30, 2025 letter from Kobre was also attached to Rubin's affirma-

tion, establishing that Seddio and Rubin were aware of Graubard's fiduciary duties to Plaintiffs and intentionally commenced the State Court Action to interfere with those duties.

141.    Less than three hours after Seddio filed the motion on behalf of Rubin's purported company Olden LLC, and despite the glaring deficiencies in the supporting papers, Kings County Supreme Court Justice Steven Z. Mostofsky granted the motion *ex parte* and granted the TRO in substantially the same form requested by Seddio. Justice Mostofsky, as the *ex parte* judge on duty, scheduled the preliminary injunction hearing for April 23, 2025, before the assigned judge: Hon. Katherine Levine. The order further directed that Olden LLC complete "personal service" of the order and all supporting papers on all parties by March 7, 2025.

**H.    Seddio's Conduct in the State Court Action Fits His Pattern of Deceitful Litigation Conduct in Other Actions**

142.    Seddio's tactic of submitting false statements to seek a purportedly emergency TRO on an *ex parte* basis and for an improper purpose is one he has employed and continues to employ in multiple actions across New York.

143.    For example, after Seddio, Graubard, Wachtler, and others were sued in New York County for conversion, fraud, and deceit in connection with $7 million in escrow deposits that was never returned, in a case commenced on April 4, 2025 and captioned *317 Oakford LLC v. Lauren J. Wachtler et al.*, Index No. 652253/2025 (N.Y. Cty. Sup. Ct.) (the "*Oakford* Manhattan Action"), Seddio filed *three* separate special proceedings in *Kings County* Supreme Court seeking emergency TROs on an *ex parte* basis to enjoin and stay the *Oakford* Manhattan Action based on an underlying agreement signed by *Sprei* on behalf of his company "Olden Group."

144.    In Seddio's first two proceedings, commenced on April 11 and 18, 2025, and both captioned *WHP Equities LLC v. Bruce Orlovsky et al.*, Index Nos. 512289/2025 and 512855/2025 (Kings Cty. Sup. Ct.), both seeking identical injunctive relief against the *Oakford* Manhattan Ac-

31

tion, Seddio falsely claimed that the petitioner, WHP Equities LLC, a New Jersey company *registered to Defendant Rubin*, was a party to Sprei's underlying agreement. In his supporting affirmation in the second-filed proceeding, Seddio also falsely stated that "[n]o prior request for this relief has been made to this or any other Court." After the respondents pointed out that WHP Equities LLC was not a party to the purported arbitration agreement, is a New Jersey company not authorized to do business in New York, *and is registered to Defendant Rubin*, Seddio voluntarily discontinued the two proceedings he brought on behalf of Rubin's company.

145.    On April 21, 2025, Seddio commenced a *third* special proceeding, captioned *Ollden* [sic] *Group LLC v. Bruce Orlofsky et al.*, Index No. 513196/2025 (Kings Cty. Sup. Ct.), seeking the same injunctive relief as he had in the two prior proceedings. In his sworn affirmation in support of an *ex parte* TRO, Seddio again falsely stated that "no prior request for this relief has been made to this or any other Court." Moreover, the amended Verified Petition signed by Sprei and filed by Seddio on April 21, 2025, again falsely alleged that "WHP EQUITIES LLC" was a party to Sprei's underlying agreement.

146.    On May 20, 2025, the plaintiff in the *Oakford* Manhattan Action voluntarily dismissed the action and commenced a new action based on the same underlying conduct, captioned *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, in Nassau County Supreme Court (the "*Oakford* Nassau Action"). Unlike the *Oakford* Manhattan Action, however, the *Oakford* Nassau Action asserts a claim against Seddio personally for deceit and collusion in violation of Judiciary Law § 487 for his misrepresentations to the courts in his three earlier proceedings. After defaulting on his obligation to answer the complaint in the *Oakford* Nassau Action, and despite facing personal liability as a named defendant, Seddio again abused process by turning to the Kings County Supreme Court and his connections there to file a *fourth*

32

special proceeding on August 11, 2025, captioned *Olden Group LLC v. Bruce Orlofsky et al.*, Index No. 527117/2025, in which he sought the same *ex parte* TRO he requested and failed to obtain in the prior three proceedings. The TRO was granted on August 19, 2025, enjoining the *Oakford* Nassau Action, and a hearing on broader relief was scheduled for September 17, 2025.

147.    The above examples (which, on information and belief, are a few of many) show that Seddio has a history of abusing and manipulating the judicial system, including by submitting knowingly false sworn statements to obtain *ex parte* injunctive relief for collateral ends and engaging in blatant forum and judge shopping through which he can utilize his political influence, stemming from his role as the former chair of the Kings County Democratic Committee, in service of Sprei's schemes.

> ### I.    Seddio, Rubin, and Graubard Take Affirmative Steps to Impede the State Court Action
>
> #### 1.    Seddio, Sprei, and Rubin Choose Not to Serve Graubard or File a Complaint, and Seddio Repeatedly Delays the Preliminary Injunction Hearing He Requested

148.    While Seddio promptly served Plaintiffs with copies of the TRO and supporting papers on February 20, 2025, the day after the TRO was issued, Seddio *never* served Graubard with the same papers even though (a) Graubard is the party against whom Seddio sought the TRO to purportedly prevent Graubard from returning the Escrow Deposits to Plaintiffs and (b) Justice Mostofsky ordered Seddio to personally serve Graubard with the TRO and its supporting papers by March 7, 2025.

149.    Instead, when almost two months elapsed without Seddio's filing on the docket a certificate of service on Graubard, and after Seddio and Graubard repeatedly refused to disclose to Plaintiffs whether Seddio had served Graubard with the TRO, *Plaintiffs* served Graubard with the TRO and supporting papers on April 18, 2025.

33

150.    Had Seddio sought and obtained the TRO for legitimate purposes, he would have served its primary target, Graubard, who purportedly held the Escrow Deposits at issue. Seddio's choice not to serve Graubard evidenced his malicious intent to use the TRO solely for the improper purpose of interfering with Plaintiffs' exclusive and unqualified contractual rights to recover their Escrow Deposits. On information and belief, Seddio knew there was no need to serve Graubard with the TRO because Seddio, Graubard, Rubin, and Sprei had worked in concert to initiate the illegitimate State Court Action to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their agents had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

151.    In addition, despite having caused Olden LLC (as its attorney and purported manager) to commence the State Court Action by simple summons with notice, to date, Seddio and Rubin have chosen not to file a complaint asserting any legal claim to the Escrow Deposits, as required under CPLR § 3012(b).

