# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELOS METAXAS and PERTSHIRE INVEST-MENTS LP,<br><br>Plaintiff,<br><br>v.<br><br>MARK DAVID GRAUBARD, ESQ. d/b/a M. DA-VID GRAUBARD, YESCHIEL SHIMON "SAM" SPREI, FRANK R. SEDDIO, ESQ., and JONA-THAN RUBIN,<br><br>Defendants,<br><br>v.<br><br>CHASKEL FRANKL a/k/a CHASKEL FRANKEL,<br><br>Third-Party Defendant. | Case No. ⸺⸺1:25-cv-05844-EK-PCG<br><br>Jury Demanded |

# AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs Angelos Metaxas and Pertshire Investments LP, through their undersigned attorneys, ~~Selendy Gay PLLC,~~ for their Amended and Supplemental ~~c~~Complaint against ~~Defendants~~ Mark David Graubard, Esq. d/b/a M. David Graubard, Esq. ("Graubard"), Yeschiel Shimon "Sam" Sprei ("Sprei"), Frank R. Seddio, Esq. ("Seddio"), ~~and~~ Jonathan Rubin ("Rubin"), and Chaskel Frankl a/k/a Chaskel Frankel ("Frankl"), allege as follows:

## NATURE OF THE ACTION

1.      This case is about the ongoing theft of $2 million by a group of con artists, including New York lawyers, and their subsequent abuse of the state and federal judicial ~~process~~systems to create a smokescreen for their brazen illegality.

2.      In connection with a potential investment opportunity with Defendant Sprei, whom Plaintiffs were falsely led to believe was an honest and successful businessman, in December 2024,

28937426 v1

Plaintiffs placed $2 million in escrow (the "Escrow Deposits") with Defendant Graubard, an attorney barred in the state of New York, for the sole purpose of demonstrating their financial ability to pursue the investment.

3. Unbeknownst to Plaintiffs, Graubard was not an independent, professionally responsible attorney, but a longtime associate of Sprei with whom, on information and belief, Defendants Graubard, Seddio, Rubin, Frankl, and others have, on multiple occasions, worked together to steal money from and engage in abuse of process and judicial deceit against innocent would-be investors.

4. Despite their unwitting entrance into a well-established embezzlement scheme to steal their funds, Plaintiffs' $2 million in escrow deposits ("Escrow Deposits") were supposed to be protected by airtight escrow agreements (each an "Escrow Agreement") with Graubard through which Graubard covenanted that no one, other than Plaintiffs and their assigns, would have the right to the Escrow Deposits and which provide Plaintiffs with the unfettered ability to demand the return of their Escrow Deposits for any reason and at any time.

5. Despite his unambiguous and unqualified legal obligations to maintain and preserve the Escrow Deposits unless and until instructed otherwise by Plaintiffs, Graubard transferred the Escrow Deposits to a third party at the instruction of Sprei and Frankl almost immediately after receiving them. Graubard did not seek the approval of or provide notice to Plaintiffs before transferring their Escrow Deposits.

6. 5. Approximately one month lafter providing Graubard with their Escrow Deposits, Plaintiffs completed their due diligence on the potential investment, decided not to pursue the venture with Sprei, and demanded the return of their deposits pursuant to their unqualified contractual right to do so.

7. Despite acknowledging Plaintiffs' demands, for weeks, Graubard stalled in fulfilling his obligation to return the Escrow Deposits, including by blaming ~~the~~his bank for ~~his~~the delay ~~and then going so far as to~~. In an attempt to conceal the unlawful dissipation and transfer of the Escrow Deposits, Frankl, whom Graubard held out to Plaintiffs as *his* agent, aided in Graubard's stall tactics by provid~~e~~ing a false federal wire identification number to Plaintiffs as "proof" that ~~he~~Graubard had returned their funds. ~~Eventually, however,~~ when, in fact, he had not.

8. After weeks of receiving blatant falsehoods regarding the return of their funds, Plaintiffs engaged counsel who sent a demand letter to Graubard requesting the return of their funds pursuant to the plain language of the Escrow Agreements as well as proof that their Escrow Deposits remained in Graubard's attorney interest on lawyer account ("IOLA"),[1] as required by the Escrow Agreements.

9. In response, Graubard ~~admitted~~falsely represented to Plaintiffs' counsel that he was *withholding* Plaintiffs' $2 million at Sprei's direction~~, claiming, for~~. For the first time, Graubard now claimed that Sprei was his own client ~~to whom he~~and was owed a competing fiduciary obligation~~.~~ by Graubard. The truth, as Plaintiffs learned much later, was that Graubard no longer possessed the Escrow Deposits and was frantically pressuring Sprei to obtain replacement funds from another source.

10. Graubard and Sprei then attempted, in concert, to delay and extort Plaintiffs by conditioning the purported return of their Escrow Deposits on Plaintiffs' execution of a legal agreement releasing Sprei from any potential claims. Even that ploy was a sham, as Graubard and Sprei did not at that time have $2 million in their possession to repay Plaintiffs.

---

[1] IOLAs are a type of attorney escrow account required to hold certain client funds pursuant to N.Y. Judiciary Law § 497 and regulations promulgated thereunder.

11.    ~~6.~~ When Plaintiffs refused to be extorted and reported Sprei and Graubard's illegal conduct to law enforcement, ~~Graubard and Sprei called upon their longtime associate, Seddio, an attorney barred in the state of New York, to file a completely bogus~~ Sprei, Seddio, Graubard, and Rubin worked in concert to commence a sham action in Kings County Supreme Court (the "State Court Action")~~, purportedly challenging Plaintiffs' rights to recover~~ ~~their Escrow Deposits. The State Court Action, which~~ ~~was initiated on February 19, 2025, was not filed by Graubard or Sprei. Instead,~~ ~~the State Court Action was~~ ~~brought by Seddio on behalf of Rubin, a complete stranger to Plaintiffs, acting through an apparently fictitious company, Olden LLC. Plaintiffs have since come to understand that Rubin and Sprei are also longtime associates.~~ claiming that there was a dispute as to the proper ownership of the Escrow Deposits despite these Defendants' actual or constructive knowledge that only Plaintiffs had any right to the Escrow Deposits and that the Escrow Deposits had already been unlawfully dissipated. The purpose of the State Court Action was to give cover to the ongoing theft of the Escrow Deposits and buy time for Sprei and Graubard to come up with replacement funds and interfere with Plaintiffs' ability to pursue relief.

~~7. Rather than filing a complaint, Seddio commenced the State Court Action by simple summons, and a one-sentence notice falsely asserting that there were "competing claims"~~ ~~to Plaintiffs' Escrow Deposits. On information and belief, the true~~ ~~purpose of the State Court Action was to manufacture a fake legal dispute that Graubard and Sprei could point to if law enforcement came knocking at their door and which would prevent any further attempts by Plaintiffs to recover their funds through legal or other process.~~

12.    Although the initial drafts of the case-initiation papers—prepared by Ethan A. Kobre ("Kobre"), one of Sprei's many attorneys—correctly named Sprei's company Olden Group

4

LLC as the plaintiff, identified Sprei as the supporting affiant, and correctly spelled Graubard's name, Sprei and Seddio chose to falsify those papers to mislead the court, Plaintiffs, and the public.

13.    Together, Sprei and Seddio altered the name of the purported plaintiff to "Olden LLC," a fictitious company, revised the affirmation to be under Rubin's name, intentionally misspelled Rubin's first name as "Johnathan," affixed a legally defective electronic /s/ signature to Rubin's purported affirmation instead of a hand-drawn signature, and intentionally misspelled Graubard's name as "Graubart."

14.    Rubin and Graubard knew the case-initiation papers were fraudulent and either approved of them anyway or did nothing to correct the falsehoods therein.

15.    Indeed, Sprei informed Rubin that he did not want the filings to accurately identify Sprei or his company Olden Group LLC because he was concerned the dispute would interfere with another pending case, captioned *Olden Group LLC v. Body Glove International Inc. et al.*, Index No. 533445/2024, that Seddio had commenced on Sprei's behalf in Kings County Supreme Court in December 2024. Sprei also told Rubin that he believed no one would be "dumb enough" to believe that Rubin himself signed a document misspelling his own name—on information and belief, a cover Rubin could (and did) later use in an attempt to dispel any liability for the fraudulent filings.

16.    8. To accomplish this goal, on the same day Seddio commencedIn initiating the sham State Court Action, he also requested, on an *ex parte* basis,Seddio—acting as counsel to Sprei and Rubin and working in concert with them—abused process to unlawfully obtain a temporary restraining order ("TRO") directing Graubard to either continue holding Plaintiffs' Escrow Deposits or deposit the funds with the clerk of court—acts which Seddio, Sprei, Rubin, and Graubard knew or constructively knew Graubard could not complete, and barring Plaintiffs from taking

5

any action to recover their ~~money~~Escrow Deposits pending a ~~preliminary injunction~~preliminary-injunction hearing.

17.     ~~9.~~ Despite ~~their~~his claimed need for ~~an~~ emergency ~~order restraining Graubard from returning Plaintiffs' deposits, once the TRO was granted~~relief, Seddio—acting in concert with at least Sprei, Graubard, and Rubin ~~actively resisted its~~—spent the next nine months delaying, through false ~~imrepl~~representation~~s~~, frivolous filings, and repeated~~ly tried to pre~~leventh hour stall tactics, the adjudication of the State Court Action ~~from proceeding on the merits. Specifically, Seddio and Rubin ignored their legal obligations to serve a copy of the TRO on Graubard or file a complaint setting forth the purported factual and legal bases for Olden LLC's claims in direct violation of New York's Civil Practice Law and Rules ("CPLR") § 3012(b). In addition, Seddio repeatedly sought and obtained adjournments of the preliminary injunction hearing he requested and ultimately did not even appear at the hearing. And finally, at the preliminary injunction hearing, Seddio directed his agent to argue~~ *against* ~~the very relief Seddio had requested in his order to show cause motion—that Graubard be ordered to deposit Plaintiffs' Escrow Deposits with the clerk of the court—instead arguing that Graubard should be permitted, without restriction, to continue holding Plaintiffs' Escrow Deposits. In response, the court noted that its hands were tied by the language of Seddio's own order to show cause motion requesting that Graubard be ordered to deposit the funds with the court.~~ *they* initiated for the sole purpose of concealing the theft of Plaintiffs' Escrow Deposits. And at no point during their over nine-month prosecution of the action did Graubard, Sprei, Seddio, or Rubin notify the Court that the Escrow Deposits had been unlawfully dissipated before the State Court Action was commenced.

18.     Indeed, every time Plaintiffs caught a glimmer of justice in the State Court Action, Seddio, Sprei, and Graubard took steps to manipulate the proceedings in their favor.

6

19.    10. Within hours of the court's order After obtaining an order from the court granting Seddio's preliminary injunction motion and ordering Graubard to deposit Plaintiffs' Escrow Deposits with the clerk of the eCourt by July 21, 2025, *Seddio* emailed Plaintiffs offering (on behalf of Olden LLC) to return the Escrow Deposits and pay an additional $35,000 to settle the State Court Action, confirming Seddio's control over Graubard and Plaintiffs' Escrow Deposits. Graubard, Sprei, and Seddio worked in concert to file a bogus stipulation extending the court ordered deadline for Graubard's deposit of Plaintiffs' funds. When the court asked why the funds had not been deposited in accordance with its July 17, 2025 order, Sprei, Seddio, and Graubard provided a false excuse for the delay claiming that the money had not been deposited because Seddio intended to oversee the process but was unavailable to do so on the court-ordered date.

11. After Plaintiffs declined Seddio's illusory settlement offer, Seddio and Graubard again abused process and violated the law.  First, Seddio and Graubard's attorney filed a stipulation purporting to unilaterally extend the court-ordered deposit deadline, then flouted even their self-imposed deadline by not depositing Plaintiffs' funds.  In response to a direct inquiry from the state court judge's principal law clerk as to why the court's order had been violated, on July 25, 2025, Seddio admitted in writing that *he had directed Graubard not to deposit the funds* with the clerk's office. Seddio further stated that *he* would ensure that Graubard would make the deposit the following week, but that, too, was a lie.

20.    On July 31, 2025, the same day that the presiding judge held a sanctions hearing regarding Graubard's failure to submit the Escrow Deposits to the clerk of the court, Sprei, Graubard, and on information and belief Seddio conspired to substitute Graubard's then-counsel of record for a new attorney, previously unknown to Graubard but well known to Sprei and Seddio, whose longstanding friendship with the presiding judge Sprei, Seddio, and Graubard believed

7

would cause his immediate recusal. Their plot was successful: the presiding judge recused himself within twenty-four hours of the substitution and before he could issue a ruling.

21.     On November 6, 2025, the day after the third presiding judge found Graubard in contempt of court for his failure to submit the Escrow Deposits into court, Seddio, Sprei, and Graubard worked in concert to discontinue the claims in the State Court Action, with the aim of depriving the court of jurisdiction to enforce its contempt order or at least further delaying the proceedings. The State Court, however, rejected Seddio, Sprei, and Graubard's frivolous argument that the court could not punish pre-discontinuance conduct.

22.     On December 15, 2025, in an effort to derail enforcement of the contempt order's requirement that Graubard file his IOLA records showing the treatment and status of the Escrow Deposits, Seddio, Sprei, and Graubard conspired to bring a new law firm, Aidala Bertuna & Kamins P.C. ("ABK"), into the State Court Action with the aim of causing the third presiding judge's recusal because ABK was representing that judge in a separate, unrelated litigation. This egregious gambit was also successful, as the judge immediately recused himself in response to a letter Seddio filed falsely informing the court that Seddio had retained ABK to represent him in a sanctions motion returnable months later.

23.     It was only on January 14, 2026, when faced with the prospect of his immediate civil commitment for disobeying the state court's order to file bank records, that Graubard finally admitted, in open court, to having transferred the Escrow Deposits out of his IOLA in December 2024 at Sprei's instruction and never having been in possession of the funds during the pendency of the State Court Action.

24.     To this day, Plaintiffs' Escrow Deposits have not been returned to them.

8

25. 12. To this day over nine months since Plaintiffs demanded the return of their Escrow Deposits pursuant to the Escrow Agreements, Graubard still has not deposited Plaintiffs' Escrow Deposits with the clerk's office, depriving Plaintiffs of substantial property that unquestionably belongs to them and no one else. In addition,And as a direct result of Defendants' intentional, deliberate, and outrageous misconduct, Plaintiffs have lost out on tens of thousands of dollars in interest they could have otherwise earned onnot only been deprived of their $2 million, lost opportunities to obtain investment returns above and beyond simple Escrow Deposits, plus interest, and havefor eighteen months and counting, but they have also been forced to incur hundreds of thousandsmillions of dollars in legal fees to defend againstlitigate the sham State Court Action and commence this action to enforce their rights.

13. Plaintiffs bring this action to vindicate their rights and punish Defendants for their flagrant and intentional misconduct.

## THE PARTIES

26. 14. Plaintiff Metaxas is a resident of Switzerland.

27. 15. Plaintiff Pertshire is a limited partnership organized under the laws of New Zealand and a citizen of New Zealand and Italy for purposes of 28 U.S.C. § 1332.

28. 16. On information and belief, Defendant Graubard is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

29. 17. On information and belief, Defendant Seddio is an attorney admitted to practice in New York, is a citizen of New York, and maintains a residence and professional office in this judicial district.

30. 18. On information and belief, Defendant Rubin is a citizen and resident of New Jersey.

31.    ~~19. On information and belief,~~ Defendant Sprei is a citizen of New York, resides in this judicial district, and serves as the managing member of non-party Olden Group LLC ("Olden Group"), a limited liability company organized under the laws of New York and headquartered in this judicial district.