152.    On information and belief, Seddio, Sprei, and Rubin never filed a complaint in the State Court Action because they knew they had no legal right, whatsoever, to Plaintiffs' Escrow Deposits. Their choice not to advance any actual claims by Olden LLC to the Escrow Deposits evidences their malicious intent to use the TRO to (1) interfere with Plaintiffs' exclusive and unqualified rights to the Escrow Deposits under the Escrow Agreements (each of which Plaintiffs filed on the docket in the State Court Action), (2) give Graubard and Sprei cover to continue misappropriating Plaintiffs' Escrow Deposits, and (3) make the legal process of recovering Plaintiffs' Escrow Deposits and obtaining related relief so irrationally protracted and costly that Plaintiffs would abandon the effort.

34

153.    Seddio also engaged in repeated delay tactics aimed at impeding and delaying the State Court Action *he initiated* and through which he requested *emergency relief*.

154.    On April 17, 2025, just five days before the originally scheduled preliminary injunction hearing—which had been scheduled since February 19, 2025—Seddio requested an adjournment via email to chambers due to an unspecified "schedule conflict" and stated that he was "not available till may [sic]." After a week of back and forth with chambers, during which Seddio would offer his available dates and then retract them once they were agreed to, Justice Levine rescheduled the hearing for Monday, May 12, 2025.

155.    On the afternoon of Friday, May 9, 2025, however, just one business day before the scheduled hearing and after presiding over the case for approximately three months, Justice Levine recused herself *sua sponte* "in order to avoid any potential appearance of impropriety or partiality with respect to a party in this proceeding." On information and belief, Justice Levine's recusal was due to her personal and professional relationship with Seddio, who chaired the Kings County Democratic Committee when Justice Levine ran for and won her Kings County Supreme Court judgeship as a Democrat in 2016.

156.    The State Court Action was reassigned to Justice Mostofsky, who had issued the initial TRO.

### 2.    Graubard Impedes the State Court Action by Refusing for Months to Appear in the Action and Making False Representations to the Court

157.    For his part, Graubard also took actions and omissions for the purpose of impeding and obstructing the State Court Action. Despite Plaintiffs serving Graubard with the TRO and its supporting papers on April 18, 2025, Graubard refused for months to make any appearance in the State Court Action.

158.    On May 9, 2025, shortly before the first adjourned hearing date on Seddio's pre-liminary-injunction motion in the State Court Action, Justice Levine abruptly recused herself "in order to avoid any potential appearance of impropriety or partiality with respect to a party in th[e] proceeding." While Justice Levine did not identity the party at issue, she and Seddio have a longstanding friendship, frequently communicate via text message, and socialize together. The case was reassigned to Justice Steven Z. Mostofsky.

159.    Only after Plaintiffs refused to consent to yet another request by Seddio to adjourn the preliminary injunction hearing, which Justice Mostofsky rescheduled for July 17, 2025, did Sprei—not Graubard—contact attorney Yeshaya Gorkin, Esq. about representing Graubard in the State Cout Action.

160.    Sprei engaged Gorkin to represent Graubard, and Graubard told Gorkin that Sprei was authorized to act as his agent throughout the State Court Action. In this capacity as Graubard's agent, Sprei directed Gorkin to enter an appearance on the evening of July 16, 2025, mere hours before the July 17 preliminary injunction hearing, and solely to request an eleventh-hour adjournment of the hearing, despite Graubard's having been on notice of the hearing date for months.

161.    In addition, Graubard and Sprei permitted Gorkin to falsely represent to the state court in his eleventh-hour adjournment request that Graubard was "willing to release the funds at issue, provided the parties execute a mutual release and consent order", a statement made for the purpose of creating the impression that Graubard was in possession of Plaintiffs' Escrow Deposits. Graubard, Sprei, and Seddio worked to maintain this false impression throughout the pendency of the State Court Action.

162.    At all times, while being represented by counsel in the State Court Action, Grau-bard continued acting as his own attorney and even submitted court filings under his own attorney

36

credentials through the New York State Courts Electronic Filing ("NYSCEF") system which contained material misrepresentations to prolong the adjudication of the matter.

163.    The primary purpose of Sprei's, Graubard's, and Seddio's delay tactics and intentional misrepresentations to the Court was to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

**J.      The State Court Issues an Order Requiring Graubard to Deposit the Escrow Deposits With the Court, and Seddio and Graubard Work in Concert to Thwart the Order**

164.    The July 17, 2025, hearing on Seddio's and Rubin's motion for a preliminary injunction, which Plaintiffs did not oppose, proceeded as scheduled. Neither Graubard nor his then-counsel Gorkin appeared.

165.    Seddio, too, failed to appear in person, though he sent an agent to represent the plaintiff, Rubin's purported company Olden LLC.

166.    Astonishingly, although the hearing was on Seddio's own motion for a preliminary injunction, Seddio's agent argued *against* the grant of the relief Seddio had sought in his motion and made several representations on Graubard's behalf, including that Graubard was travelling and thus could not deposit Plaintiffs' Escrow Deposits with the clerk of the court until Monday, July 21, 2025.

167.    At the hearing and in their answering papers to Seddio's motion for a preliminary injunction, Plaintiffs raised Seddio's failure to file a complaint interposing any legal claims on his client's behalf and requested at the hearing that the state court deem Seddio's summons with notice a complaint to allow Plaintiffs to file counterclaims in the State Court Action.

168.    At the conclusion of the hearing, Justice Mostofsky issued an order (the "Deposit Order") requiring Graubard to deposit Plaintiffs' $2 million in Escrow Deposits by 5 p.m. on July

37

21, 2025. Plaintiffs served the Deposit Order on Seddio and Graubard (through Gorkin) within a half-hour of its filing on Thursday, July 17, 2025.

169. That evening, Seddio emailed counsel for Plaintiffs stating that his "Client would like to know if [Plaintiffs] would accept $2M plus additional $35k to settle this matter. So we can be done with this case." Seddio's email illustrates his knowledge that the case he initiated was without merit and that Sprei and Rubin, not Graubard, were in fact controlling Plaintiffs' Escrow Deposits, contrary to the representations made by Seddio and Rubin in their State Court Action filings that Graubard maintained exclusive control of the Escrow Deposits.