32.    Third-Party Defendant Frankl is a citizen and resident of New York.

**JURISDICTION AND VENUE**

33.    ~~20.~~ This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because this action is between citizens of New York and New Jersey (all Defendants) and citizens of a foreign state (all Plaintiffs), who are not lawfully admitted for permanent residence in the United States and are not domiciled in New York, and the amount in controversy exceeds $75,000.

34.    ~~21.~~ This Court has general personal jurisdiction over Defendants Graubard, Seddio, ~~and~~ Sprei, and Frankl because they are each domiciled in New York.

35.    ~~22.~~ The Court has specific personal jurisdiction over Defendant Rubin pursuant to CPLR § 302(a)(2) because Plaintiffs' claims against Rubin arise out of his tortious acts committed in New York, particularly in this judicial district.

36.    The Court also has specific personal jurisdiction over Rubin by virtue of his participation in this Action, including substantial discovery, since it was commenced on October 17, 2025, without any objection to the Court's exercise of jurisdiction over him.

37.    ~~23.~~ Venue is ~~additionally~~ proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district~~.~~

~~24.~~ , as well as ~~Venue is additionally proper in this judicial district under 28 U.S.C. § 1391(b)(2)~~ because a substantial part of the property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

### A. Plaintiffs Are Introduced to Sprei by Attorney Paul Montclare, Who Misrepresents Sprei as an Honest Businessman

### A.  Sprei Induces Plaintiffs to Put Substantial Funds in Escrow By Falsely Claiming He Needs Proof of Their Liquidity

38.  25. In or around November 2024, an advisor to Plaintiff Pertshire, non-party Javier Macaya ("Macaya"), was introduced to Sprei by Paul Montclare, a partner at the New York office of the law firm Mitchell Silberberg & Knupp LLP ("Montclare"), an attorney who had done work for both Macaya and Sprei in the past. Montclare represented that he "personally ha[d] represented Sam [Sprei] in business transactions," and that Montclare's wife, Lauren Wachtler, ("Wachtler"), was Sprei's "trusted advisor on many of his business deals." Montclare described Sprei as "honest and true to his word," and as being "very successful."

39.  26. During a conversation on or around November 15, 2024, Sprei proposed to Macaya that he consider a potential investment opportunity with Sprei, through Sprei's company Olden Group, in a the outdoor and sports equipment company called Surf 9 LLC ("Surf 9," (or the "Potential Investment").

40.  27. After meeting Sprei, Macaya expressly asked Montclare whether he would say, based on his knowledge of Sprei, as well as Wachtler's work with Sprei, that Sprei was "a careful manager of his investment portfolio and an honest partner to his co-investing partners?" Montclare responded, "Absolutely."

41.  28. Contrary to Montclare's representations, however, and as Montclare well knew, Sprei is neither honest nor successful.

42.  29. For example, in a sworn affidavit filed in connection with a separate lawsuit against him, captioned *Shimon Avrahami v. Sam Sprei et al.*, Index No. 506581/2025 (N.Y. Sup. Ct. Kings Cty.), Sprei admitted that, in November and December 2019, he induced the plaintiff in

11

that matter to invest $1.1 million into two separate real-estate transactions, in Brooklyn and in New Jersey, but kept the money for himself instead. Sprei admits that he improperly "retained [Avrahami's] investment without legal basis or authorization." A copy of Sprei's affidavit is attached hereto as Exhibit 1. That lawsuit resulted in a $560,000 money judgment against Sprei.

43.    ~~30.~~ In another action, *Randy Chang et al. v. Sam Sprei*, Index No. 523209/2016 (N.Y. Sup. Ct. Kings Cty.), Sprei similarly admitted in a sworn affirmation confessing judgment that he had defaulted on his promise to repay $941,000 that he borrowed in 2014 from non-parties Randy Chang and Ann Hsiung. A copy of Sprei's affirmation is attached hereto as Exhibit 2. The litigation resulted in a money judgment of $871,225 against Sprei.

~~31. On information and belief, Montclare was aware of Sprei's unlawful practices, including repeated thefts of unwitting investors, when he introduced Plaintiffs to Sprei.~~

44.    ~~32.~~ While Montclare's ~~failed to disclose, and indeed lied about, his knowledge of Sprei's dishonesty and business failures to Plaintiffs~~description of Sprei as honest and successful was inaccurate, Montclare accurately described Sprei as "politically well-connected in Brooklyn[]"—to Defendant Frank Seddio, the former chair of the Kings County Democratic Committee, whom ~~Sprei would later engage~~ ~~in the State Court Action~~ ~~to manipulate~~ ~~the New York City civil court system~~ ~~as a means~~ ~~of shielding Sprei's many ongoing thefts.~~served as Sprei's ongoing litigation counsel for years in exchange for a retainer of $5,000 to $10,000 per week, depending on the workload. Seddio is also dependent on Sprei, whose cases account for approximately 80% of Seddio's litigation work and whose payments accounted for up to 40% of Seddio's law firm revenues.

45.    ~~33.~~ Based on Montclare's ~~false~~inaccurate representations about Sprei's character for honesty and fair dealing, Macaya informed Plaintiff Metaxas and ~~two~~three business associates,

non-parties Reda Maamari ("Maamari") ~~and~~, Phillip Elias Farid El-Khoury ("El-Khoury"), and Karim Gargour ("K. Gargour") about the Potential Investment, which Plaintiffs, Maamari, ~~and~~ El-Khoury, and K. Gargour (together, the "Potential Investors") decided to explore.

### ~~B. Sprei Induces Plaintiffs to Put Substantial Funds in Escrow By Falsely Claiming He Needs Proof of Their Liquidity~~

46. ~~34.~~ Before sharing substantive information about the Potential Investment, however, Sprei insisted that Plaintiffs, Maamari, ~~and~~ El-Khoury, and K. Gargour deposit "soft money in escrow" to demonstrate they were bona fide investors with sufficient liquidity to complete the Potential ~~Transaction~~Investment, if they so chose.

47. ~~35.~~ Having no issue with simply displaying their liquidity, Plaintiffs agreed ~~and engaged Montclare as their attorney to assist in drafting an~~in principle with Sprei's proposed approach, so long as the deposits were made pursuant to escrow agreements ~~for them~~confirming Plaintiffs' and their co-investors' unconditional rights to obtain the return of their respective deposits upon demand.

48. ~~36.~~ On or about December 3, 2024, Sprei emailed to Montclare and Macaya an initial draft escrow agreement, ~~naming~~ that appointed Graubard as the escrow agent, ~~to Montclare and Macaya~~. Montclare then sent a revised draft escrow agreement to Sprei and Macaya~~.~~, with Graubard remaining as the draft's identified escrow agent. Montclare expressly acknowledged to Macaya that these funds would be just for escrow and not for investment.

49. ~~37.~~ Upon seeing Graubard's name in the draft escrow agreement, Macaya asked Montclare whether Graubard worked for him and whether Montclare trusted Graubard. In response, Montclare made clear that it was *Sprei* who hand-picked Graubard to serve as Plaintiffs' escrow agent ~~but nonetheless vouched, extensively, for Graubard, writing, "No. He does not work for me, but he is a well-known bankruptcy attorney in Brooklyn and has been practicing for 30~~

13

years. He has a good reputation, and my wife [Wachtler] has worked with him on other deals and speaks highly of him." Montclare continued, "I think [that] is why Sam [Sprei] believes [Graubard] is a good person to hold these funds to show cash available so we can try to move forward to do the Surf 9 transaction." Montclare added, "Since this is a short-term IOLA attorney trust account with an attorney with years of successful [*sic*] I have no reason not to trust Mr. Graubard."[1].

38. On information and belief, Montclare was aware of Graubard's unlawful practices, including Graubard's ongoing work with Sprei to steal money from unwitting investors, when Montclare introduced Plaintiffs to Graubard.

**B.**        ~~C.~~ **Plaintiffs Execute Legal Agreements with Graubard Requiring Him to Hold $2 Million in Escrow for Plaintiffs' Sole and Exclusive Benefit and to Promptly Return the Escrow Deposits upon Plaintiffs' Demand**

50.        ~~39.~~ Based on Montclare's representations about Graubard, which turned out to be false, Plaintiffs (as well as their co-investors Maamari ~~and~~, El-Khoury, and K. Gargour's relative, Toufick Gargour ("T. Gargour")) each executed a materially identical Escrow Agreement with Graubard, each governed by New York law.

51.        Plaintiffs' valid and enforceable Escrow Agreements, as executed on December 5, 2024, are attached as Exhibits 3 ~~4~~ and 4.

52.        Sprei received a fully executed copy of Plaintiff Metaxas's Escrow Agreement with Graubard on December 5, 2025. And Sprei was aware that Pertshire had executed an identical Escrow Agreement with Graubard.

---

[1] "IOLA" refers to an "~~interest on lawyer account~~" for holding ~~certain client funds~~ that is governed by ~~N.Y. Judiciary Law § 497 and~~ related regulations.

14

53.    40. Pursuant to Paragraph 2 of each Escrow Agreement, each depositor agreed to deposit funds to into Graubard's IOLA ending in -1102 at the Valley National Bank branch located at 2054 86th Street, Brooklyn, NY 11214.

54.    41. Pursuant to Paragraph 3 of each Escrow Agreement, the "sole purpose" of the Escrow Deposits was to "establish" that each depositor "ha[d] available cash equal to" the amount of the Escrow Deposit. Paragraph 3 further provides, in bold capital letters, "**NOTHING IN THIS ESCROW AGREEMENT NOR THE DEPOSITING OF THE ESCROW AMOUNT SHALL BE CONSTRUED AS AN AGREEMENT OF ANY KIND MADE BY THE ESCROWEE IN CONNECTION WITH ANY ACTUAL OR POTENTIAL SURF 9 TRANSACTION OR ANY OTHER TRANSACTION.**"

55.    42. The Escrow Agreements expressly grant each depositor the unconditional right to have their Escrow Deposits returned upon demand. Paragraph 4 of each Escrow Agreement provides, in bold capital letters, "**THE ESCROW AMOUNT WILL BE RETURNED TO THE ESCROWEE,[2] OR ITS DESIGNEE, UPON ESCROWEE'S DEMAND, *WHICH RETURN SHALL BE MADE IN ESCROWEE'S SOLE AND ABSOLUTE DISCRETION*, IN ACCORDANCE [WITH] PARAGRAPH 5 OF THIS ESCROW AGREEMENT**" (emphasis italics added). Paragraph 5 provides that Graubard "shall" return an Escrow Deposit by wire transfer *within two business days* of each escrowee's request by email for such return.

56.    43. Other provisions of the Escrow Agreements further cement each depositor's absolute control over and right to such depositor's Escrow Deposits. Under Paragraph 6, Graubard

---

[2] Although the terms "escrow agent" and "escrowee" are typically used interchangeably to refer to the third-party depositary of an escrow, each Escrow Agreement expressly defines its *beneficiary* as "Escrowee" and defines Graubard as "Escrow Agent." Accordingly, where quoted provisions of the Escrow Agreements refer to "Escrowee," they should be understood to mean the beneficiary of such Escrow Agreement, *i.e.*, one of Plaintiffs, Maamari, or El-Khoury, or T. Gargour.

15

expressly agreed "to release and return the Deposit or any part thereof as the case may be, pursuant to and in strict accordance with all of the terms and conditions of this Escrow Agreement," and further "warrant[ed] and agree[d] that *only the Escrowee has any right to recover or direct the payment or distribution of the Escrow Amount or any part thereof*" (emphasis added).

57.    44. In Paragraph 7, Graubard further expressly "acknowledge[d], warrant[ed] and agree[d] that [he] has no right to, and shall not release, distribute, pledge, deposit or hypothecate any part of the Escrow Deposit for any reason or in any way whatsoever without the express prior written permission and consent of Escrowee."

58.    45. On December 5, 2024, and pursuant to Paragraph 2 of its respective Escrow Agreement, Pertshire wired $1,000,000 from a trust account at Citibank, in New York, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. The wire made clear that it was a "transfer to an escrow account."

59.    46. On December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, Metaxas wired $1,000,000 from his account at Banque Pictet, in Geneva, Switzerland, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Metaxas made clear that the deposit was for the "Surf 9 Olden Group Deal."

60.    47. The same day, and pursuant to Paragraph 2 of his respective Escrow Agreement, Maamari wired $1,000,000 from his account at Banque Lombard Odier, in Geneva, Switzerland, to Graubard's "attorney trust account" ending in -1102 at Valley National Bank. In the memo line of the wire transfer, Maamari made clear that the deposit was for "payment into escrow account."

61.    48. Also on December 6, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, El-Khoury wired $250,000 from his account at Interaudi Bank, in New York, to

16

Graubard's "attorney trust" account ending in -1102 at Valley National Bank. The payment purpose indicated that the funds were to be placed "in an escrow account."

62.     On December 12, 2024, and pursuant to Paragraph 2 of his respective Escrow Agreement, T. Gargour wired $250,000 from his account at UBS, in Zurich, Switzerland, to Graubard's "attorney trust" account ending in -1102 at Valley National Bank. In the memo line of the wire transfer, T. Gargour made clear that the deposit was made "as per escrow agreement."

63.     Together, the Potential Investors entrusted Graubard with a total of $3,500,000, all of which was wired to Graubard's IOLA pursuant to the Escrow Agreements.

64.     $2,000,000 of the $3,500,000 constituted Plaintiffs' Escrow Deposits.

**C.     Working in Concert, Graubard, Sprei, Rubin, and Frankl Immediately Dissipate Plaintiffs' Escrow Deposits**

65.     Sprei received actual, contemporaneous notice of each of the Potential Investors' wire transfers detailed above.

66.     On information and belief, Frankl and Rubin were also aware of the Escrow Agreements and that the Potential Investors had, on December 5 and 6, 2024, wired their funds to Graubard to hold in escrow pursuant to such agreements.

67.     Immediately after the Potential Investors wired their escrow funds to Graubard, Graubard, Sprei, Rubin, Frankl, and their agents worked in concert to convert the Potential Investors' $3,500,00 in escrowed funds, including Plaintiffs' Escrow Deposits.

68.     At no point in time did Plaintiffs authorize Frankl to act on their behalf in any context. In fact, before Graubard held Frankl out as his agent in response to Plaintiffs' demand for the return of the Escrow Deposits in January 2025, Plaintiffs had never even heard of Frankl. And at all times, Graubard, Sprei, and Rubin knew that Frankl, their associate, was not an agent of or

17

authorized to act on behalf of Plaintiffs. And Frankl of course knew it too—having never met, spoken, or even corresponded by email with Plaintiffs as of December 2024.

69. In accordance with Sprei, Graubard, Rubin, and Frankl's scheme to convert the Potential Investors' funds, on December 6, 2024, without authorization from Plaintiffs or any of the other Potential Investors, Frankl instructed Graubard to transfer $2,850,000 of the escrowed funds Graubard had received from the Potential Investors to Sprei "for Surf 9."

70. The same day (December 6), Sprei directed Graubard to immediately distribute the funds as reimbursements to two entities that had previously funded Sprei's investments: $2.5 million to 536 Holdings LLC ("536 Holdings") and $350,000 to Queen Equities LLC ("Queen Equities").

71. Sprei was so insistent about the transfers that he accompanied Graubard to the bank to ensure that Graubard wire the $2.5 million to 536 Holdings, which Graubard did on December 6. Graubard also followed Sprei's direction and issued a $350,000 check to Queen Equities on December 6.

72. 536 Holdings is wholly owned and controlled by Jacob Jacobowitz.