170. Seddio's settlement offer was illusory and Seddio made the offer in concert with Sprei, Graubard, and Rubin as a means of delaying justice in the State Court Action, as they knew that Plaintiffs' Escrow Deposits had already been dissipated and thus Graubard would not deposit Plaintiffs' Escrow Deposits with the clerk of the court as required by the Deposit Order.

171. After Plaintiffs' counsel informed Seddio that Plaintiffs would only consider settlement discussions after their funds were deposited with the court, Seddio and Graubard schemed to further impede the State Court Action, in direct violation of the Deposit Order.

172. At 3:01 p.m. on Monday, July 21, 2025, less than two hours before the 5 p.m. deadline under the Deposit Order, Seddio and Graubard (through his then-counsel Gorkin) filed a stipulation purporting to unilaterally extend the Deposit Order's deadline until Thursday, July 24, 2025. Plaintiffs opposed any extension and requested that Justice Mostofsky disregard the stipulation. But despite Seddio and Graubard's unilateral grant of a three-day extension of time to fulfil the court's mandate, Graubard still failed to deposit the funds with the clerk's office by July 24.

173. On Friday, July 25, 2025, in response to an inquiry from Justice Mostofsky's principal law clerk regarding the status of the Escrow Deposits, Seddio effectively admitted that he

had directed Graubard to violate the Deposit Order. In an email ghostwritten by Graubard's then-attorney Gorkin, at Sprei's direction, Seddio stated to the Court, "Given the amount at issue, I intended to personally oversee the deposit to ensure proper compliance. However, I was unable to make it to the courthouse before, and did not feel it appropriate for the nominal defendant to deposit the funds in my absence. It is not my intention to place the nominal defendant in noncompliance. I will coordinate with Nominal Defendant's counsel, Shaya Gorkin, and ensure the deposit is made promptly next week. I respectfully submit that this brief delay does not prejudice any party. [I] will keep the court updated."

174.    These statements were false. Seddio had never spoken with Graubard about overseeing his deposit of the Escrow Deposits. And although Seddio also stated in his July 25, 2025 email that he would "ensure the deposit is made promptly next week," that statement was false because Seddio had not communicated with Gorkin or Graubard about the Escrow Deposits, and no deposit was made the following week. Instead, Seddio, working in concert with Sprei and Graubard, made these misrepresentations to the court in an effort to further delay justice in the State Court Action.

175.    On July 28, 2025, Judge Mostofsky scheduled, *sua sponte*, a remote hearing on possible attorney sanctions based on the continued violation of the Deposit Order.

176.    On July 29, 2025, Plaintiffs moved to hold Graubard, Seddio, and Gorkin in contempt of the Deposit Order.

177.    After Judge Mostofsky denied Gorkin's repeated requests to adjourn the attorney sanctions hearing, Gorkin moved on July 30, 2025—the day before the hearing—to withdraw as Graubard's counsel. The next day, less than an hour before the scheduled hearing, Graubard noticed the substitution of non-party Israel Goldberg, Esq., as his new counsel in place of Gorkin.

178.     Sprei, Graubard (through his agents), and on information and belief, Seddio, knew that Goldberg, also one of Sprei's and Seddio's longtime associates, had a personal relationship with Justice Mostofsky.

179.     Sprei, Graubard, and on information and belief Seddio coordinated Graubard's retention of Goldberg with the intention and for the primary purpose of compelling Justice Mostofsky to recuse himself due to his personal relationship with Goldberg.

180.     Indeed, Sprei—not Graubard—contacted and directly engaged Goldberg. Sprei also promised to pay for Goldberg's legal services for Graubard.

181.     On July 31, 2025, Justice Mostofsky held a video conference hearing on possible attorney sanctions against Graubard. Seddio, Gorkin, and Gorkin's law firm partner Geoffrey Bowser, Esq. appeared. Graubard and his new attorney, Goldberg, were not present.

182.     During the hearing, Gorkin's attorney, Bowser, stated that, while Gorkin previously "understood that his client [Graubard] was willing to pay the money into the court[,] … he no longer represents that, he now has doubts about that."

183.     Justice Mostofsky responded, "There is only one reason why the money isn't paid into court and that's because the escrowee [*i.e.*, Graubard] doesn't have it. And that's the problem that we are all putting the escrowee into because you are leaving me with the only option I have, which is to believe that the escrowee is not holding the $2 million dollars that was represented to me in court."

184.     For his part, Seddio repeatedly admitted to communicating directly with Graubard and made several representations on Graubard's behalf, despite the fact that Graubard is a named party to the State Court Action and is represented by counsel. Seddio stated that "[t]he last contact [Seddio] had with [Graubard] is he was hiring Izzy Goldberg to represent him," which, Sprei,

Graubard, and on information and belief, Seddio, had arranged for the purpose of creating a conflict with Judge Mostofsky. Seddio further stated that Graubard "was looking for some kind of a guarantee that he wasn't going to be included in any future lawsuits once the money was turned in."

185.    In light of Seddio's and Gorkin's admissions during the hearing and their conduct to date, Plaintiffs made an oral motion for sanctions against both attorneys pursuant to 22 NYCRR § 130-1.1. At the conclusion of the sanctions hearing, Justice Mostofsky reserved ruling.

186.    Despite reserving ruling on sanctions against Seddio and Gorkin, the very next morning, Justice Mostofsky recused himself *sua sponte* "due to personal relationship with" Graubard's replacement counsel Goldberg, just as Sprei, Graubard, and, on information and belief, Seddio had intended.

187.    The State Court Action was then assigned to a third judge in the Kings County Supreme Court, Hon. Richard J. Montelione, who scheduled a hearing on Plaintiffs' contempt motion for November 5, 2025. Plaintiffs requested that Justice Montelione address Plaintiffs' motion for attorney sanctions on which Justice Mostofsky reserved decision before his recusal.

188.    The instant federal action was commenced on October 17, 2025.

189.    Days before the November 5, 2025 contempt hearing, Seddio requested an adjournment due to various "[e]lection[] matters" as well as an extension of his time to answer the Contempt Motion.

190.    The Court responded to this request with the interim order dated October 31, 2025 (the "Interim Order") granting the requested adjournment only if one of three conditions was met, including the posting of a $120,000 bond by Seddio's client by 5 p.m. on November 3, 2025.

41

191. Seddio, Sprei, Rubin, and Graubard then worked to obtain a bond in an effort to delay adjudication of Plaintiffs' contempt motion. The four corresponded with each other and a potential bondsman, with Rubin volunteering to advance $60,000.00 for the appearance bond. Ultimately, the four Defendants were unable to obtain a bond.