73. Queen Equities is wholly controlled by Defendant Rubin, who is the entity's sole manager. Rubin holds a ninety-nine percent interest in Queen Equities and is singularly responsible for all of Queen Equities' operations. At all relevant times, Rubin exercised exclusive and unilateral control over Queen Equities' bank accounts and finances. Defendant Rubin's wife, Malka Rubin, holds the remaining one percent interest in Queen Equities. Queen Equites' operating agreement specifically provides, however, that Defendant Rubin may individually sign documents on behalf of Queen Equities without the separate co-signature and/or authorization of Malka Rubin.

18

74.     Rubin used Queen Equities as a vehicle to direct funds for Sprei's benefit. On many occasions, Rubin, via Queen Equities, moved funds on Sprei's behalf without any formal loan agreement, accounting records, or other formal documentation. In some instances, Rubin received a personal benefit from the transactions he completed for Sprei through Queen Equities in the form of an interest or other payment to Rubin, while in other instances Rubin completed these transactions through Queen Equities as a personal favor to Sprei.

75.     In December 2024, both 536 Holdings and Queen Equities engaged in several additional transactions worth millions of dollars with Montclare and Wachtler's law firm Montclare & Wachtler LLP ("M&W"), by wire transfers and paper checks and in connection with Sprei's investment in Surf 9.

76.     On December 11, 2024, five days *after* working in concert to disburse Plaintiffs' Escrow Deposits, Graubard, Frankl, and Sprei conspired to create a false paper trail to justify Graubard's unlawful disbursement of Plaintiffs' Escrow Deposits in violation of Graubard's fiduciary and contractual obligations.

77.     To accomplish this goal, Sprei directed Graubard to fabricate an authorization letter (the "Fabricated Authorization"), purporting to have been authored and sent by Frankl, confirming Frankl's previous instructions to Graubard to transfer the Escrow Deposits and falsely stating that Frankl had authority to issue such instructions. Graubard then sent the Fabricated Authorization, which purported to be a letter from Frankl to Graubard, to Frankl for his signature, which Frankl executed and returned to Graubard on December 12, nearly a week after $2.85 million of the Potential Investors' $3.5 million in escrow funds had already been disbursed to 536 Holdings and Queen Equities without authorization.

19

78.     The Fabricated Authorization Graubard authored falsely stated as follows: "Dear Mr. Graubard: This confirms my prior email instructions to you with regard to the escrow deposits sent to you from various investors originating overseas, including and associated with Javiar Macaya, which so far have totaled $3,250,000; that I have the right and authorization to direct the disposition of those deposits. Further, those instructions for disposition shall be in writing, including without limitation, by email. Thank you. Sincerely yours, Chaskel Frankl."

79.     Graubard, Frankl, and Sprei intended the Fabricated Authorization to retroactively create the impression that Graubard had properly transferred Plaintiffs' Escrow Deposits in accordance with Paragraph 5 of the Escrow Agreements. On information and belief, Graubard wanted this false record to create a cover for his misconduct in the event his unauthorized disbursements of the Potential Investors' escrowed funds ever came to light. Indeed, Graubard has already pointed to the Fictitious Authorization in the instant litigation as cover for his and other Defendants' unlawful dissipation of Plaintiffs' funds.

80.     Frankl's representation that he had "the right and authorization to direct the disposition of" the Escrow Deposits was at all times patently false. Frankl, Sprei, and Graubard knew that the Potential Investors never gave Frankl such authority because the three were colleagues working in concert to convert Plaintiffs' funds. Indeed, at no point did Graubard reach out to any of the Potential Investors, including Plaintiffs, to confirm that Frankl was their agent or that they had requested the immediate transfer of their funds from his IOLA and on what basis. Graubard also did not send any record of such transfers to any of the Potential Investors. And of course, Plaintiffs never once represented to Graubard, Sprei, or Frankl that Frankl was their agent authorized to act on their behalf.

81.     Frankl's work with Graubard to create the Fictitious Authorization establishes Frankl's knowledge of the Escrow Agreements and Graubard's obligations thereunder.

82.     On December 12, 2024, the same day Frankl signed the Fictitious Authorization, Frankl directed Graubard to disburse most of the Potential Investors' remaining $650,000 in escrowed funds as follows: $335,000 to 536 Holdings and $250,000 to Rubin's company Queen Equities. Graubard did so without question, authorization, or notice to the Potential Investors.

83.     On information and belief, Rubin knew that the $600,000 transferred from Graubard's IOLA to Queen Equities in December 2024 were unauthorized distributions from the Potential Investors' escrowed funds.

84.     Graubard depleted the remainder of the Potential Investors' escrowed funds by issuing checks to himself amounting to $65,000 between December 12, 2024, and January 17, 2025.

85.     As of December 31, 2024, the ending balance in Graubard's IOLA was only $44,755.82, in plain violation of Graubard's contractual obligations under the Escrow Agreements, fiduciary duties to the Potential Investors, and regulatory and ethical obligations governing attorney escrow accounts. At that time, Graubard was legally and ethically bound to have no less than $3.5 million preserved in his IOLA, to account for all the Potential Investors' escrow deposits.

**D.      After Plaintiffs Demand the Return of Their Escrow Deposits, ~~but~~ Graubard ~~Conspires~~ ~~with Sprei and Others to Withhold~~, Sprei, and Frankl Mislead Plaintiffs~~²~~ About the Status of Their Funds**

86.     ~~49.~~ In early January 2025, after completing a month~~'s~~ ~~long due~~of diligence on the Potential Investment, Plaintiffs~~, Maamari, and El-Khoury~~ and the other Potential Investors decided not to pursue ~~the Potential Investment~~it and thus to demand the return of their escrow deposits pursuant to their respective Escrow Agreements.

87.     Through K. Gargour, T. Gargour sent Graubard written correspondence on January 4, 2025, receipt of which Graubard acknowledged the next day, demanding the return of his $250,000 escrow deposits.

88.     Frankl followed up via email on January 6, 2025, confirming that "the wire will be sent tomorrow," *i.e.*, January 7, 2025. That was false. Graubard did not and could not return T. Gargour's escrow deposits on January 7, 2025, because the entire balance of Graubard's IOLA on that date was only $42,255.82.

89.     Also on January 6, 2025, Rubin's company Queen Equities wired $2,450,000 to M&W in connection with Sprei's Surf 9 transaction. The funds reflected $2,551,111.11 that had been transferred to Queen Equities at Sprei's direction from Express Trade Capital, Inc., a company involved in Surf 9, minus more than $100,000 that Rubin kept as payment from Sprei.

90.     On January 8, 2025, M&W wired $250,000 to Graubard's IOLA, on information and belief at Sprei's direction and for the purpose of repaying T. Gargour for his $250,000 that had been dissipated.

91.     The next day, January 9, 2025, Graubard wired $250,000 to T. Gargour with the false memo line "REAL ESTATE INVESTMENT." In reality, the wire was the return of T. Gargour's escrow deposits pursuant to his Escrow Agreement with Graubard.

92.     50. On January 9 and 10, 2025, in compliance with Paragraph 4 of each Escrow Agreement, each of Plaintiffs, Maamari, and El-Khoury (or their designee) sent Graubard an email (together, the "Demands") demanding the return of their respective Escrow Deposits by January 15, 2025, and providing individualized instructions for the return wire transfers, thereby performing all of their obligations under the Escrow Agreements.

22

93.    ~~51.~~ Under Paragraphs 4 and 5 of the Escrow Agreements, nothing more was required from Plaintiffs to trigger Graubard's unqualified obligation to return the Escrow Deposits to each of Plaintiffs, Maamari, and El-Khoury.

94.    That same day, on January 9, Graubard forwarded some of the Demands to Sprei and Frankl, writing, "Here are the two request for return of funds I received this morning $250K for Khoury and $1 million for Metaxa [*sic*]."

95.    ~~52.~~ On January 15, 2025, Graubard acknowledged to Plaintiffs his receipt of each of Plaintiffs' Demands (as well as those of Maamari and El-Khoury), writing, "All of your various emails about return of funds have been received." Frankl was copied on Graubard's ~~raised no issue or concern with his obligation to return~~ ~~the Escrow Deposits~~email.

~~53. Instead of complying with his unqualified contractual obligations to return the Escrow Deposits, however, over the course of the next two weeks, Graubard repeatedly made false statements to Plaintiffs regarding the return of their funds because, on information and belief, Graubard had unlawfully transferred the Escrow Deposits out of his IOLA to Sprei or one of his associates.~~

96.    At no point during Graubard's and Frankl's communications with Plaintiffs did Graubard state that he had, at Frankl and Sprei's direction, transferred Plaintiffs' Escrow Deposits out of Graubard's IOLA. Nor did Frankl, at any point, raise any confusion with Plaintiffs' Demands, nor state that he had directed Graubard to transfer the Escrow Deposits at Plaintiffs' direction. Neither Graubard nor Frankl made such claims because, all along, Frankl, Graubard, Sprei, and their associates, including Rubin, had been working in concert to convert and misappropriate Plaintiffs' funds without their knowledge or authorization.

97.    Rather than confess his inability to return Plaintiffs' Escrow Deposits—because he had already disbursed them without authorization—in response to Plaintiffs' Demands, Graubard

falsely represented that he would return Plaintiffs' funds. Over the course of the next two weeks, Graubard, Frankl, and Sprei together made one false statement after another to Plaintiffs regarding the return of their funds to conceal their misconduct and prevent Plaintiffs from taking any legal action to recoup their Escrow Deposits.

98.     54. When theirFor example, when Plaintiffs' funds were not returned on January 15, 2025, Plaintiffs reiterated their Demands for the return of their Escrow Deposits on January 16, 2025. In response as required by the Escrow Agreements, Graubard falsely blamed a "computer problem" at Valley National Bank for the delay, writing, "Unfortunately, some of the New York banks have been hit with a computer problem that has shut down operations. We are working to see what else can be done to get wires out."

55. When Macaya emailed Graubard the next day, on January 17, 2025, to "confirm that the funds ha[d] been wired," *Sprei* responded, falsely, "Bank is still down." After Macaya responded to both Sprei and Graubard, "copying Paul Montclare" on the email given that Montclare had referred Plaintiffs to Sprei and Graubard, Sprei replied, "Tell us what more we can do." Sprei's use of "we" was the first indication of his involvement in Graubard's failure to return the Escrow Deposits.

56. After Macaya responded to Sprei's email demanding that Graubard immediately comply with his contractual obligations to return the Escrow Deposits, Sprei added Wachtler, *Montclare's wife*, to the email thread. Unbeknownst to Plaintiffs at the time, Wachtler was also working in concert with Graubard, Sprei, and others to divert millions of dollars in escrow deposits from another victim.[3]

---

[3] That other scheme gave rise to an ongoing lawsuit against Wachtler, Graubard, Seddio, and others captioned *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025 (Nassau Cty. Sup. Ct.).

57. Once added to Plaintiffs' communications with Graubard, Sprei, Montclare, and others, Wachtler responded to Macaya with an apparent attempt to cover Sprei's and Graubard's misconduct. She wrote, "I want you to be assured that this is not any 'hold up' of any kind whatsoever," and proceeded to describe a technical failure affecting New York banks that had purportedly begun on January 16, 2025.

58. Neither Graubard nor Sprei (nor Wachtler or Montclare) gave any explanation for why Graubard had failed to return the Escrow Deposits by January 15, 2025, as required by the plain terms of the Escrow Agreements and before the alleged technical failures at the banks began. Nor did Wachtler explain when and why she became involved in the return of Plaintiffs' Escrow Deposits.

99. 59. After four more days elapsed without the return of Plaintiffs' funds, Macaya emailed Graubard on January 21, 2025, again demanding the return of Pertshire's Escrow Deposit. Graubard responded the same day acknowledging his obligation to return Plaintiffs' Escrow Deposits and representing that he would "send the confirmation as soon as it is done." On

100. On January 22, 2025, M&W wired $425,000 to Graubard's IOLA. On information and belief, M&W made the wire transfer at Sprei's direction for the purpose of repaying a portion of Maamari's escrow deposit.

101. On January 21, 22, and 23, Frankl and Graubard and his agent, non-party Chaskel Frankel, falsely represented to Plaintiffs, as well as Maamari and El-Khoury, that all of their Escrow Deposits had been returned by wire transfer, when in. In fact, only $400,000 of Maamari's $1 million Eescrow Ddeposit, all of which had been returned, already been unlawfully dissipated, had actually been repaid (by wire transfer dated January 23, 2025).

25

102.    Even though the Potential Investors' remaining $2.85 million in ~~E~~escrow ~~D~~deposits remained outstanding and had not been repaid as of January 23, 2025, Frankl, whom Graubard~~,~~ ~~through~~ represented to Plaintiffs to be his agent ~~Frankel~~, provided Metaxas with a fictitious "Fed ref"~~—~~or federal reference~~—~~number which ~~he purported to represent~~Frankl falsely indicated was confirmation of the return wire of Metaxas' funds from Graubard's IOLA.

103.    ~~60. When~~But when Metaxas followed up on January 24, 2025, saying his bank could not trace the federal reference number ~~Graubard's agent~~Frankl provided and requesting "a copy of the Swift that will show the date of transfer as well as the USD correspondent bank used to effect it," ~~Graubard's agent~~Frankl falsely ~~stated~~responded, "Yes will do~~.~~."~~, but~~ Frankl ultimately provided no Swift or other proof of transfer.

104.    ~~61.~~ On the morning of January 27, 2025, Metaxas again emailed Graubard for an update on the return of his Escrow Deposit. In response, ~~Graubard's agent~~ Frank~~e~~l falsely represented that the wire would be "out today."

~~62. Graubard was copied on all of his agent Frankel's emails to Plaintiffs but did nothing to correct the false and misleading statements.~~

~~63. Not once in Graubard's interactions with Plaintiffs between January 9 through January 27, 2025 did Graubard contest his contractual obligation to return the Escrow Deposits to Plaintiffs or suggest that any third party had any right to interfere with the return of Plaintiffs' funds. Instead, Graubard repeatedly committed and claimed to return Plaintiffs' Escrow Deposits.~~

105.    Graubard and/or Sprei were copied on all of Frankl's emails to Plaintiffs but did nothing to correct Frankl's false and misleading statements regarding the status of their Escrow Deposits, nor did Graubard provide any indication that he believed Frankl was Plaintiffs' agent who had properly authorized him to transfer the Escrow Deposits out of his IOLA. Instead, Grau-

bard repeatedly held Frankl out to Plaintiffs as his agent and falsely represented his intention to return Plaintiffs' Escrow Deposits in accordance with the Escrow Agreements.

106. By the same token, at no point in his communications with Plaintiffs, Graubard, and Sprei did Frankl claim to be Plaintiffs' agent authorized to direct the transfer of their Escrow Deposits. Nor did Frankl disclose the fact that he had directed Graubard to transfer Plaintiffs' Escrow Deposits out of his IOLA in December 2024.

107. Alongside his communications with Plaintiffs, Frankl, and Sprei regarding Plaintiffs' Demands, throughout January 2025, Graubard repeatedly asked Frankl to wire funds to his IOLA to replace the Potential Investors' escrowed funds, including the Escrow Deposits.

108. Frankl told Graubard, in writing, that he would wire an amount equal to the stolen escrowed funds, including the Escrow Deposits.

109. 64. After two weeks of false representations regarding the return of their Escrow Deposits, Plaintiffs retained the undersigned counsel, who sent Graubard a letter on January 27, 2025, demanding the immediate return of each Escrow Deposit in full, with interest at the New York statutory rate of 9% annually from January 15, 2025, and documentation establishing that the Escrow Deposits were still held, in full, in Graubard's IOLA as required by the Escrow Agreements.