192. Despite Defendants' failure to obtain a bond, Seddio attempted to manipulate the court into delaying the hearing by sending a woefully deficient and ineffective "draft bond" form to the Court six minutes before the 5 p.m. deadline the Court had set for the posting of the bond. On information and belief, Seddio sent the invalid draft bond form to the court, in concert with Graubard and Sprei, so that Seddio and Graubard could later falsely claim (and did) that they thought a bond was being filed to excuse their knowing failure to appear at the November 5, 2025 hearing.

193. No bond was filed on November 3, 2025, or subsequently in the matter.

194. Despite the Court's Interim Order requiring Graubard and his counsel to appear at the hearing with proof that Plaintiffs' Escrow Deposits were intact in his IOLA, neither Graubard nor his counsel attended the November 5 contempt hearing. Nor did Sprei, Seddio, or Rubin.

195. Instead, only after the state court ordered Plaintiffs to contact Seddio regarding his failure to appear that day, did Seddio send a per diem attorney to the hearing to make an application for adjournment to delay the resolution of the contempt motion against Graubard and to claim, untruthfully, that a bond was contemporaneously being filed with the court.

196. During the hearing on November 5, 2025, Justice Montelione orally granted Defendants' contempt motion against Graubard on his default.

197. That same evening, Graubard filed a letter to the Court under his own NYSCEF credentials falsely stating that he was prepared "to comply with Court directives." That represen-

42

tation was false because, at the time, the court's directive was for Graubard to deposit the $2 million Escrow Deposits with the clerk of the court, but Graubard did not possess the funds. Graubard filed a similar follow-on letter on November 7, 2025.

**K.      Seddio Discontinues the State Court Action In Another Attempt to Manipulate the Contempt Proceedings Against Graubard**

198.    After Justice Montelione orally granted Defendants' contempt motion against Graubard, Sprei directed Gorkin, on behalf of *Graubard*, to draft a notice of discontinuance of the State Cout Action and an accompanying letter which would be filed by *Seddio*, Gorkin's purportedly *opposing* counsel. The aim of the discontinuance was to divest the court of jurisdiction over the contempt order so that Graubard would not have to deposit the $2 million with the clerk of the court and to force the court to end the State Court Action and any continued inquiry into the status of Plaintiffs' Escrow Deposits, or at least to muddy the waters and delay the contempt proceedings to give Defendants more time to try to come up with the funds to repay Plaintiffs.

199.    On November 6, 2025, Seddio filed the notice of voluntary discontinuance of the action and accompanying letter which argued that the discontinuance deprived the court of jurisdiction over the contempt order and State Court Action generally. Seddio's letter admitted that, because "no complaint was ever filed" within "the twenty-day period for service of a complaint" pursuant to CPLR § 3012(b) following the defendants' (Plaintiffs here) appearance through counsel, the "time to serve a complaint ha[d] expired." Seddio further stated that he did not want to "litigate the procedural consequences of that lapse," so was instead "voluntarily discontinue[ing] this action without prejudice." Seddio concluded the letter by contending, wrongly, "that the failure to comply with CPLR § 3012(b) divest[ed the state court] of jurisdiction over the matter" and that his notice of discontinuance "terminates the proceeding in its entirety"—including, as he

43

would later argue, the Court's enforcement of the contempt order against Graubard issued the previous day.

200.    The discontinuance had its intended effect. On November 7, 2025, Justice Montelione issued a final order punishing Graubard for contempt of court, which the Court had drafted before Seddio filed the notice of discontinuance. At the end of the order, the Judge added the following, handwritten addendum: "The foregoing Final Order punishing David Graubart, Escrow Agent / Nominal Defendant is stayed pending a further order from the Court. All counsel for the respective parties must show cause at the call of the calendar on 11/12/2025 at 9:30am, Part 99, whether the forgoing final order should or should not be vacated, modified, or enforced, based on the notice of discontinuance filed on 11/6/2025."

201.    While Seddio could have discontinued the action at any time prior to November 6, 2025, Seddio, Sprei, Rubin, and Graubard chose to voluntarily discontinue the action the day after Justice Montelione orally found Graubard in contempt of court for the purpose of preventing the court from effectuating its contempt order and delaying justice.

202.    Pursuant to his November 7, 2025 order, Justice Montelione held a hearing on November 12 to determine the effect of Plaintiff's discontinuance on the contempt proceedings. Seddio sent a per diem attorney to the hearing to argue that the court no longer retained jurisdiction, and anything further should be addressed in the instant action in federal court. In response, the Court asked what standing or reason the Plaintiff in this matter had to argue against the court's enforcement of its contempt order against Graubard. The reason was that, at all times, Seddio, Sprei, Graubard, and Rubin were working together to manipulate the State Court Action proceedings to hide the theft of Plaintiffs' Escrow Deposits and make the process of recouping those funds so costly and painful as to force Plaintiffs to abandon their rights.

44

203.     Goldberg, Graubard's attorney and agent, attended the November 12 hearing and represented to the Court that, despite his client's ongoing contempt of the Deposit Order, he could not say or represent whether the Escrow Deposits remained in Graubard's IOLA. This statement was false, as Goldberg has since testified under oath that, at least upon entering the matter, he was aware that Graubard was not in possession of Plaintiffs' Escrow Deposits.

204.     On November 20, 2025, Plaintiffs moved for sanctions against Seddio and Rubin for frivolous litigation conduct.

205.     On December 3, 2025, Justice Montelione entered a superceding contempt order ("Superceding Contempt Order") against Graubard for violating the Court's Deposit Order requiring Graubard to deposit the Escrow Deposits with the Court. The Superceding Contempt Order imposed monetary sanctions and required Graubard to file properly redacted copies of his IOLA records ("Account Records") showing all deposits, disbursements, or balances related to Plaintiffs' Escrow Deposits.

### L.     Graubard Files Frivolous Seriatim TRO Applications

206.     Two days after the state court's issued its December 3, 2025 Final Contempt Order against Graubard, Graubard and Sprei, acting on information and belief in concert with Seddio, sought a TRO in the State Court Action seeking to vacate the Superceding Contempt Order and stay enforcement of its requirement that Graubard publicly file the Account Records on the State Court Action docket.

207.     Sprei worked in concert with Graubard and his agents to draft the frivolous and abusive TRO papers, and Sprei received copies of the motion papers before they were filed.