110. Sure enough, on January 27, Graubard's IOLA was replenished with wire transfers of $325,000 from M&W and $500,000 from Shefa Holdings LLC. On information and belief, these transfers were made at Sprei's direction and for the purpose of repaying Maamari's and El-Khoury's escrow deposits.

111. 65. That same evening, Maamari's and El-Khoury's Eescrow Ddeposits were returnedfinally repaid in full, though without any acknowledgment that the deposits had been un-

27

lawfully dissipated and without any interest reflecting the unauthorized twelve-day delay in repayment.

112. 66. The $2 million belonging to Plaintiffs, however, remains outstanding. To datehas never been repaid. On information and belief, Graubard has provided no explanation for his decision to returnrepaid Maamari's and El-Khoury's Escrow Deposits but not those of Plaintiffs. Graubard has also continually refused to provide any proof whatsoever that Plaintiffs' funds remain intact in his IOLA despite Plaintiffs' repeated requests.for their $1.25 million in total escrow deposits but did not repay Plaintiffs for their $2 million Escrow Deposits because Graubard never received sufficient funds from Sprei, Frankl, or their agents to replenish those Escrow Deposits.

E.    **Graubard and Sprei Admit to HoldingFalsely Claim to Be Withholding Plaintiffs' Escrow Deposits Hostage and DemandUntil Plaintiffs Releases Them from Liability for Their Misconduct**

113. 67. On January 29, 2025, two days after returningrepaying Maamari's and El-Khoury's Escrow Depositsin full and receiving the demand letter from Plaintiffs' counsel, Graubard made an about-face. After two weeks of repeatedly promising to return Plaintiffs' funds, Graubard stated that he would not return Plaintiffs' Escrow Deposits. Rather than acknowledging his contractual and fiduciary duties to *Plaintiffs* as their escrow agent, Graubard claimed *for the first time* to be representing *his* "client," later revealed to be Sprei, who purportedly "require[d] a general release" of liability from Plaintiffs before Graubard would fulfill his legal obligation to return the Escrow Deposits. At no point in Plaintiffs' prior dealings with Graubard and Sprei did either of them indicate that Graubard served as Sprei's counsel, let alone that Graubard would put Sprei's interests ahead of his own contractual and, fiduciary, ethical, and regulatory duties to Plaintiffs as their escrow agent.

114. 68. In subsequent correspondence the same day, Graubard ignored Plaintiffs' counsel's repeated requests to provide proof that the Escrow Deposits were in fact being held in his IOLA. Instead, Graubard continued to stall, writing, "I am asking you to indulge me another day[] to deal with both my client's release issue and the funds transfer."

115. Also on January 29, 2025, Seddio sent a pre-litigation demand email to Graubard, copying Sprei and Kobre, with the subject line "Olden Group v. Surf 9." The email stated:

> Good afternoon,
>
> Please be advised that no funds from your account can be released until you receive a release from the investing group as they have been attacking and threatening my client, Mr. Sprei. Mr. Graubard as soon as you receive a release in escrow you may release the funds. In any event if I do not hear from you by 5pm then we will file an order to show cause in Kings County Supreme to have the funds deposited with the Court.

On information and belief, Seddio sent the email at Sprei's direction for the purpose of giving Graubard apparent legal cover for his about-face to Plaintiffs' counsel.

116. 69. On January 30, 2025, despite having no previous contact with Sprei, Plaintiffs' counsel received a letter from Ethan A. Kobre, Esq., who represented himself to be Sprei's "litigation counsel." In that letter, attached as Exhibit 5, Kobre acknowledged Graubard owed fiduciary duties to Plaintiffs as their escrow agent. He also stated that Sprei had "instructed Mr. Graubard not to release the escrowed funds"—further establishing Graubard's collusion with Sprei and Sprei's affirmative interference with Plaintiffs' contractual rights. Kobre reiterated Graubard's proposed hostage deal: "Your clients want the escrowed funds. My client wants certainty that your clients will not pursue meritless claims against him. All that's needed for everyone's satisfaction is a release in my client's favor."

117. 70. Plaintiffs responded to Kobre's letter on January 31, 2025, reiterating Graubard's unqualified duty to return the Escrow Deposits under the Escrow Agreements, highlighting

29

Sprei's interference with that duty, noting Graubard's repeated refusal to provide proof that the funds remained in his IOLA, demanding such proof from Sprei, and raising the impropriety of Graubard's and Sprei's conditioning the return of funds on any release.

118. ~~71.~~ Plaintiffs have since learned that Sprei's conduct in the instant matter fits his *modus operandi* of ensnaring potential investors into fraudulent investment schemes. Other cases involving allegations of similar misconduct by Sprei and those working in concert with him include:

a. *Rolnick Investment Holdings et al. v. Edward Harold King et al.*, Index No. 611100/2025, pending in the Nassau County Supreme Court;

b. *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, pending in the Nassau County Supreme Court;

~~c. *Victor Ferreira v. Solomon Rubin et al.*, Index No. 601008/2025, pending in Nassau County Supreme Court;~~

~~d. *Shimon Avrahami v. Sam Sprei et al.*, Index No. 506581/2025, pending in the Kings County Supreme Court;~~

c. ~~e.~~ *Ira Russack v. Queen Equities LLC et al.*, Index No. 717729/2025, pending in Queens County Supreme Court;

d. ~~f.~~ *TD Bank, N.A. v. Edward Harold King*, No. 25-cv-3574, pending in this Court;

e. ~~g.~~ *Jetro Cash & Carry Enterps., LLC v. Olden Equities, L.L.C. et al.*, Index No. 605680/2024, ~~pending~~judgment entered in the Nassau County Supreme Court;

f. ~~h.~~ *Jest Holdings LLC v. Anhui Edgewater St. Realty LLC et al.*, Index No. 727110/2024, pending in the Queens County Supreme Court; and

~~i. *Edgewater Property Equity LLC v. Anhui Edgewater St. Realty LLC et al.*, Index No. 151734/2021, pending in the Richmond County Supreme Court.~~

F.      **After Plaintiffs Contact Law Enforcement, ~~Defendants~~Sprei, Seddio, and Rubin Commence ~~a~~the Sham ~~Litigation to Provide Cover for Graubard's and Sprei's Misconduct~~State Court Action to Conceal the Theft of Plaintiffs' Escrow Deposits and Prevent Plaintiffs from Taking Steps to Obtain Relief**

119.    ~~72.~~ Plaintiffs refused to give in to Graubard's and Sprei's improper demands and, convinced that criminal conduct was afoot, reported the misconduct to law enforcement authorities on January 31, 2025.

120.    ~~73.~~ On or about February 12, 2025, when on information and belief Graubard and Sprei learned that law enforcement had been contacted by Plaintiffs, Sprei's attorney Kobre contacted Plaintiffs in yet another attempt to extort them. Notably, in his letter, *Sprei's counsel* made representations on Graubard's behalf. Kobre wrote, "Mr. Graubard no longer wishes to hold the escrowed funds. As such, my client [Sprei] will move tomorrow to deposit the money into the court. My client remains willing to have the escrowed funds sent to you or your client upon receipt of a release. The choice is yours." Kobre's letter again established Sprei's collusion with Graubard and control over the Escrow Deposits. Plaintiffs declined Kobre's extortionate and illusory offer.

121.    ~~74.~~ On February 19, 2025, just a week after Plaintiffs rejected Kobre's unlawful demand, a civil action was filed against Plaintiffs, but not by ~~Graubard, or even~~ Sprei. Instead, Seddio, Sprei's longtime co-conspirator, commenced a civil action against Plaintiffs in Kings County Supreme Court on behalf of the fictitious and non-existent entity called "Olden LLC~~, an apparently fictitious entity~~" that was purportedly managed by Rubin. ~~On information and belief, Rubin is an associate of Sprei.~~

122.    The case is captioned *Olden LLC v. Metaxas et al.*, Index No. 505819/2025, names Metaxas and Pertshire as defendants, and names Graubard as the nominal defendant, though with an intentionally misspelled version of his name as a means, on information and belief, to conceal Graubard's status as a defendant from the public.

31

123. Sprei personally directed and controlled Seddio's filing of the State Court Action. Although the action was nominally brought on behalf of Olden LLC and Rubin, Sprei orchestrated the filing as part of his scheme with Graubard, Seddio, and Rubin to obstruct Plaintiffs' recovery of their Escrow Deposits.

124. 75. The case is captioned *Olden LLC v. Metaxas et al.*, Index No. 505819/2025, and names both Plaintiffs as defendants, as well as Graubard as a nominal defendant.[4] Although styledAlthough the case was presented as a commercial contract dispute, Olden LLC is not a party to or third-party beneficiary of any contracts with either Plaintiff. Indeed, neither Olden LLC nor Rubin were known to either Plaintiff before the case was filed. And, before filing the action, Seddio did not review the contract on which he purportedly based the dispute.

125. The case-initiation papers for the State Court Action, which were originally drafted by Kobre, identified Sprei's company Olden Group LLC as the plaintiff and Sprei as the affiant in support of emergency injunctive relief, given that Sprei is the manager and sole member of that entity. Kobre's initial draft initiating papers also correctly spelled Graubard's last name.

126. In a brazen and largely successful effort to mislead the Court and Plaintiffs, however, Sprei and Seddio, with and through their agents, falsified the papers before filing to misidentify the plaintiff as the non-existent "Olden LLC," change the manager and affiant's name to "Johnathan Rubin," affix a legally defective electronic /s/ signature to Rubin's purported affirmation instead of a hand-drawn signature, and misspell Graubard's last name as "Graubart."

127. Sprei told Rubin that Sprei and Seddio, who represents Rubin in several other legal actions, had filed the affirmation under Rubin's name because if Sprei or his company Olden

---

[4] On information and belief, Seddio intentionally misspelled Graubard's name as "Graubart" in his State Court Action filings to make it more difficult for the public to connect the litigation to Graubard.

Group LLC were known to be involved in the dispute, issues might arise with another pending case, captioned *Olden Group LLC v. Body Glove International Inc. et al.*, Index No. 533445/2024, that Seddio had commenced on Sprei's behalf in Kings County Supreme Court in December 2024 relating to Sprei's investment in Surf 9. Sprei also told Rubin that he believed no one would be "dumb enough" to believe that Rubin himself signed a document misspelling his own name—on information and belief, a cover Rubin could (and did) later use in an attempt to dispel any liability for the fraudulent filings.

128.    ~~76. Nor did Seddio commence Olden LLC's action by filing a complaint. Instead~~To allow Sprei to further control the State Court Action, Seddio took advantage of a procedural mechanism that has become his *modus operandi* in abusing judicial process. Under CPLR § 305(b), a plaintiff may commence a civil action by simple summons with "a notice stating the nature of the action and the relief sought, and, except in an action for medical malpractice, the sum of money for which judgment may be taken in case of default." Once commenced, the action can be used as a vehicle to obtain emergency injunctive relief, while maintaining optionality to discontinue the action at will because a plaintiff retains the unqualified right to discontinue an action at any time before the filing of responsive pleadings, and responsive pleadings are not permitted in the absence of a complaint.

129.    Under CPLR § 3012(b), a complaint must be served within 20 days of the defendant's demand or notice of appearance in the action. As detailed below, ~~to this day—almost eight months after initiating~~ ~~the State Court Action—Seddio has not~~Seddio never served a complaint in that action.

130.    ~~77.~~ The notice drafted and filed by Seddio ~~on behalf of Olden LLC~~in the State Court Action falsely states, in its entirety, "This action seeks a judicial declaration and injunctive relief

33

as to escrow funds held by the Nominal Defendants [*sic*], as to which the parties have competing claims."

131.    ~~78. On information and belief, when~~When Seddio filed the summons with notice ~~in Olden LLC's action against Plaintiffs~~ (and parallel request for a TRO) in the State Court Action, he knew that Olden LLC had no claims to Plaintiffs' Escrow Deposits, had no contractual or other relationship with either Plaintiff, and was not, in fact, a legal entity. Seddio commenced the State Court Action not to vindicate the rights of his client(s)—as ~~neither~~none of Olden LLC, a fictitious entity, ~~nor~~ Rubin, who has never met or interacted with Plaintiffs, or even Sprei has any claim to the Escrow Deposits.

132.    At no point did Seddio, Sprei, Rubin, or Olden LLC have probable cause to believe that Olden LLC had any valid claim to Plaintiffs' Escrow Deposits. Olden LLC is not a party to, nor a third-party beneficiary of, the Escrow Agreements. Neither Olden LLC nor Rubin had any prior dealings with Plaintiffs. The State Court Action was commenced not to vindicate any legitimate legal right, but solely to obstruct Plaintiffs' recovery of their property.

133.    Indeed, Seddio has since admitted, under oath, that no one other than Plaintiffs has any rights to the Escrow Deposits.

134.    ~~79.~~ On information and belief, Seddio, working in concert with Sprei, Rubin, and Graubard, commenced the State Court Action ~~in coordination with Graubard, Sprei, and Rubin, but brought the action on behalf of Olden LLC to conceal Sprei's involvement in the underlying misconduct and create the appearance that Sprei and Seddio do not control Graubard or~~under false pretenses to conceal the fact that the Escrow Deposits ~~Indeed, in subsequent correspondence with Plaintiffs' counsel regarding a potential settlement of~~ had been stolen well before the State Court Action~~, Seddio expressly referred to Sprei's self-described litigation counsel, Kobre, as *Seddio's*~~

34

~~"co-counsel," highlighting Seddio's coordination with Sprei.~~ was commenced, and to interfere with Plaintiffs' ability to obtain timely and effective relief.

G.      Seddio and Rubin Obtain a ~~Temporary Restraining Order~~TRO Based on False Statements to Improperly Restrain Plaintiffs from Recovering Their Escrow Deposits and to Hide Sprei's and Graubard's Misconduct

135.    ~~80.~~On information and belief, the true purpose of Seddio's and Rubin's sham preliminary injunction motion was to obtain a TRO which would prevent Plaintiffs from taking affirmative steps to obtain their Escrow Deposits, give Graubard and Sprei the ability to point to an ongoing civil action in the event they were questioned by law enforcement, and buy Graubard and Sprei time to replenish Plaintiffs' funds, which they or their associates had illegally dissipated.

136.    ~~81.~~To that end, on February 19, 2025, Seddio filed, alongside a supporting declaration from Rubin, an "emergency" motion, by order to show cause, seeking the *ex parte* entry of a TRO enjoining Graubard "from releasing the Escrowed Funds to any party"; directing Graubard "to continue to hold the Escrowed Funds in his escrow account (or deposit the Escrowed Funds with the Court) pending further order of this Court or agreement of the parties"; and enjoining Plaintiffs and all other parties to the action "from taking any steps to transfer, encumber, sell, or otherwise dispose of the subject property" pending the hearing on and resolution of Olden LLC's preliminary injunction motion, which requested that the court order Graubard to deposit the Escrow Deposits with the Kings County Supreme Court Clerk's office.

137.    ~~82.~~To obtain *ex parte* relief, Seddio filed an "emergency" affirmation swearing, under penalty of perjury, that Olden LLC "could not give notice of this application because, if notice were given of this action, [Plaintiffs] would take steps to further harass and intimidate and bully the Nominal Defendant escrow agent [Graubard] to released [*sic*] the disputed funds before the Court could even hear this matter." On information and belief, Seddio knew his basis for seeking *ex parte* relief was legally insufficient (a purported risk of "intimid[ation]" and "bully[ing]" is

35

not a basis for an *ex parte* application for a preliminary injunction) and pretextual: the sole reason he filed an *ex parte* application was to prevent Plaintiffs from contesting his completely meritless request.