208.     The TRO was issued on December 8, 2025 (the "December 8 TRO"). The primary purpose of the request for the December 8 TRO was to prevent the public disclosure of the Account

45

Records because they would reveal that Graubard had violated his legal and ethical obligations by immediately dissipating Plaintiffs' Escrow Deposits. The TRO lasted through December 12, 2025.

209.    During and after the pendency of the December 8 TRO, Graubard, working in concert with Seddio, Sprei, and their agents, filed five additional seriatim TRO applications in rapid succession, each seeking similar relief and each designed to further delay the court's requirement that Graubard publicly file the Account Records.

210.    The repeated filing of TRO applications, each based on substantially similar grounds and each denied by the Court, demonstrates that Graubard, Seddio, and Sprei employed the litigation process not for any legitimate purpose, but solely to obstruct justice, prevent Plaintiffs from discovering the fate of their Escrow Deposits, and deter them from vindicating their rights by making the judicial process as costly and protracted as possible.

**M.    Defendants Orchestrate Justice Montelione's Recusal**

211.    When Justice Montelione indicated an unwillingness to grant Graubard's meritless TROs, Seddio, Sprei, and Graubard, further deceived and manipulated the state court to prevent Plaintiffs from vindicating their rights.

212.    On December 14, 2025, in the midst of the seriatim TRO applications described above and on the eve of Graubard's deadline to publicly file the Account Records on the State Court Action docket, Sprei and Graubard's attorney Gorkin discussed via WhatsApp messages a scheme to cause another recusal. Specifically, Sprei and Gorkin worked through the idea of bringing the ABK law firm into the State Court Action or starting a new related action in the same court wherein ABK would serve as counsel for Graubard or Rubin and thereby force Justice Montelione to recuse himself from the State Court Action due to the fact that ABK was representing Montelione in a separate unrelated litigation.

213.    The next day, December 15, 2025, Sprei and Seddio successfully executed a version of that scheme. Together, Seddio and Sprei had a phone call with Imran H Ansari, Esq. ("Ansari"), a partner at ABK who was also representing Justice Montelione, about potentially retaining ABK in connection with the pending sanctions motion against him, which was not returnable until February 2026.

214.    Ansari agreed in principle but considered ABK's retention subject to the execution of a retention agreement and payment of ABK's requisite $20,000 retainer. ABK conveyed to Seddio and Sprei that the firm would not notice its appearance nor represent Seddio in the State Court Action unless and until both these conditions were met.

215.    That afternoon, Sprei sent Ansari via email a letter to the court on Seddio's letterhead stating that Seddio had retained ABK to represent him in connection with the pending sanctions motion against him. The letter conspicuously omitted both the name of Justice Montelione, Ansari's client, and the caption of the State Court Action. The draft letter contained signature lines for both Seddio and Ansari.

216.    As of December 15, 2025 (or as of any day in the next two and a half months), Seddio had not in fact retained ABK because no retention agreement had yet been signed, and no retainer had yet been paid. And at no point before the letter's filing did Ansari indicate that he had reviewed the draft letter to the Court regarding ABK's purported engagement by Seddio.

217.    Nonetheless, Seddio filed the letter at 3:19 p.m. on December 15, 2025. As filed, the letter falsely stated, "I *have retained* counsel, Mr. Imran H Ansari, from the law firm of Aidala, Bertuna & Kamins P.C., to represent me in this matter." (emphasis added) and added electronic signatures not only for Seddio, but Ansari as well.

47

218.    At the time Seddio filed his December 15, 2025 letter, Seddio and Sprei knew that ABK represented Justice Montelione in unrelated litigation. Seddio, working in concert with Sprei and Graubard, filed the letter for the express purpose of orchestrating Justice Montelione's recusal from the State Court Action. Indeed, Montelione recused himself the next day.

219.    ABK did not receive Seddio's executed retainer agreement (signed by both Seddio and Sprei, who is singularly responsible for ABK's fees) and did not begin representing Seddio until March 2, 2026—a week after Plaintiffs supplemented their motion for sanctions against Seddio on with additional evidence, and just four days before Seddio's deadline to oppose the motion. Accordingly, Seddio's representation to the court that he had retained ABK as of December 15, 2025 was false.

220.    Seddio's and Sprei's delay in actually retaining ABK, combined with Seddio's immediate notification to the state court of ABK's purported involvement, demonstrates that Seddio's, Sprei's, and Graubard's purpose in filing the December 15 letter—which did not amount to a notice of appearance and had no legal effect or merit whatsoever—was to create a conflict that would force Justice Montelione off the case and further delay resolution of the matters pending before the court.

221.    Justice Montelione's recusal on December 16, 2025—the very next day after Seddio filed his letter—confirms that Seddio's, Sprei's, and Graubard's scheme achieved its intended objective of removing the presiding judge from the case and delay the sanctions hearing. Justice Francois A. Rivera was subsequently assigned to the case.

**N.    The Truth is Finally Revealed at the January 14, 2026 Hearing on Graubard's Civil Commitment for Contempt of Court**

222.    On December 17, 2025, pursuant to the Superceding Contempt Order, Plaintiffs made an *ex parte* application for the arrest and commitment of Graubard due to Graubard's failure

to cure his contempt by filing the Account Records by the December 8, 2025 deadline ordered by the Court.

223. On January 6, 2026, Justice Rivera granted the application and issued an arrest warrant against Graubard for his continued contempt of the Deposit Order and the December 3, 2025 Superseding Contempt Order. The arrest warrant provided for Graubard to be seized and brought to (or otherwise appear at) a hearing on January 14, 2026, to show cause why he should not be civilly committed for contempt.

224. On the morning of the commitment hearing, Graubard filed via his own NYSCEF credentials copies of December 2024 IOLA bank statement which he had redacted by hand and that were plainly non-compliant with the Superceding Contempt Order's requirement that the Account Records include all deposits, disbursements, or balances related to the Escrow Deposits.

225. At the January 14, 2026 hearing before Justice Rivera, the truth was finally revealed: Graubard had transferred Plaintiffs' $2 million Escrow Deposits out of his IOLA almost immediately after he received them from Plaintiffs on December 6, 2024.

226. Goldberg confirmed to Justice Rivera at the January 14, 2026 hearing that, according to the December 2024 bank statement, on December 6, 2024, $2.5 million went out of Graubard's IOLA account-including the $2 million that Defendants had deposited.

227. Goldberg further confirmed at the January 14, 2026 hearing that Valley National Bank had closed Graubard's IOLA as of June 30, 2025—weeks before the July 17, 2025 Deposit Order was even issued.