138. 83. Seddio also filed a sworn affirmation from Rubin setting forth purported facts supporting Olden LLC's request for a TRO. In it, Rubin perjured himself by making several knowingly false statements of fact:

> a.   Rubin falsely represented that he was "the manager of Plaintiff in this action," *i.e.*, Olden LLC. That was false because Olden LLC did not exist and, to the extent that he was referring to Olden *Group* LLC, that entity's sole member and manager is Sprei.
>
> b.   a. Rubin falsely stated that Olden LLC and Plaintiffs "entered into negotiations to invest and jointly purchase a certain non-party company." That is categorically false. Before Olden LLC commenced its sham litigation against Plaintiffs on February 19, 2025, Plaintiffs had never even heard of or interacted with the company, which is not a legal entity.
>
> c.   b. Rubin falsely stated that, after "disputes arose between the parties," Plaintiffs "level[ed] very serious but frivolous claims against [Olden LLC] and against [Rubin] personally." That, too, is false. Again, Plaintiffs had never interacted with either Olden LLC or Rubin prior to the initiation of Olden LLC's sham State Court Action.
>
> d.   c. Rubin falsely stated that *he* "explained to [Plaintiffs] (through counsel) that [Rubin] would have no objection to the release of the Escrowed Funds if only [Plaintiffs] released [Rubin] from their unfounded bullying claims," and Rubin claimed that "[a] copy of just one such correspondence through counsel" was exhibited to his affirmation. Each of those statements was also false. Plaintiffs have never had any communication with Rubin, and the letter attached to Rubin's affirmation was the January 30, 2025 letter from *Sprei's* litigation counsel Ethan A. Kobre.

139. To this day, neither Rubin nor Seddio have withdrawn Rubin's affirmation or requested leave of the court to correct any statements therein.

140. 84. On information and belief, Seddio and Rubin both knew that Rubin's sworn affirmation contained false statements of material fact at the time they filed Rubin's affirmation in the State Court Action. The January 30, 2025 letter from Kobre was also attached to Rubin's af-

36

firmation, establishing that Seddio and Rubin were aware of Graubard's fiduciary duties to Plaintiffs and intentionally commenced the State Court Action to interfere with those duties.

141.    85. Less than three hours after Seddio filed the motion on behalf of Rubin's purported company Olden LLC, and despite the glaring deficiencies in the supporting papers, Kings County Supreme Court Justice Steven Z. Mostofsky granted the motion *ex parte* and granted the TRO in substantially the same form requested by Seddio. Justice Mostofsky, as the *ex parte* judge on duty, scheduled the preliminary injunction hearing for April 23, 2025, before the assigned judge: Hon. Katherine Levine. The order further directed that Olden LLC complete "personal service" of the order and all supporting papers on all parties by March 7, 2025.

### H.    Seddio's Conduct in the State Court Action Fits His Pattern of Deceitful Litigation Conduct in Other Actions

142.    Seddio's tactic of submitting false statements to seek a purportedly emergency TRO on an *ex parte* basis and for an improper purpose is one he has employed and continues to employ in multiple actions across New York.

143.    For example, after Seddio, Graubard, Wachtler, and others were sued in New York County for conversion, fraud, and deceit in connection with $7 million in escrow deposits that was never returned, in a case commenced on April 4, 2025 and captioned *317 Oakford LLC v. Lauren J. Wachtler et al.*, Index No. 652253/2025 (N.Y. Cty. Sup. Ct.) (the "*Oakford* Manhattan Action"), Seddio filed *three* separate special proceedings in *Kings County* Supreme Court seeking emergency TROs on an *ex parte* basis to enjoin and stay the *Oakford* Manhattan Action based on an underlying agreement signed by *Sprei* on behalf of his company "Olden Group."

144.    In Seddio's first two proceedings, commenced on April 11 and 18, 2025, and both captioned *WHP Equities LLC v. Bruce Orlovsky et al.*, Index Nos. 512289/2025 and 512855/2025 (Kings Cty. Sup. Ct.), both seeking identical injunctive relief against the *Oakford* Manhattan Ac-

tion, Seddio falsely claimed that the petitioner, WHP Equities LLC, a New Jersey company *registered to Defendant Rubin*, was a party to Sprei's underlying agreement. In his supporting affirmation in the second-filed proceeding, Seddio also falsely stated that "[n]o prior request for this relief has been made to this or any other Court." After the respondents pointed out that WHP Equities LLC was not a party to the purported arbitration agreement, is a New Jersey company not authorized to do business in New York, *and is registered to Defendant Rubin*, Seddio voluntarily discontinued the two proceedings he brought on behalf of Rubin's company.

145.    On April 21, 2025, Seddio commenced a *third* special proceeding, captioned *Ollden* [sic] *Group LLC v. Bruce Orlofsky et al.*, Index No. 513196/2025 (Kings Cty. Sup. Ct.), seeking the same injunctive relief as he had in the two prior proceedings. In his sworn affirmation in support of an *ex parte* TRO, Seddio again falsely stated that "no prior request for this relief has been made to this or any other Court." Moreover, the amended Verified Petition signed by Sprei and filed by Seddio on April 21, 2025, again falsely alleged that "WHP EQUITIES LLC" was a party to Sprei's underlying agreement.

146.    On May 20, 2025, the plaintiff in the *Oakford* Manhattan Action voluntarily dismissed the action and commenced a new action based on the same underlying conduct, captioned *Oakford Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, in Nassau County Supreme Court (the "*Oakford* Nassau Action"). Unlike the *Oakford* Manhattan Action, however, the *Oakford* Nassau Action asserts a claim against Seddio personally for deceit and collusion in violation of Judiciary Law § 487 for his misrepresentations to the courts in his three earlier proceedings. After defaulting on his obligation to answer the complaint in the *Oakford* Nassau Action, and despite facing personal liability as a named defendant, Seddio again abused process by turning to the Kings County Supreme Court and his connections there to file a *fourth*

special proceeding on August 11, 2025, captioned *Olden Group LLC v. Bruce Orlofsky et al.*, Index No. 527117/2025, in which he sought the same *ex parte* TRO he requested and failed to obtain in the prior three proceedings. The TRO was granted on August 19, 2025, enjoining the *Oakford* Nassau Action, and a hearing on broader relief was scheduled for September 17, 2025.

147.    The above examples (which, on information and belief, are a few of many) show that Seddio has a history of abusing and manipulating the judicial system, including by submitting knowingly false sworn statements to obtain *ex parte* injunctive relief for collateral ends and engaging in blatant forum and judge shopping through which he can utilize his political influence, stemming from his role as the former chair of the Kings County Democratic Committee, in service of Sprei's schemes.

### I.    ~~H.~~ Seddio, Rubin, and Graubard Take Affirmative Steps to Impede the State Court Action

#### 1.    Seddio ~~And~~, Sprei, and Rubin Choose Not to Serve Graubard or File a Complaint, and Seddio Repeatedly Delays the Preliminary Injunction Hearing He Requested

148.    ~~86.~~ While Seddio promptly served Plaintiffs with copies of the TRO and supporting papers on February 20, 2025, the day after the TRO was issued, Seddio *never* served Graubard with the same papers even though (a) Graubard is the party against whom Seddio sought the TRO to purportedly prevent Graubard from returning the Escrow Deposits to Plaintiffs and (b) Justice Mostofsky ordered Seddio to personally serve Graubard with the TRO and its supporting papers by March 7, 2025.

149.    ~~87.~~ Instead, when almost two months elapsed without Seddio's filing on the docket a certificate of service on Graubard, and after Seddio and Graubard repeatedly refused to disclose to Plaintiffs whether Seddio had served Graubard with the TRO, *Plaintiffs* served Graubard with the TRO and supporting papers on April 18, 2025.

150.  88. Had Seddio sought and obtained the TRO for legitimate purposes, he would have served its primary target, Graubard, who purportedly held the Escrow Deposits at issue. Seddio's choice not to serve Graubard evidenced his malicious intent to use the TRO solely for the improper purpose of interfering with Plaintiffs' exclusive and unqualified contractual rights to recover their Escrow Deposits. On information and belief, Seddio knew there was no need to serve Graubard with the TRO because Seddio, Graubard, Rubin, and Sprei had worked in concert to initiate the illegitimate State Court Action to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their agents had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

151.  89. In addition, despite having caused Olden LLC (as its attorney and purported manager) to commence the State Court Action by simple summons with notice, to date, Seddio and Rubin have chosen not to file a complaint asserting any legal claim to the Escrow Deposits, as required under CPLR § 3012(b).

152.  90. On information and belief, Rubin (on behalf of Olden LLC) and Seddio have notSeddio, Sprei, and Rubin never filed a complaint in the State Court Action because they knoew they havehad no legal right, whatsoever, to Plaintiffs' Escrow Deposits. Rubin's and Seddio'sTheir choice not to advance any actual claims by Olden LLC to the Escrow Deposits evidences their malicious intent to use the TRO to (1) interfere with Plaintiffs' exclusive and unqualified rights to the Escrow Deposits under the Escrow Agreements (each of which Plaintiffs filed on the docket in the State Court Action), and (2) give Graubard and Sprei cover to continue misappropriating Plaintiffs' Escrow Deposits, and (3) make the legal process of recovering Plaintiffs' Escrow Deposits and obtaining related relief so irrationally protracted and costly that Plaintiffs would abandon the effort.

153. 91. Seddio also engaged in repeated delay tactics aimed at impeding and delaying the State Court Action *he initiated* and through which he requested *emergency relief*.

154. 92. On April 17, 2025, just five days before the originally scheduled preliminary injunction hearing—which had been scheduled since February 19, 2025—Seddio requested an adjournment via email to chambers due to an unspecified "schedule conflict" and stated that he was "not available till may [sic]." After a week of back and forth with chambers, during which Seddio would offer his available dates and then retract them once they were agreed to, Justice Levine rescheduled the hearing for Monday, May 12, 2025.

155. 93. On the afternoon of Friday, May 9, 2025, however, just one business day before the scheduled hearing and after presiding over the case for approximately three months, Justice Levine recused herself *sua sponte* "in order to avoid any potential appearance of impropriety or partiality with respect to a party in this proceeding." On information and belief, Justice Levine's recusal was due to her personal and professional relationship with Seddio, who chaired the Kings County Democratic Committee when Justice Levine ran for and won her Kings County Supreme Court judgeship as a Democrat in 2016.

156. 94. The State Court Action was reassigned to Justice Mostofsky, who had issued the initial TRO.

### 2. Graubard Impedes the State Court Action by Refusing for Months to Appear in the Action and Making False Representations to the Court

157. 95. For his part, Graubard also took actions and omissions for the purpose of impeding and obstructing the State Court Action. Despite Plaintiffs serving Graubard with the TRO and its supporting papers on April 18, 2025, Graubard refused for months to make any appearance in the State Court Action.

158. On May 9, 2025, shortly before the first adjourned hearing date on Seddio's preliminary-injunction motion in the State Court Action, Justice Levine abruptly recused herself "in order to avoid any potential appearance of impropriety or partiality with respect to a party in th[e] proceeding." While Justice Levine did not identity the party at issue, she and Seddio have a longstanding friendship, frequently communicate via text message, and socialize together. The case was reassigned to Justice Steven Z. Mostofsky.

159. 96. Only after Plaintiffs refused to consent to yet another request by Seddio to adjourn the preliminary injunction hearing, which ~~Judge~~Justice Mostofsky rescheduled for July 17, 2025, did Sprei—not Graubard ~~engage~~—contact attorney Yeshaya Gorkin, Esq. about representing Graubard in the State Cout Action.

160. Sprei engaged Gorkin to represent ~~him. On information and belief, Graubard~~Graubard, and Graubard told Gorkin that Sprei was authorized to act as his agent throughout the State Court Action. In this capacity as Graubard's agent, Sprei directed Gorkin to enter an appearance on the evening of July 16, 2025, mere hours before the July 17 preliminary injunction hearing, and solely to request an eleventh-hour adjournment of the hearing, despite Graubard's having been on notice of the hearing date for months.

161. 97. In addition, Graubard and Sprei permitted Gorkin to falsely represent to the state court in his eleventh-hour adjournment request that Graubard was "willing to release the funds at issue, provided the parties execute a mutual release and consent order.~~" During a subsequent hearing on potential attorney sanctions, described in Section I, *infra*, Gorkin's own attorney was forced "to correct the record" by retracting Gorkin's prior representation because Gorkin "no longer represents [Graubard's July 16, 2025 statement as true], he now has doubts about that."~~", a statement made for the purpose of creating the impression that Graubard was in possession of

42

Plaintiffs' Escrow Deposits. Graubard, Sprei, and Seddio worked to maintain this false impression throughout the pendency of the State Court Action.

162.    At all times, while being represented by counsel in the State Court Action, Graubard continued acting as his own attorney and even submitted court filings under his own attorney credentials through the New York State Courts Electronic Filing ("NYSCEF") system which contained material misrepresentations to prolong the adjudication of the matter.

163.    98. On information and belief, theThe primary purpose of Sprei's, Graubard's, and Seddio's delay tactics, in which he engaged in concert with Seddio, and intentional misrepresentations to the Court was to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their agents had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

**J.    I. The State Court Issues an Order Requiring Graubard to Deposit the Escrow Deposits With the Court, and Seddio and Graubard Work in Concert to Thwart the Order**

164.    99. The July 17, 2025, hearing on Seddio's and Rubin's motion for a preliminary injunction, which Plaintiffs did not oppose, proceeded as scheduled. Neither Graubard nor his then-counsel Gorkin appeared.

165.    100. Seddio, too, failed to appear in person, though he sent an agent to represent the plaintiff, Rubin's purported company Olden LLC.

166.    Astonishingly, although the hearing was on Seddio's own motion for a preliminary injunction, Seddio's agent argued *against* the grant of the relief Seddio had sought in his motion and made several representations on Graubard's behalf, including that Graubard was travelling and thus could not deposit Plaintiffs' Escrow Deposits with the clerk of the court until Monday, July 21, 2025.

43

167.    At the hearing and in their answering papers to Seddio's motion for a preliminary injunction, Plaintiffs raised Seddio's failure to file a complaint interposing any legal claims on his client's behalf and requested at the hearing that the state court deem Seddio's summons with notice a complaint to allow Plaintiffs to file counterclaims in the State Court Action.

168.    101. At the conclusion of the hearing, Justice Mostofsky issued an order (the "Deposit Order") requiring Graubard to deposit Plaintiffs' $2 million in Escrow Deposits by 5 p.m. on July 21, 2025. Plaintiffs served the Deposit Order on Seddio and Graubard (through Gorkin) within a half-hour of its filing on Thursday, July 17, 2025.

169.    102. That evening, Seddio emailed counsel for Plaintiffs stating that his "Client would like to know if [Plaintiffs] would accept $2M plus additional $35k to settle this matter. So we can be done with this case." Seddio's email illustrates that Seddio, Rubin, and/or Sprei, his knowledge that the case he initiated was without merit and that Sprei and Rubin, not Graubard, were in fact controlling Plaintiffs' Escrow Deposits, contrary to the representations made by Seddio and Rubin in their State Court Action filings that Graubard maintained exclusive control of the Escrow Deposits.

170.    103. On information and belief, Seddio's settlement offer was illusory and Seddio made the offer in concert with Sprei, Graubard, and Rubin as a means of delaying justice in the State Court Action, as they knew that Plaintiffs' Escrow Deposits had already been dissipated and thus Graubard would not deposit Plaintiffs' Escrow Deposits with the clerk of the court as required by the Deposit Order.

171.    104. After Plaintiffs' counsel informed Seddio that Plaintiffs would only consider settlement discussions after their funds were deposited with the court, Seddio and Graubard schemed to further impede the State Court Action, in direct violation of the Deposit Order.