228. These revelations demonstrated that, throughout the entirety of this litigation, from the filing of the State Court Action and TRO in February 2025 through multiple court orders re-

quiring the deposit or return of the Escrow Deposits, Graubard never possessed the $2 million he was repeatedly ordered to deposit with the Court.

229. The January 14, 2026 hearing thus confirmed that the representations made by Graubard, Seddio, Sprei, Rubin, and their agents throughout the State Court Action—including repeated assurances that Graubard would comply with court orders to deposit Plaintiffs' Escrow Deposits with the clerk of the court—were false when made. At no point during the State Court Action did Graubard have the ability to comply with any order directing him to deposit the $2 million because those funds had been disbursed to a third party at Sprei's direction on December 6, 2024, before the State Court Action was even commenced.

230. Defendants were aware of this fact before and at the time they commenced the sham litigation. Despite this fact, Defendants knowingly, deceitfully, and maliciously prosecuted for nine months a meritless litigation through which they sought relief, on an emergency basis, that they did not want or need. Defendants utilized the State Court Action and abused process for the improper purpose of shielding their unlawful behavior and preventing Plaintiffs from obtaining the Escrow Deposits that were rightfully theirs.

### O.   Plaintiffs' Injuries Are Ongoing

231. The ongoing theft of Plaintiffs' Escrow Deposits has caused, and continues to cause, significant financial injuries, including the $2 million in original principal, tens of thousands of dollars (and counting) in foregone interest payments that Plaintiffs would have received by maintaining the $2 million in a savings account, lost opportunities to obtain investment returns above and beyond simple interest in an amount to be determined at trial, and millions of dollars (and counting) in legal expenses to defend against the sham State Court Action and prosecute this action, which Defendants have also willfully protracted through their violation of multiple of this

Court's orders as part of their continued goal of delaying process and deterring Plaintiffs from relying on the justice system to protect and enforce their unquestionable and unqualified rights.

232.    In addition, Defendants' misconduct has had the effect of tarnishing the reputation of the American judicial system in the eyes of foreign investors like Plaintiffs, who previously admired American courts' commitment to the rule of law. Defendants' seeming ability to get away with a heist of $2 million in broad daylight, through transparent lies and abuses of legal process, makes a mockery of those ideals. It must be stopped.

## CAUSES OF ACTION

### COUNT 1
### Declaratory Judgment
### 28 U.S.C. § 2201
### (Against Graubard, Sprei, Rubin, and Frankl)

233.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

234.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration," and "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

235.    Here, an actual and substantial controversy exists among Plaintiffs, Graubard, Sprei, Rubin, and Frankl concerning the scope and extent of Plaintiffs' rights to the $2 million Escrow Deposits they entrusted to Graubard in December 2024.

236.    Plaintiffs' interests in the Escrow Deposits are real and adverse to the purported interests of Graubard, Sprei, Rubin, and Frankl.

237.    This controversy is ripe for adjudication because Graubard, Sprei, Rubin, and Frankl are continuing to repudiate and interfere with Plaintiffs' rights to the Escrow Deposits, and Plaintiffs' injuries are ongoing.

238.    Accordingly, Plaintiffs are entitled to a declaratory judgment that the Escrow Agreements grant Plaintiffs exclusive and preclusive rights to obtain the return of the Escrow Deposits, the Escrow Agreements require Graubard to unconditionally return the Escrow Deposits to Plaintiffs immediately, and Plaintiffs' rights to recover the Escrow Deposits are superior to any interests that Graubard, Sprei, Rubin, and Frankl may claim to have in preventing their recovery.

**COUNT 2**
**Breach of Contract**
**(Against Graubard)**

239.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

240.    Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

241.    Plaintiffs performed all of their obligations under the Escrow Agreements.

242.    Graubard failed to perform his unqualified obligation to return Plaintiffs' Escrow Deposits upon their demand pursuant to Paragraph 4 of the Escrow Agreements.

243.    As a direct and proximate result of Graubard's breach of the Escrow Agreements, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

**COUNT 3**
**Tortious Interference with Contract**
**(Against Sprei, Seddio, Rubin, and Frankl)**

244.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

245.    Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

246.    Sprei, Seddio, Rubin, and Frankl have had knowledge of the Escrow Agreements.

247.    Sprei intentionally and improperly procured a breach of the Escrow Agreement by instructing Graubard not to release the Escrow Deposits to Plaintiffs and by working in concert

52

with Seddio and Rubin to initiate and prosecute the sham State Court Action under false pretenses and for improper collateral purposes.

248.    Seddio and Rubin intentionally and improperly procured a breach of the Escrow Agreements by initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and assisting Graubard's contempt of the Deposit Order, Interim Order, and Superceding Contempt Order.

249.    Frankl intentionally and improperly procured a breach of the Escrow Agreements by instructing and working with Graubard to release the Escrow Deposits to third-party entities for the benefit of Sprei and Rubin, knowing that Frankl himself lacked authority from Plaintiffs to do so and that the Escrow Agreements prohibited the transfer of the Escrow Deposits absent Plaintiffs' consent.

250.    As a direct and proximate result of Sprei's, Seddio's, Rubin's, and Frankl's misconduct, Graubard breached the Escrow Agreements, and Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

251.    Because Sprei, Seddio, Rubin, and Frankl acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

### COUNT 4
### Breach of Fiduciary Duty
### (Against Graubard)

252.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

253.    Graubard owes Plaintiffs fiduciary duties in his capacity as their escrow agent, including a strict obligation to protect Plaintiffs' rights in connection with their Escrow Deposits and a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

254. Graubard breached his fiduciary duties to Plaintiffs by placing interests of others above Plaintiffs' exclusive rights to their Escrow Deposits.

255. Graubard further breached his fiduciary duties to Plaintiffs by refusing to return the Escrow Deposits to Plaintiffs in strict compliance with his unqualified obligations under the Escrow Agreements.

256. Graubard further breached his fiduciary duties to Plaintiffs by, on information and belief, dissipating their Escrow Deposits and/or transferring them to one or more third parties.