44

172. 105. At 3:01 p.m. on Monday, July 21, 2025, less than two hours before the 5 p.m. deadline under the Deposit Order, Seddio and Graubard (through his then-counsel Gorkin) filed a stipulation purporting to unilaterally extend the Deposit Order's deadline until Thursday, July 24, 2025. Plaintiffs opposed any extension and requested that Justice Mostofsky disregard the stipulation. But despite Seddio and Graubard's unilateral grant of a three-day extension of time to fulfil the court's mandate, Graubard still failed to deposit the funds with the clerk's office by July 24.

173. 106. On Friday, July 25, 2025, in response to an inquiry from Justice Mostofsky's principal law clerk regarding the status of the Escrow Deposits, Seddio effectively admitted that he had directed Graubard to violate the Deposit Order. Seddio wroteIn an email ghostwritten by Graubard's then-attorney Gorkin, at Sprei's direction, Seddio stated to the Court, "Given the amount at issue, I intended to personally oversee the deposit to ensure proper compliance. However, I was unable to make it to the courthouse before, and did not feel it appropriate for the nominal defendant to deposit the funds in my absence." It is not my intention to place the nominal defendant in noncompliance. I will coordinate with Nominal Defendant's counsel, Shaya Gorkin, and ensure the deposit is made promptly next week. I respectfully submit that this brief delay does not prejudice any party. [I] will keep the court updated."

174. 107. These statements were false. Seddio had never spoken with Graubard about overseeing his deposit of the Escrow Deposits. And Aalthough Seddio also stated in his July 25, 2025 email that he would "ensure the deposit is made promptly next week," again establishing Seddio's control over Graubard and the Escrow Deposits, that statement was false asbecause Seddio had not communicated with Gorkin or Graubard about the Escrow Deposits, and no deposit was made the following week. Instead, on information and belief, when Seddio made thatSeddio, working in concert with Sprei and Graubard, made these misrepresentations to the court, he had

no intention of ensuring ~~that the deposit was made~~ at all, but rather made the statement to secure a in an effort to further delay ~~of~~ justice in the State Court Action. ~~Indeed, to~~ ~~this day, Plaintiffs'~~ ~~Escrow Funds have not been deposited with the clerk of the~~ ~~Kings County Supreme Court of~~ ~~Brooklyn.~~

175. ~~108.~~ On July 28, 2025, Judge Mostofsky scheduled, *sua sponte*, ~~an attorney sanc-~~ ~~tion~~a remote hearing ~~regarding~~on possible attorney sanctions based on the continued violation of the Deposit Order.

176. ~~109.~~ On July 29, 2025, Plaintiffs moved to hold Graubard, Seddio, and Gorkin in contempt of the Deposit Order.

177. ~~110.~~ After Judge Mostofsky denied Gorkin's repeated requests to adjourn the attorney sanctions hearing, Gorkin moved on July 30, 2025—the day before the hearing—to withdraw as Graubard's counsel. The next day, less than an hour before the scheduled hearing, Graubard noticed the substitution of non-party Israel Goldberg, Esq., as his new counsel in place of Gorkin. ~~On~~

178. Sprei, Graubard (through his agents), and on information and belief, Seddio, knew that Goldberg, also one of Sprei's and Seddio's longtime associates, had a personal relationship with Justice Mostofsky.

179. ~~and~~Sprei, Graubard, and on information and belief Seddio coordinated Graubard's retention of Goldberg with the intention and for the primary purpose~~s~~ of compelling Justice Mostofsky to recuse himself due to his personal relationship with Goldberg.

180. Indeed, Sprei—not Graubard—contacted and directly engaged Goldberg. Sprei also promised to pay for Goldberg's legal services for Graubard.

181.   ~~111.~~ On July 31, 2025, Justice Mostofsky held a video conference hearing on possible attorney sanctions against Graubard. Seddio, Gorkin, and Gorkin's law firm partner Geoffrey Bowser, Esq. appeared. Graubard and his new attorney, Goldberg, were not present.

182.   ~~112.~~ During the hearing, Gorkin's attorney, Bowser, stated that, while Gorkin previously "understood that his client [Graubard] was willing to pay the money into the court[,] … he no longer represents that, he now has doubts about that."

183.   ~~113.~~ Justice Mostofsky responded, "There is only one reason why the money isn't paid into court and that's because the escrowee [*i.e.*, Graubard] doesn't have it. And that's the problem that we are all putting the escrowee into because you are leaving me with the only option I have, which is to believe that the escrowee is not holding the $2 million dollars that was represented to me in court."

184.   ~~114.~~ For his part, Seddio repeatedly admitted to communicating directly with Graubard~~,~~ and made several representations on ~~his~~Graubard's behalf, despite the fact that Graubard is a named party to the State Court Action and is represented by counsel. Seddio stated that "[t]he last contact [Seddio] had with [Graubard] is he was hiring Izzy Goldberg to represent him," which, Sprei, Graubard, and on information and belief, Seddio ~~and Graubard,~~ had arranged for the purpose of creating a conflict with Judge Mostofsky. Seddio further stated that Graubard "was looking for some kind of a guarantee that he wasn't going to be included in any future lawsuits once the money was turned in."

185.   ~~115.~~ In light of Seddio's and Gorkin's admissions during the hearing and their conduct to date, Plaintiffs made an oral motion for sanctions against both attorneys pursuant to 22 NYCRR § 130-1.1. ~~Judge~~At the conclusion of the sanctions hearing, Justice Mostofsky reserved ruling ~~on Plaintiffs' motion~~.

186.    116. Despite reserving ruling on sanctions against Seddio and Gorkin, ~~and his state-ments during the attorney sanctions hearing regarding the likely dissipation~~ ~~of Plaintiffs' Escrow Deposits,~~ the very next morning, ~~Judge~~Justice Mostofsky recused himself *sua sponte* "due to personal relationship with" Graubard's replacement counsel Goldberg, just as ~~Seddio and~~Sprei, Graubard, and, on information and belief, Seddio had intended.

187.    117. The State Court Action ~~has since been~~was then assigned to a third judge in the Kings County Supreme Court, Hon. Richard J. Montelione, who ~~has~~ scheduled a hearing on Plaintiffs' contempt motion ~~on~~for November 5, 2025. Plaintiffs ~~have~~ requested that Justice Montelione address Plaintiffs' motion for attorney sanctions on which Justice Mostofsky reserved decision before his recusal.

188.    The instant federal action was commenced on October 17, 2025.

189.    Days before the November 5, 2025 contempt hearing, Seddio requested an adjournment due to various "[e]lection[] matters" as well as an extension of his time to answer the Contempt Motion.

190.    The Court responded to this request with the interim order dated October 31, 2025 (the "Interim Order") granting the requested adjournment only if one of three conditions was met, including the posting of a $120,000 bond by Seddio's client by 5 p.m. on November 3, 2025.

191.    Seddio, Sprei, Rubin, and Graubard then worked to obtain a bond in an effort to delay adjudication of Plaintiffs' contempt motion. The four corresponded with each other and a potential bondsman, with Rubin volunteering to advance $60,000.00 for the appearance bond. Ultimately, the four Defendants were unable to obtain a bond.

192.    Despite Defendants' failure to obtain a bond, Seddio attempted to manipulate the court into delaying the hearing by sending a woefully deficient and ineffective "draft bond" form

to the Court six minutes before the 5 p.m. deadline the Court had set for the posting of the bond. On information and belief, Seddio sent the invalid draft bond form to the court, in concert with Graubard and Sprei, so that Seddio and Graubard could later falsely claim (and did) that they thought a bond was being filed to excuse their knowing failure to appear at the November 5, 2025 hearing.

193.    No bond was filed on November 3, 2025, or subsequently in the matter.

194.    Despite the Court's Interim Order requiring Graubard and his counsel to appear at the hearing with proof that Plaintiffs' Escrow Deposits were intact in his IOLA, neither Graubard nor his counsel attended the November 5 contempt hearing. Nor did Sprei, Seddio, or Rubin.

195.    Instead, only after the state court ordered Plaintiffs to contact Seddio regarding his failure to appear that day, did Seddio send a per diem attorney to the hearing to make an application for adjournment to delay the resolution of the contempt motion against Graubard and to claim, untruthfully, that a bond was contemporaneously being filed with the court.

196.    During the hearing on November 5, 2025, Justice Montelione orally granted Defendants' contempt motion against Graubard on his default.

197.    That same evening, Graubard filed a letter to the Court under his own NYSCEF credentials falsely stating that he was prepared "to comply with Court directives." That representation was false because, at the time, the court's directive was for Graubard to deposit the $2 million Escrow Deposits with the clerk of the court, but Graubard did not possess the funds. Graubard filed a similar follow-on letter on November 7, 2025.

**K.**    ~~J.~~ Seddio~~'s~~ ~~Conduct in~~Discontinues the State Court Action ~~Fits His Pattern of Deceitful Litigation Conduct in Other Actions~~ In Another Attempt to Manipulate the Contempt Proceedings Against Graubard

198.    After Justice Montelione orally granted Defendants' contempt motion against Graubard, Sprei directed Gorkin, on behalf of *Graubard*, to draft a notice of discontinuance of the

49

State Cout Action and an accompanying letter which would be filed by *Seddio*, Gorkin's purportedly *opposing* counsel. The aim of the discontinuance was to divest the court of jurisdiction over the contempt order so that Graubard would not have to deposit the $2 million with the clerk of the court and to force the court to end the State Court Action and any continued inquiry into the status of Plaintiffs' Escrow Deposits, or at least to muddy the waters and delay the contempt proceedings to give Defendants more time to try to come up with the funds to repay Plaintiffs.

118. Seddio's tactic of submitting false statements to seek a purportedly emergency TRO on an *ex parte* basis and for an improper purpose is one he has employed and continues to employ in multiple actions across New York.

119. For example, after Seddio, Graubard, Wachtler, and others were sued in New York County for conversion, fraud, and deceit in connection with $7 million in escrow deposits that were never returned, in a case commenced on April 4, 2025, and captioned *317 Oakford LLC v. Lauren J. Wachtler et al.*, Index No. 652253/2025 (N.Y. Cty. Sup. Ct.) (the "*Oakford* Manhattan Action"), Seddio filed *three* separate special proceedings in *Kings County* Supreme Court seeking emergency TROs on an *ex parte* basis to enjoin and stay the *Oakford* Manhattan Action based on an underlying agreement signed by *Sprei* on behalf of his company "Olden Group."

120. In Seddio's first two proceedings, commenced on April 11 and 18, 2025, and both captioned *WHP Equities LLC v. Bruce Orlovsky et al.*, Index Nos. 512289/2025 and 512855/2025 (Kings Cty. Sup. Ct.), both seeking identical injunctive relief against the *Oakford* Manhattan Action, Seddio falsely claimed that the petitioner, WHP Equities LLC, a New Jersey company *registered to Defendant Rubin*, was a party to Sprei's underlying agreement. In his supporting affirmation in the second-filed proceeding, Seddio also falsely stated that "[n]o prior request for this relief has been made to this or any other Court." After the respondents pointed out that WHP Equities

50

LLC was not a party to the purported arbitration agreement, is a New Jersey company not authorized to do business in New York, *and is registered to Defendant Rubin*, Seddio voluntarily discontinued the two proceedings he brought on behalf of Rubin's company.

199.    121. On April 21November 6, 2025, Seddio commenced a *third* special proceeding, captioned *Ollden* [sic] *Group LLC v. Bruce Orlofsky et al.*, Index No. 513196/2025 (Kings Cty. Sup. Ct.), seeking the same injunctive relief as he had in the two prior proceedings. In his sworn affirmation in support of an *ex parte* TRO, Seddio again falsely stated that "no prior request for this relief has been made to this or any other Court." Moreover, the amended Verified Petition signed by Sprei and filed by Seddio on April 21, 2025, again falsely alleged that "WHP EQUITIES LLC" was a party to Sprei's underlying agreement.filed the notice of voluntary discontinuance of the action and accompanying letter which argued that the discontinuance deprived the court of jurisdiction over the contempt order and State Court Action generally. Seddio's letter admitted that, because "no complaint was ever filed" within "the twenty-day period for service of a complaint" pursuant to CPLR § 3012(b) following the defendants' (Plaintiffs here) appearance through counsel, the "time to serve a complaint ha[d] expired." Seddio further stated that he did not want to "litigate the procedural consequences of that lapse," so was instead "voluntarily discontinue[ing] this action without prejudice." Seddio concluded the letter by contending, wrongly, "that the failure to comply with CPLR § 3012(b) divest[ed the state court] of jurisdiction over the matter" and that his notice of discontinuance "terminates the proceeding in its entirety"—including, as he would later argue, the Court's enforcement of the contempt order against Graubard issued the previous day.

122. On May 20, 2025, the plaintiff in the *Oakford* Manhattan Action voluntarily dismissed the action and commenced a new action based on the same underlying conduct, captioned *Oakford*

*Management LLC et al. v. Lauren J. Wachtler et al.*, Index No. 610915/2025, in Nassau County Supreme Court (the "*Oakford* Nassau Action"). Unlike the *Oakford* Manhattan Action, however, the *Oakford* Nassau Action asserts a claim against Seddio personally for deceit and collusion in violation of Judiciary Law § 487 for his misrepresentations to the courts in his three earlier proceedings. After defaulting on his obligation to answer the complaint in the *Oakford* Nassau Action, and despite facing personal liability as a named defendant, Seddio again abused process by turning to the Kings County Supreme Court and his connections there to file a *fourth* special proceeding on August 11, 2025, captioned *Olden Group LLC v. Bruce Orlofsky et al.*, Index No. 527117/2025, in which he sought the same *ex parte* TRO he requested and failed to obtain in the prior three proceedings. The TRO was granted on August 19, 2025, enjoining the *Oakford* Nassau Action, and a hearing on broader relief was scheduled for September 17, 2025.

123. The above examples (which, on information and belief, are a few of many) show that Seddio has a history of abusing and manipulating the judicial system, including by submitting knowingly false sworn statements to obtain *ex parte* injunctive relief for collateral ends and engaging in blatant forum and judge shopping through which he can utilize his political influence, stemming from his role as the former chair of the Kings County Democratic Committee, in service of Sprei's schemes.

200. The discontinuance had its intended effect. On November 7, 2025, Justice Montelione issued a final order punishing Graubard for contempt of court, which the Court had drafted before Seddio filed the notice of discontinuance. At the end of the order, the Judge added the following, handwritten addendum: "The foregoing Final Order punishing David Graubart, Escrow Agent / Nominal Defendant is stayed pending a further order from the Court. All counsel for the respective parties must show cause at the call of the calendar on 11/12/2025 at 9:30am, Part 99,

52

whether the forgoing final order should or should not be vacated, modified, or enforced, based on the notice of discontinuance filed on 11/6/2025."

201.    While Seddio could have discontinued the action at any time prior to November 6, 2025, Seddio, Sprei, Rubin, and Graubard chose to voluntarily discontinue the action the day after Justice Montelione orally found Graubard in contempt of court for the purpose of preventing the court from effectuating its contempt order and delaying justice.

202.    Pursuant to his November 7, 2025 order, Justice Montelione held a hearing on November 12 to determine the effect of Plaintiff's discontinuance on the contempt proceedings. Seddio sent a per diem attorney to the hearing to argue that the court no longer retained jurisdiction, and anything further should be addressed in the instant action in federal court. In response, the Court asked what standing or reason the Plaintiff in this matter had to argue against the court's enforcement of its contempt order against Graubard. The reason was that, at all times, Seddio, Sprei, Graubard, and Rubin were working together to manipulate the State Court Action proceedings to hide the theft of Plaintiffs' Escrow Deposits and make the process of recouping those funds so costly and painful as to force Plaintiffs to abandon their rights.