257. As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

258. Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 5
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Sprei, Seddio, Rubin, and Frankl)

259. Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

260. As alleged in Count 4, Graubard breached his fiduciary duties to Plaintiffs.

261. Sprei, Seddio, Rubin, and Frankl each have had actual knowledge of Graubard's fiduciary duties to Plaintiffs in his capacity as their escrow agent, including a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

262. By directing and working with Graubard to transfer the Escrow Deposits to third party entities absent Plaintiffs' consent or knowledge, directing Graubard not to return the Escrow Deposits to Plaintiffs, and working in concert with Seddio, Rubin, and Graubard to initiate and prosecute the sham State Court Action to give cover to and allow the continuation of Graubard's breach, Sprei substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

54

263. By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and assisting Graubard's contempt of the Deposit Order, Interim Order, and Superceding Contempt Order, Seddio and Rubin substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

264. By directing Graubard to dissipate the Escrow Deposits by transferring them to third-party entities for the benefit of Sprei and Rubin and absent Plaintiffs' consent or knowledge, Frankl and Sprei substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

265. As a direct and proximate result of Sprei's, Seddio's, Rubin's, and Frankl's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

266. Because Sprei, Seddio, Rubin, and Frankl each acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

### COUNT 6
### Abuse of Process: February 19, 2025 TRO
### (Against Sprei, Seddio, and Rubin)

267. Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

268. On February 19, 2025, Sprei, Seddio, and Rubin together obtained and employed regularly issued process in the State Court Action, namely TRO compelling Graubard not to return Plaintiffs' Escrow Deposits and Plaintiffs to forbear from obtaining the return of their Escrow Deposits.

269. As evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, Sprei, Seddio, and Rubin intended, without excuse or justification, to harm Plaintiffs' exclusive rights to their Escrow Deposits.

270.    As evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, Sprei, Seddio, and Rubin employed the TRO to obtain a collateral objective outside the legitimate ends of the process, namely to give the false appearance of legality to the misappropriation of Plaintiffs' funds by Graubard, Sprei, Frankl, and those working in concert with them, to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their associates had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

271.    As evidenced by their subsequent and strategically timed discontinuance of any claims in the State Court Action, Sprei, Seddio, and Rubin knew the TRO had been improperly obtained.

272.    Sprei, Seddio, and Rubin's actions demonstrate a perversion of the legal process for a purpose not justified by the nature of the process at issue.

273.    As a direct and proximate result of Sprei, Seddio, and Rubin's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and the instant action, in an amount to be determined at trial.

274.    Because Sprei, Seddio, and Rubin acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 7**
**Abuse of Process: December 8, 2025 TRO**
**(Against Graubard and Sprei)**

275.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

276.    On December 8, 2025, Graubard and Sprei obtained and employed regularly issued process in the State Court Action in the form of a TRO. The December 8 TRO enjoined enforcement of the Superceding Contempt Order until December 12, 2025.

56

277. Graubard and Sprei directly participated in obtaining the preparation of the December 8 TRO.

278. The December 8 TRO was entirely without legal merit, as it did not even reference irreparable and imminent harm, the touchstone requirements for a temporary restraining order.

279. On information and belief, and as evidenced by their conduct in filing five additional and near identical seriatim TROs after obtaining the December 8 TRO, Graubard and Sprei intended to harm, without excuse or justification, Plaintiffs' exclusive rights to their Escrow Deposits.

280. On information and belief, and as evidenced by their conduct in filing five additional and near identical seriatim TRO's after the December 8 TRO was issued, Graubard and Sprei employed the December 8 TRO to obtain a collateral objective outside the legitimate ends of the process, namely to hide the fact that Graubard and his associates had immediately dissipated the Escrow Deposits more than a year earlier and to prevent Plaintiffs from discovering the truth about their stolen funds.

281. Graubard's and Sprei's actions demonstrate a perversion of the legal process for a purpose not justified by the nature of the process at issue.

282. As a direct and proximate result of Graubard's and Sprei's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate the sham State Court Action, in an amount to be determined at trial.

283. Because Graubard and Sprei acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 8
### Malicious Prosecution
### (Against Seddio, Sprei, Graubard, and Rubin)

284. Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

285. Seddio, Sprei, Graubard, and Rubin worked in concert to commence and prosecute the State Court Action against Plaintiffs.

286. Sprei actively participated in and controlled the State Court Action from the moment of its initiation until (and through) its discontinuance.

287. Graubard also directly participated, including through his agents Sprei and Gorkin, in the prosecution of the State Court Action, including by drafting correspondence and documents for Seddio to submit to the court on behalf of the purported Plaintiff.

288. Rubin had actual knowledge that the State Court Action was initiated and was being prosecuted in his name by and through his own attorney and agent, Seddio, and affirmatively or constructively approved the prosecution of the sham State Court Action in his name. Rubin remained in constant contact with Sprei throughout the pendency of the State Court Action regarding the developments and Defendants' strategy there and even worked in concert with Seddio, Graubard, and Sprei to engineer (unsuccessfully) an adjournment of the November 5, 2025 contempt hearing before Justice Monteleone to avoid a ruling on Graubard's contempt of the July 17, 2025 Deposit Order.

289. The initiation and prosecution of the State Court Action substantially interfered with Plaintiffs' property rights in the Escrow Deposits.

290. Seddio, Sprei, Graubard, and Rubin acted with malice in commencing and prosecuting the State Court Action.

291. Seddio, Sprei, Graubard, and Rubin had no probable cause to believe the State Court Action could succeed.

292. No complaint was ever filed in the State Court Action.

293. The State Court Action was terminated in favor of Plaintiffs when it was voluntarily discontinued on November 6, 2025.

294. Plaintiffs suffered special damages as a result of the State Court Action.

295. Because Seddio, Sprei, Graubard, and Rubin acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 9
### Attorney Deceit and Collusion
### N.Y. Judiciary Law § 487
### (Against Seddio)

296. Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

297. New York Judiciary Law § 487(1) provides that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

298. Seddio is an attorney admitted to practice in New York.

299. In connection with the State Court Action, Seddio engaged in numerous acts of deceitful and collusive conduct, with the intention of deceiving the court and other parties, including, but not limited to, (a) misrepresenting that Olden LLC's motion for a TRO had to be heard on an emergency, *ex parte* basis; (b) submitting a knowingly false and fraudulent affidavit from Rubin in support of the TRO and preliminary injunction; (c) purporting to unilaterally extend the state court's Deposit Order deadline before directing Graubard not to deposit the funds, in violation of the Deposit Order; (d) making false and fraudulent representations to Justice Mostofsky's Chambers concerning the reasons for Graubard's failure to deposit the $2 million with the clerk of the court as ordered; and (e) orchestrating the recusal of one or more presiding judges.

59

300.    As a direct and proximate result of Seddio's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and this action, in an amount to be determined at trial.