203.    Goldberg, Graubard's attorney and agent, attended the November 12 hearing and represented to the Court that, despite his client's ongoing contempt of the Deposit Order, he could not say or represent whether the Escrow Deposits remained in Graubard's IOLA. This statement was false, as Goldberg has since testified under oath that, at least upon entering the matter, he was aware that Graubard was not in possession of Plaintiffs' Escrow Deposits.

204.    On November 20, 2025, Plaintiffs moved for sanctions against Seddio and Rubin for frivolous litigation conduct.

53

205.    On December 3, 2025, Justice Montelione entered a superceding contempt order ("Superceding Contempt Order") against Graubard for violating the Court's Deposit Order requiring Graubard to deposit the Escrow Deposits with the Court. The Superceding Contempt Order imposed monetary sanctions and required Graubard to file properly redacted copies of his IOLA records ("Account Records") showing all deposits, disbursements, or balances related to Plaintiffs' Escrow Deposits.

**L.    Graubard Files Frivolous Seriatim TRO Applications**

206.    Two days after the state court's issued its December 3, 2025 Final Contempt Order against Graubard, Graubard and Sprei, acting on information and belief in concert with Seddio, sought a TRO in the State Court Action seeking to vacate the Superceding Contempt Order and stay enforcement of its requirement that Graubard publicly file the Account Records on the State Court Action docket.

207.    Sprei worked in concert with Graubard and his agents to draft the frivolous and abusive TRO papers, and Sprei received copies of the motion papers before they were filed.

208.    The TRO was issued on December 8, 2025 (the "December 8 TRO"). The primary purpose of the request for the December 8 TRO was to prevent the public disclosure of the Account Records because they would reveal that Graubard had violated his legal and ethical obligations by immediately dissipating Plaintiffs' Escrow Deposits. The TRO lasted through December 12, 2025.

209.    During and after the pendency of the December 8 TRO, Graubard, working in concert with Seddio, Sprei, and their agents, filed five additional seriatim TRO applications in rapid succession, each seeking similar relief and each designed to further delay the court's requirement that Graubard publicly file the Account Records.

210.    The repeated filing of TRO applications, each based on substantially similar grounds and each denied by the Court, demonstrates that Graubard, Seddio, and Sprei employed

54

the litigation process not for any legitimate purpose, but solely to obstruct justice, prevent Plaintiffs from discovering the fate of their Escrow Deposits, and deter them from vindicating their rights by making the judicial process as costly and protracted as possible.

**M.      Defendants Orchestrate Justice Montelione's Recusal**

211.    When Justice Montelione indicated an unwillingness to grant Graubard's meritless TROs, Seddio, Sprei, and Graubard, further deceived and manipulated the state court to prevent Plaintiffs from vindicating their rights.

212.    On December 14, 2025, in the midst of the seriatim TRO applications described above and on the eve of Graubard's deadline to publicly file the Account Records on the State Court Action docket, Sprei and Graubard's attorney Gorkin discussed via WhatsApp messages a scheme to cause another recusal. Specifically, Sprei and Gorkin worked through the idea of bringing the ABK law firm into the State Court Action or starting a new related action in the same court wherein ABK would serve as counsel for Graubard or Rubin and thereby force Justice Montelione to recuse himself from the State Court Action due to the fact that ABK was representing Montelione in a separate unrelated litigation.

213.    The next day, December 15, 2025, Sprei and Seddio successfully executed a version of that scheme. Together, Seddio and Sprei had a phone call with Imran H Ansari, Esq. ("Ansari"), a partner at ABK who was also representing Justice Montelione, about potentially retaining ABK in connection with the pending sanctions motion against him, which was not returnable until February 2026.

214.    Ansari agreed in principle but considered ABK's retention subject to the execution of a retention agreement and payment of ABK's requisite $20,000 retainer. ABK conveyed to Seddio and Sprei that the firm would not notice its appearance nor represent Seddio in the State Court Action unless and until both these conditions were met.

55

215.    That afternoon, Sprei sent Ansari via email a letter to the court on Seddio's letterhead stating that Seddio had retained ABK to represent him in connection with the pending sanctions motion against him. The letter conspicuously omitted both the name of Justice Montelione, Ansari's client, and the caption of the State Court Action. The draft letter contained signature lines for both Seddio and Ansari.

216.    As of December 15, 2025 (or as of any day in the next two and a half months), Seddio had not in fact retained ABK because no retention agreement had yet been signed, and no retainer had yet been paid. And at no point before the letter's filing did Ansari indicate that he had reviewed the draft letter to the Court regarding ABK's purported engagement by Seddio.

217.    Nonetheless, Seddio filed the letter at 3:19 p.m. on December 15, 2025. As filed, the letter falsely stated, "I *have retained* counsel, Mr. Imran H Ansari, from the law firm of Aidala, Bertuna & Kamins P.C., to represent me in this matter." (emphasis added) and added electronic signatures not only for Seddio, but Ansari as well.

218.    At the time Seddio filed his December 15, 2025 letter, Seddio and Sprei knew that ABK represented Justice Montelione in unrelated litigation. Seddio, working in concert with Sprei and Graubard, filed the letter for the express purpose of orchestrating Justice Montelione's recusal from the State Court Action. Indeed, Montelione recused himself the next day.

219.    ABK did not receive Seddio's executed retainer agreement (signed by both Seddio and Sprei, who is singularly responsible for ABK's fees) and did not begin representing Seddio until March 2, 2026—a week after Plaintiffs supplemented their motion for sanctions against Seddio on with additional evidence, and just four days before Seddio's deadline to oppose the motion. Accordingly, Seddio's representation to the court that he had retained ABK as of December 15, 2025 was false.

56

220.     Seddio's and Sprei's delay in actually retaining ABK, combined with Seddio's immediate notification to the state court of ABK's purported involvement, demonstrates that Seddio's, Sprei's, and Graubard's purpose in filing the December 15 letter—which did not amount to a notice of appearance and had no legal effect or merit whatsoever—was to create a conflict that would force Justice Montelione off the case and further delay resolution of the matters pending before the court.

221.     Justice Montelione's recusal on December 16, 2025—the very next day after Seddio filed his letter—confirms that Seddio's, Sprei's, and Graubard's scheme achieved its intended objective of removing the presiding judge from the case and delay the sanctions hearing. Justice Francois A. Rivera was subsequently assigned to the case.

### N.     The Truth is Finally Revealed at the January 14, 2026 Hearing on Graubard's Civil Commitment for Contempt of Court

222.     On December 17, 2025, pursuant to the Superceding Contempt Order, Plaintiffs made an *ex parte* application for the arrest and commitment of Graubard due to Graubard's failure to cure his contempt by filing the Account Records by the December 8, 2025 deadline ordered by the Court.

223.     On January 6, 2026, Justice Rivera granted the application and issued an arrest warrant against Graubard for his continued contempt of the Deposit Order and the December 3, 2025 Superseding Contempt Order. The arrest warrant provided for Graubard to be seized and brought to (or otherwise appear at) a hearing on January 14, 2026, to show cause why he should not be civilly committed for contempt.

224.     On the morning of the commitment hearing, Graubard filed via his own NYSCEF credentials copies of December 2024 IOLA bank statement which he had redacted by hand and

57

that were plainly non-compliant with the Superceding Contempt Order's requirement that the Account Records include all deposits, disbursements, or balances related to the Escrow Deposits.

225. At the January 14, 2026 hearing before Justice Rivera, the truth was finally revealed: Graubard had transferred Plaintiffs' $2 million Escrow Deposits out of his IOLA almost immediately after he received them from Plaintiffs on December 6, 2024.

226. Goldberg confirmed to Justice Rivera at the January 14, 2026 hearing that, according to the December 2024 bank statement, on December 6, 2024, $2.5 million went out of Graubard's IOLA account-including the $2 million that Defendants had deposited.

227. Goldberg further confirmed at the January 14, 2026 hearing that Valley National Bank had closed Graubard's IOLA as of June 30, 2025—weeks before the July 17, 2025 Deposit Order was even issued.

228. These revelations demonstrated that, throughout the entirety of this litigation, from the filing of the State Court Action and TRO in February 2025 through multiple court orders requiring the deposit or return of the Escrow Deposits, Graubard never possessed the $2 million he was repeatedly ordered to deposit with the Court.

229. The January 14, 2026 hearing thus confirmed that the representations made by Graubard, Seddio, Sprei, Rubin, and their agents throughout the State Court Action—including repeated assurances that Graubard would comply with court orders to deposit Plaintiffs' Escrow Deposits with the clerk of the court—were false when made. At no point during the State Court Action did Graubard have the ability to comply with any order directing him to deposit the $2 million because those funds had been disbursed to a third party at Sprei's direction on December 6, 2024, before the State Court Action was even commenced.

230. Defendants were aware of this fact before and at the time they commenced the sham litigation. Despite this fact, Defendants knowingly, deceitfully, and maliciously prosecuted for nine months a meritless litigation through which they sought relief, on an emergency basis, that they did not want or need. Defendants utilized the State Court Action and abused process for the improper purpose of shielding their unlawful behavior and preventing Plaintiffs from obtaining the Escrow Deposits that were rightfully theirs.

### O. ~~K.~~ Plaintiffs' Injuries Are Ongoing

231. ~~124. Graubard's~~The ongoing ~~refusal, in coordination with Seddio, Rubin, and Sprei, to return the $2 million in~~theft of Plaintiffs' Escrow Deposits ~~that unquestionably belong to Plaintiffs~~ has caused, and continues to cause, significant financial injuries, including the $2 million in original principal, tens of thousands of dollars (and counting) in foregone interest payments that Plaintiffs would have received by ~~holding~~maintaining the $2 million in a savings account, lost opportunities to obtain investment returns above and beyond simple interest in an amount to be determined at trial, and ~~hundreds of thousands~~millions of dollars (and counting) in legal expenses to defend against the sham State Court Action and prosecute this action~~,~~, which Defendants have also willfully protracted through their violation of multiple of this Court's orders as part of their continued goal of delaying process and deterring Plaintiffs from relying on the justice system to protect and enforce their unquestionable and unqualified rights.

232. ~~125.~~ In addition, Defendants' misconduct has had the effect of tarnishing the reputation of the American judicial system in the eyes of foreign investors like Plaintiffs, who previously admired American courts' commitment to the rule of law. Defendants' seeming ability to get away with a heist of $2 million in broad daylight, through transparent lies and abuses of legal process, makes a mockery of those ideals. It must be stopped.

## CAUSES OF ACTION

### COUNT 1
### Declaratory Judgment
### 28 U.S.C. § 2201
### (Against Graubard, Sprei, Rubin, and ~~Sprei~~Frankl)

233. ~~126.~~ Plaintiffs restate and reallege paragraphs 1–232~~122~~ as if fully set forth herein.

234. ~~127.~~ Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration," and "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

235. ~~128.~~ Here, an actual and substantial controversy exists among Plaintiffs, Graubard, Sprei, Rubin, and ~~Sprei~~Frankl concerning the scope and extent of Plaintiffs' rights to the $2 million Escrow Deposits ~~held by~~they entrusted to Graubard in December 2024.

236. ~~129.~~ Plaintiffs' interests in the Escrow Deposits are real and adverse to the purported interests of Graubard, Sprei, Rubin, and ~~Sprei~~Frankl.

237. ~~130.~~ This controversy is ripe for adjudication because Graubard, Sprei, Rubin, and ~~Sprei~~Frankl are continuing to repudiate and interfere with Plaintiffs' rights to the Escrow Deposits, and Plaintiffs' injuries are ongoing.

238. ~~131.~~ Accordingly, Plaintiffs are entitled to a declaratory judgment that the Escrow Agreements grant Plaintiffs exclusive and preclusive rights to obtain the return of the Escrow Deposits, the Escrow Agreements require Graubard to unconditionally return the Escrow Deposits to Plaintiffs immediately, and Plaintiffs' rights to recover the Escrow Deposits are superior to any interests that Graubard, Sprei, Rubin, ~~or Sprei~~and Frankl may claim to have in preventing their recovery.

60

**COUNT 2**
**Breach of Contract**
**(Against Graubard)**

239. ~~132.~~ Plaintiffs restate and reallege paragraphs 1–232~~122~~ as if fully set forth herein.

240. ~~133.~~ Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

241. ~~134.~~ Plaintiffs performed all of their obligations under the Escrow Agreements.

242. ~~135.~~ Graubard failed to perform his unqualified obligation to return Plaintiffs' Escrow Deposits upon their demand pursuant to Paragraph 4 of the Escrow Agreements.

243. ~~136.~~ As a direct and proximate result of Graubard's breach of the Escrow Agreements, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

**COUNT 3**
**Tortious Interference with Contract**
**(Against Sprei, Seddio, ~~and~~ Rubin, and Frankl)**

244. ~~137.~~ Plaintiffs restate and reallege paragraphs 1–232~~122~~ as if fully set forth herein.

245. ~~138.~~ Each Plaintiff is a party to a materially identical Escrow Agreement with Graubard, each of which is valid and enforceable.

246. ~~139.~~ Sprei, Seddio, ~~and~~ Rubin, and Frankl have had knowledge of the Escrow Agreements.

247. ~~140.~~ Sprei intentionally and improperly procured a breach of the Escrow Agreement by instructing Graubard not to release the Escrow Deposits to Plaintiffs and by working in concert with Seddio and Rubin to initiate and prosecute the sham State Court Action under false pretenses and for improper collateral purposes.

248. ~~141.~~ Seddio and Rubin intentionally and improperly procured a breach of the Escrow Agreements by initiating and prosecuting the sham State Court Action under false pretenses

61

and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and assisting Graubard's contempt of the Deposit Order, Interim Order, and Superceding Contempt Order.

249.    Frankl intentionally and improperly procured a breach of the Escrow Agreements by instructing and working with Graubard to release the Escrow Deposits to third-party entities for the benefit of Sprei and Rubin, knowing that Frankl himself lacked authority from Plaintiffs to do so and that the Escrow Agreements prohibited the transfer of the Escrow Deposits absent Plaintiffs' consent.

250.    142. As a direct and proximate result of Sprei's, Seddio's, and Rubin's, and Frankl's misconduct, Graubard breached the Escrow Agreements, and Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

251.    143. Because Sprei, Seddio, and Rubin, and Frankl acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 4
### Breach of Fiduciary Duty
### (Against Graubard)

252.    144. Plaintiffs restate and reallege paragraphs 1–232122 as if fully set forth herein.

253.    145. Graubard owes Plaintiffs fiduciary duties in his capacity as their escrow agent, including a strict obligation to protect Plaintiffs' rights in connection with their Escrow Deposits and a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

254.    146. Graubard breached his fiduciary duties to Plaintiffs by placing interests of others above Plaintiffs' exclusive rights to their Escrow Deposits.

255. ~~147.~~ Graubard further breached his fiduciary duties to Plaintiffs by refusing to return the Escrow Deposits to Plaintiffs in strict compliance with his unqualified obligations under the Escrow Agreements.

256. ~~148.~~ Graubard further breached his fiduciary duties to Plaintiffs by, on information and belief, dissipating their Escrow Deposits and/or transferring them to one or more third parties.

257. ~~149.~~ As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

258. ~~150.~~ Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT 5
### Aiding and Abetting Breach of Fiduciary Duty
**(Against Sprei, Seddio, ~~and~~ Rubin, and Frankl)**

259. ~~151.~~ Plaintiffs restate and reallege paragraphs 1–232~~122~~ as if fully set forth herein.

260. ~~152.~~ As alleged in Count 4, Graubard breached his fiduciary duties to Plaintiffs.