301.    Plaintiffs are entitled to treble damages.

**COUNT 10**
**Attorney Deceit and Collusion**
**N.Y. Judiciary Law § 487**
**(Against Graubard)**

302.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

303.    New York Judiciary Law § 487(1) provides that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

304.    Graubard is an attorney admitted to practice in New York.

305.    In connection with the State Court Action, Graubard engaged in numerous acts of deceitful and collusive conduct, with the intention of deceiving the court and other parties, including, but not limited to, (a) submitting knowingly false and fraudulent correspondence to the court falsely indicating that Graubard continued to possess and was capable of returning Plaintiffs' $2 million Escrow Deposits; (b) making false and fraudulent representations for Seddio to relay to Justice Mostofsky's Chambers concerning the reasons for Graubard's failure to deposit the $2 million with the clerk of the court as ordered; and (c) orchestrating the recusal of one or more presiding judges.

306.    As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and this action, in an amount to be determined at trial.

307.    Plaintiffs are entitled to treble damages.

## COUNT 11
## Conversion
## (Against Graubard)

308.    This claim is brought in the alternative to Count 2 (breach of contract).

309.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

310.    The Escrow Deposits constitute identifiable funds of money belonging to Plaintiffs alone.

311.    Graubard has exercised dominion, ownership, and control of the Escrow Deposits without legal authorization.

312.    Plaintiffs made repeated demands to Graubard for the immediate return of the Escrow Deposits.

313.    Graubard refuses to return the Escrow Deposits to Plaintiffs.

314.    As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

315.    Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 12
## Aiding and Abetting Conversion
## (Against Sprei, Seddio, Rubin, and Frankl)

316.    This claim is brought in the alternative to Count 3 (tortious interference).

317.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

318.    As alleged in Count 11, Graubard unlawfully converted Plaintiffs' Escrow Deposits.

319.    Sprei, Seddio, Rubin, and Frankl each have had actual knowledge of Graubard's conversion of Plaintiffs' funds.

61

320.    By directing Graubard to transfer the Escrow Deposits out of his IOLA, Frankl substantially assisted Graubard's conversion of Plaintiffs' Escrow Deposits.

321.    By directing and working with Graubard to transfer the Escrow Deposits to third party entities, directing Graubard not to return the Escrow Deposits to Plaintiffs, and by working in concert with Seddio and Rubin to initiate and prosecute the sham State Court Action under false pretenses and for improper collateral purposes, Sprei substantially assisted Graubard's conversion of Plaintiffs' Escrow Deposits.

322.    By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and unilaterally extending the deadline for, then coordinating Graubard's violation of, the state court's Deposit Order, Interim Order, and Superceding Contempt Order, Seddio and Rubin substantially assisted in Graubard's conversion of Plaintiff's Escrow Deposits.

323.    As a direct and proximate result of Sprei's, Seddio's, Rubin's, and Frankl's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

324.    Because Sprei, Seddio, Rubin, and Frankl each acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

### COUNT 13
### Unjust Enrichment
### (Against Sprei and Rubin)

325.    This claim is brought in the alternative to Count 3 (tortious interference), Count 5 (aiding and abetting breach of fiduciary duty), and Count 12 (aiding and abetting conversion).

326.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

62

327.    Sprei was enriched by the transfer of Plaintiffs' Escrow Deposits, which Sprei directed, from Graubard's IOLA to 536 Holdings and Queen Entities for the purpose of directing those funds to fund Sprei's other investments and satisfy his outstanding debts.

328.    The benefit Sprei received was both specific and direct, as Sprei directed the transfer of Plaintiffs' Escrow Deposits for the specific purpose of funding his personal debts and investment positions.

329.    Sprei personally obtained a possessory and/or investment interest in Surf 9 and other assets that he would not otherwise have held, using Plaintiffs' Escrow Funds rather than his own capital.

330.    Rubin, via Queen Equities, was enriched by Plaintiffs' Escrow Deposits, which Queen Equities—i.e. Rubin, received from Graubard's IOLA as follows: via a $350,000 check deposit on December 6, 2024 and a $250,000 wire on December 12, 2024.

331.    The relevant portions of Plaintiffs' Escrow Funds deposited into Queen Equities' account were, in substance, placed under Rubin's direct and personal control.

332.    Rubin, as the sole manager and ninety-nine percent owner of Queen Equities, used those funds for his own personal benefit.

333.    The direct and specific benefit Rubin received from the Escrow Deposits was separate and apart from, and independent of, his role as the sole manager and member of Queen Equities.

334.    While Sprei and Rubin benefitted from their receipt of Plaintiffs' Escrow Funds, Plaintiffs suffered harm by being denied the return of their Escrow Deposits.

335.    Equity and good conscience weigh against permitting Sprei and Rubin to retain the benefits each personally obtained from Plaintiffs' Escrow Funds.

63

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.      an order declaring that Plaintiffs have exclusive rights to the Escrow Deposits, that Defendants' actions, as set forth above, constitute violations of the common law set forth above, and that Defendants are liable to Plaintiffs, as described herein, for damages arising therefrom;

B.      a judgment awarding Plaintiffs all appropriate actual damages permitted by law, in an amount to be determined at trial, but no less than $2 million;

C.      a judgment awarding Plaintiffs exemplary, punitive, and/or treble damages, as permitted by law;

D.      a judgment awarding Plaintiffs equitable, injunctive, and/or declaratory relief as may be appropriate, including, but not limited to, specific performance, rescission, restitution, and disgorgement;

E.      a judgment awarding Plaintiffs pre- and post-judgment interest, as permitted by law;

F.      a judgment awarding Plaintiffs costs and fees, including attorneys' fees, as permitted by law; and

G.      such other legal, equitable, or further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all issues so triable as a matter of right.

Dated:  New York, NY
July 13, 2026

Respectfully submitted,

By:   /s/   *Lauren J. Zimmerman*

Lauren J. Zimmerman
BENESCH, FRIEDLANDER, COPLAN & AR-
ONOFF LLP
1155 Avenue of the Americas, Floor 26
New York, NY 10036
Tel: (646) 356-6023
lzimmerman@beneschlaw.com

Jennifer M. Selendy
Lauren J. Zimmerman
Babak Ghafarzade
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
jselendy@selendygay.com lzimmer-
man@selendygay.com bghafarzade@selendy-
gay.com

*Attorneys for Plaintiffs Angelos Metaxas and
Pertshire Investments LP*