261. ~~153.~~ Sprei, Seddio, ~~and~~ Rubin, and Frankl each have had actual knowledge of Graubard's fiduciary duties to Plaintiffs in his capacity as their escrow agent, including a duty to deliver the Escrow Deposits in strict compliance with the conditions imposed by the Escrow Agreements.

262. ~~154.~~ By directing and working with Graubard to transfer the Escrow Deposits to third party entities absent Plaintiffs' consent or knowledge, directing Graubard not to return the Escrow Deposits to Plaintiffs ~~as well as~~, and working in concert with Seddio, Rubin, and Graubard to initiate and prosecute the sham State Court Action to give cover to and allow the continuation of Graubard's breach, Sprei substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

263. ~~155.~~ By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for im-

proper collateral purposes, and assisting Graubard's contempt of the Deposit Order, Interim Order, and Superceding Contempt Order, Seddio and Rubin substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

264.    By directing Graubard to dissipate the Escrow Deposits by transferring them to third-party entities for the benefit of Sprei and Rubin and absent Plaintiffs' consent or knowledge, Frankl and Sprei substantially assisted Graubard in breaching his fiduciary duties to Plaintiffs.

265.    156. As a direct and proximate result of Sprei's, Seddio's, and Rubin's, and Frankl's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

266.    157. Because Sprei, Seddio, and Rubin, and Frankl each acted intentionally, will-fully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 6**
**Abuse of Process: February 19, 2025 TRO**
**(Against Sprei, Seddio, and Rubin)**

267.    158. Plaintiffs restate and reallege paragraphs 1–232122 as if fully set forth herein.

268.    159. On February 19, 2025, Sprei, Seddio, and Rubin together obtained and em-ployed regularly issued process in the State Court Action, namely the TRO, compelling Graubard not to return Plaintiffs' Escrow Deposits and Plaintiffs to forbear from obtaining the return of their Escrow Deposits.

269.    160. On information and belief, and asAs evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, bothSprei, Seddio, and Rubin intended, without ex-cuse or justification, to harm Plaintiffs' exclusive rights to their Escrow Deposits without justifi-cation.

270.    ~~161. On information and belief, and as~~As evidenced by their conduct in and after obtaining and serving the TRO on Plaintiffs, Sprei, Seddio, and Rubin employed the TRO to obtain a collateral objective outside the legitimate ends of the process, namely to give the false appearance of legality to the misappropriation of Plaintiffs' funds by Graubard, Sprei, Frankl, and those working in concert with them, to buy time for Sprei and Graubard to replenish Plaintiffs' Escrow Deposits, which they or their associates had illegally dissipated, and to prevent Plaintiffs from pursuing the return of their Escrow Deposits through legal or other process.

271.    As evidenced by their subsequent and strategically timed discontinuance of any claims in the State Court Action, Sprei, Seddio, and Rubin knew the TRO had been improperly obtained.

272.    ~~162.~~ Sprei, Seddio, and Rubin's actions demonstrate a perversion of the legal process for a purpose not justified by the nature of the process at issue.

273.    ~~163.~~ As a direct and proximate result of Sprei, Seddio, and Rubin's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and the instant action, in an amount to be determined at trial.

274.    ~~164.~~ Because Sprei, Seddio, and Rubin acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 7**
**Abuse of Process: December 8, 2025 TRO**
**(Against Graubard and Sprei)**

275.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

276.    On December 8, 2025, Graubard and Sprei obtained and employed regularly issued process in the State Court Action in the form of a TRO. The December 8 TRO enjoined enforcement of the Superceding Contempt Order until December 12, 2025.

65

277. Graubard and Sprei directly participated in obtaining the preparation of the December 8 TRO.

278. The December 8 TRO was entirely without legal merit, as it did not even reference irreparable and imminent harm, the touchstone requirements for a temporary restraining order.

279. On information and belief, and as evidenced by their conduct in filing five additional and near identical seriatim TROs after obtaining the December 8 TRO, Graubard and Sprei intended to harm, without excuse or justification, Plaintiffs' exclusive rights to their Escrow Deposits.

280. On information and belief, and as evidenced by their conduct in filing five additional and near identical seriatim TRO's after the December 8 TRO was issued, Graubard and Sprei employed the December 8 TRO to obtain a collateral objective outside the legitimate ends of the process, namely to hide the fact that Graubard and his associates had immediately dissipated the Escrow Deposits more than a year earlier and to prevent Plaintiffs from discovering the truth about their stolen funds.

281. Graubard's and Sprei's actions demonstrate a perversion of the legal process for a purpose not justified by the nature of the process at issue.

282. As a direct and proximate result of Graubard's and Sprei's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate the sham State Court Action, in an amount to be determined at trial.

283. Because Graubard and Sprei acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 8**
**Malicious Prosecution**
**(Against Seddio, Sprei, Graubard, and Rubin)**

284. Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

285.    Seddio, Sprei, Graubard, and Rubin worked in concert to commence and prosecute the State Court Action against Plaintiffs.

286.    Sprei actively participated in and controlled the State Court Action from the moment of its initiation until (and through) its discontinuance.

287.    Graubard also directly participated, including through his agents Sprei and Gorkin, in the prosecution of the State Court Action, including by drafting correspondence and documents for Seddio to submit to the court on behalf of the purported Plaintiff.

288.    Rubin had actual knowledge that the State Court Action was initiated and was being prosecuted in his name by and through his own attorney and agent, Seddio, and affirmatively or constructively approved the prosecution of the sham State Court Action in his name. Rubin remained in constant contact with Sprei throughout the pendency of the State Court Action regarding the developments and Defendants' strategy there and even worked in concert with Seddio, Graubard, and Sprei to engineer (unsuccessfully) an adjournment of the November 5, 2025 contempt hearing before Justice Monteleone to avoid a ruling on Graubard's contempt of the July 17, 2025 Deposit Order.

289.    The initiation and prosecution of the State Court Action substantially interfered with Plaintiffs' property rights in the Escrow Deposits.

290.    Seddio, Sprei, Graubard, and Rubin acted with malice in commencing and prosecuting the State Court Action.

291.    Seddio, Sprei, Graubard, and Rubin had no probable cause to believe the State Court Action could succeed.

292.    No complaint was ever filed in the State Court Action.

293. The State Court Action was terminated in favor of Plaintiffs when it was voluntarily discontinued on November 6, 2025.

294. Plaintiffs suffered special damages as a result of the State Court Action.

295. Because Seddio, Sprei, Graubard, and Rubin acted intentionally, willfully, and with a malicious, fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 79**
**Attorney Deceit and Collusion**
**N.Y. Judiciary Law § 487**
**(Against Seddio)**

296. 165. Plaintiffs restate and reallege paragraphs 1–122232 as if fully set forth herein.

297. 166. New York Judiciary Law § 487(1) provides that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

298. 167. Seddio is an attorney admitted to practice in New York.

299. 168. In connection with the State Court Action, Seddio engaged in and consented to numerous acts of deceitful and collusive conduct, with the intention of deceiving the court and other parties, including, but not limited to, (a) misrepresenting that Olden LLC's motion for a TRO had to be heard on an emergency, *ex parte* basis; (b) submitting a knowingly false and fraudulent affidavit from Rubin in support of the TRO and preliminary injunction; (c) purporting to unilaterally extend the state court's Deposit Order deadline before directing Graubard not to deposit the funds, in violation of the Deposit Order; and (e) apparently(d) making false and fraudulent representations to Justice Mostofsky's Chambers concerning the reasons for Graubard's failure to de-

68

posit the $2 million with the clerk of the court as ordered; and (e) orchestrating the recusal of ~~at~~ ~~least~~ one or more presiding judges ~~in the State Court Action~~.

300.    As a direct and proximate result of Seddio's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and this action, in an amount to be determined at trial.

301.    Plaintiffs are entitled to treble damages.

**COUNT 10**
**Attorney Deceit and Collusion**
**N.Y. Judiciary Law § 487**
**(Against Graubard)**

302.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

303.    New York Judiciary Law § 487(1) provides that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

304.    Graubard is an attorney admitted to practice in New York.

305.    In connection with the State Court Action, Graubard engaged in numerous acts of deceitful and collusive conduct, with the intention of deceiving the court and other parties, including, but not limited to, (a) submitting knowingly false and fraudulent correspondence to the court falsely indicating that Graubard continued to possess and was capable of returning Plaintiffs' $2 million Escrow Deposits; (b) making false and fraudulent representations for Seddio to relay to Justice Mostofsky's Chambers concerning the reasons for Graubard's failure to deposit the $2 million with the clerk of the court as ordered; and (c) orchestrating the recusal of one or more presiding judges.

306. ~~169.~~ As a direct and proximate result of ~~Seddio's~~Graubard's misconduct, Plaintiffs have suffered actual damages, including substantial legal expenses to litigate both the sham State Court Action and this action, in an amount to be determined at trial.

307. ~~170.~~ Plaintiffs are entitled to treble damages.

## COUNT ~~8~~11
### Conversion
### (Against Graubard)

308. ~~171.~~ This claim is brought in the alternative to Count 2 (breach of contract)~~, in the event the Escrow Agreements are deemed invalid or otherwise unenforceable~~.

309. ~~172.~~ Plaintiffs restate and reallege paragraphs 1–~~122~~232 as if fully set forth herein.

310. ~~173.~~ The Escrow Deposits constitute identifiable funds of money belonging to Plaintiffs alone.

311. ~~174.~~ Graubard has exercised dominion, ownership, and control of the Escrow Deposits without legal authorization.

312. ~~175.~~ Plaintiffs made repeated demands to Graubard for the immediate return of the Escrow Deposits.

313. ~~176.~~ Graubard refuses to return the Escrow Deposits to Plaintiffs.

314. ~~177.~~ As a direct and proximate result of Graubard's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

315. ~~178.~~ Because Graubard acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

## COUNT ~~9~~12
### Aiding and Abetting Conversion
### (Against Sprei, Seddio, ~~and~~ Rubin, and Frankl)

316. ~~179.~~ This claim is brought in the alternative to Count 3 (tortious interference)~~, in the event the Escrow Agreements are deemed invalid or otherwise unenforceable~~.

70

317.    180. Plaintiffs restate and reallege paragraphs 1–122232 as if fully set forth herein.

318.    181. As alleged in Count 811, Graubard unlawfully converted Plaintiffs' Escrow Deposits.

319.    182. Sprei, Seddio, and Rubin, and Frankl each have had actual knowledge of Graubard's conversion of Plaintiffs' funds.

320.    By directing Graubard to transfer the Escrow Deposits out of his IOLA, Frankl substantially assisted Graubard's conversion of Plaintiffs' Escrow Deposits.

321.    183. By directing and working with Graubard to transfer the Escrow Deposits to third party entities, directing Graubard not to return the Escrow Deposits to Plaintiffs, and by working in concert with Seddio and Rubin to initiate and prosecute the sham State Court Action under false pretenses and for improper collateral purposes, Sprei substantially assisted Graubard's conversion of Plaintiffs' Escrow Deposits.

322.    184. By initiating and prosecuting the sham State Court Action under false pretenses and for improper collateral purposes, obtaining the TRO under false pretenses and for improper collateral purposes, and unilaterally extending the deadline for, then coordinating Graubard's violation of, the state court's Deposit Order, Interim Order, and Superceding Contempt Order, Seddio and Rubin substantially assisted in Graubard's conversion of Plaintiff's Escrow Deposits.

323.    185. As a direct and proximate result of Sprei's, Seddio's, and Rubin's, and Frankl's misconduct, Plaintiffs have suffered actual damages in an amount, no less than $2 million, to be determined at trial.

324.    186. Because Sprei, Seddio, and Rubin, and Frankl each acted intentionally, willfully, and with fraudulent motive and wanton disregard of Plaintiffs' rights, punitive damages are also warranted.

**COUNT 13**
**Unjust Enrichment**
**(Against Sprei and Rubin)**

325.    This claim is brought in the alternative to Count 3 (tortious interference), Count 5 (aiding and abetting breach of fiduciary duty), and Count 12 (aiding and abetting conversion).

326.    Plaintiffs restate and reallege paragraphs 1–232 as if fully set forth herein.

327.    Sprei was enriched by the transfer of Plaintiffs' Escrow Deposits, which Sprei directed, from Graubard's IOLA to 536 Holdings and Queen Entities for the purpose of directing those funds to fund Sprei's other investments and satisfy his outstanding debts.

328.    The benefit Sprei received was both specific and direct, as Sprei directed the transfer of Plaintiffs' Escrow Deposits for the specific purpose of funding his personal debts and investment positions.

329.    Sprei personally obtained a possessory and/or investment interest in Surf 9 and other assets that he would not otherwise have held, using Plaintiffs' Escrow Funds rather than his own capital.

330.    Rubin, via Queen Equities, was enriched by Plaintiffs' Escrow Deposits, which Queen Equities—i.e. Rubin, received from Graubard's IOLA as follows: via a $350,000 check deposit on December 6, 2024 and a $250,000 wire on December 12, 2024.

331.    The relevant portions of Plaintiffs' Escrow Funds deposited into Queen Equities' account were, in substance, placed under Rubin's direct and personal control.

332.    Rubin, as the sole manager and ninety-nine percent owner of Queen Equities, used those funds for his own personal benefit.

72

333.    The direct and specific benefit Rubin received from the Escrow Deposits was separate and apart from, and independent of, his role as the sole manager and member of Queen Equities.

334.    While Sprei and Rubin benefitted from their receipt of Plaintiffs' Escrow Funds, Plaintiffs suffered harm by being denied the return of their Escrow Deposits.

335.    Equity and good conscience weigh against permitting Sprei and Rubin to retain the benefits each personally obtained from Plaintiffs' Escrow Funds.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.    an order declaring that Plaintiffs have exclusive rights to the Escrow Deposits, that Defendants' actions, as set forth above, constitute violations of the common law set forth above, and that Defendants are liable to Plaintiffs, as described herein, for damages arising therefrom;

B.    a judgment awarding Plaintiffs all appropriate actual damages permitted by law, in an amount to be determined at trial, but no less than $2 million;

C.    a judgment awarding Plaintiffs exemplary, punitive, and/or treble damages, as permitted by law;

D.    a judgment awarding Plaintiffs equitable, injunctive, and/or declaratory relief as may be appropriate, including, but not limited to, specific performance, rescission, restitution, and disgorgement;

E.    a judgment awarding Plaintiffs pre- and post-judgment interest, as permitted by law;

F.    a judgment awarding Plaintiffs costs and fees, including attorneys' fees, as permitted by law; and

G.    such other legal, equitable, or further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all issues so triable as a matter of right.

Dated:  New York, NY
         ~~October~~July 1~~7~~3, 202~~5~~6

Respectfully submitted,

~~SELENDY GAY PLLC~~

By:    /s/    *Lauren J. Zimmerman*
       Lauren J. Zimmerman
       BENESCH, FRIEDLANDER, COPLAN & AR-
       ONOFF LLP
       1155 Avenue of the Americas, Floor 26
       New York, NY 10036
       Tel: (646) 356-6023
       lzimmerman@beneschlaw.com

       Jennifer M. Selendy
       Lauren J. Zimmerman
       Babak Ghafarzade
       SELENDY GAY PLLC
       1290 Avenue of the Americas
       New York, NY  10104
       Tel: 212-390-9000
       jselendy@selendygay.com lzimmer-
       man@selendygay.com bghafarzade@selendy-
       gay.com

       *Attorneys for Plaintiffs Angelos Metaxas and*
       *Pertshire Investments LP*

74

| Changes Key |
| --- |
| Add |
| Delete |
| Move From |
| Move To |