# Law Offices of Mordy Gross LLC

418 Broadway # 10612 • Albany, NY 12207
484.680.0768 • mg@mordygross.com
*Admitted in New York and New Jersey*

July 21, 2026

Via ECF
Hon. Peggy Cross-Goldenberg
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *Metaxas et al. v. Graubard et al.*, No. 1:25-cv-05844 (EK) (PCG)
       Defendant Jonathan Rubin's Opposition to Plaintiffs' Motion for Leave to Amend (ECF 151), to the Extent It Asserts New Claims Against Mr. Rubin

Dear Judge Cross-Goldenberg:

I represent Defendant Jonathan Rubin. Mr. Rubin respectfully submits this letter in partial opposition to Plaintiffs' motion for leave to amend and supplement the Complaint (ECF 151; the proposed amended complaint is annexed in clean form at ECF 151-1 and in redline at ECF 151-2 — paragraph citations herein are to the clean version, ECF 151-1) — solely as to the two new claims proposed against him: malicious prosecution (proposed Count 8) and unjust enrichment (proposed Count 13). Mr. Rubin takes no position on the balance of the amendment. Leave should be denied as to these two counts because (i) the motion reverses, without explanation, Plaintiffs' June 3 representation to this Court that no new claims against Mr. Rubin were coming, and (ii) both counts are futile on the face of the proposed pleading. In the alternative, the discovery record reinforces those defects and defines the targeted discovery any amendment would require, and amendment after the close of discovery would unduly prejudice Mr. Rubin unless conditioned as set out at the end of this letter. Because the state-court materials cited below are matters of public record subject to judicial notice, and the remaining record materials are not on this Court's docket, copies are annexed to the accompanying Declaration of Mordy Gross: the cited state-court filings as Exhibits A–G, excerpts of the cited deposition transcripts as Exhibit H, the cited bank-record pages (from the RUBIN-000127–578 production, redacted) as Exhibit I, Sprei's responses to Mr. Rubin's Second Set of Requests for Admission as Exhibit J, and Mr. Rubin's First Set of Requests for Admission to Sprei — to which no response was ever served — together with the service and extension correspondence, as Exhibit K; and the July 2026 correspondence in which Plaintiffs' counsel confirmed there is "nothing to supplement" in response to Interrogatory No. 16, as Exhibit L.

**Legal standard.** Leave to amend, though freely given, is properly denied for undue delay, bad faith or dilatory motive, undue prejudice, or futility. *Foman v. Davis*, 371 U.S. 178,

1

182 (1962); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021) (cited by Plaintiffs, ECF 151 at 3). A proposed amendment is futile if it would not survive Rule 12(b)(6). *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (cited by Plaintiffs, ECF 151 at 5). Point I addresses undue delay and bad faith. Points II and III thus show, on the proposed pleading alone (together with state-court filings subject to judicial notice), that the proposed counts fail. Point IV addresses the discovery record separately and in the alternative — as confirmation of the facial defects, as the measure of prejudice, and as the basis for the conditions requested at the end of this letter. Point V addresses the undue prejudice to Mr. Rubin.[1]

### I.    The Motion Reverses Plaintiffs' June 3 Representation, Without Explanation, on Facts They Had Possessed for Months.

On June 3, 2026, in the Joint Status Report, Mr. Rubin asked to be heard on the scope of any amendment before it was made. Plaintiffs responded that his request was "nonsensical given that Plaintiffs do not intend to add any new claims against Rubin," and added: "In any event, Rubin will have every opportunity to advance his theory of the case in his forthcoming dispositive motions." ECF 118 at 20. Plaintiffs had, on the prior page, proposed to move after the close of discovery "to amend and supplement their Complaint to conform to the evidence learned through discovery." ECF 118 at 19. So the timing of a motion was disclosed; the claims against Mr. Rubin were expressly taken off the table. Mr. Rubin proceeded on that stated understanding: two days later, he renewed his Rule 12(c) pre-motion request to Judge Donnelly (then presiding) on the stated premise that "[t]he Complaint as pled is therefore the entirety of Plaintiffs' case against Mr. Rubin," ECF 120 at 1 (June 5, 2026), and he completed the final month of fact discovery — including his additional June 29 Rule 36 requests — on the case as pleaded. Forty days after the representation, and thirteen days after fact discovery closed, Plaintiffs moved to add two new claims against Mr. Rubin, without acknowledging the representation, let alone explaining what changed. Mr. Rubin does not ask the Court to work through the elements of judicial estoppel; *Foman* supplies the standard here. But the equitable principle the Supreme Court has endorsed in that neighboring context states the common sense of the matter: "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4477, p. 782 (1981)). The unexplained reversal, and the reliance it induced, bear directly on the dilatory-motive, bad-faith, and prejudice factors that warrant denial under *Foman*.

The chronology forecloses any suggestion that the new claims rest on new information:

---

1 In *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110–11 (2d Cir. 2001), the Second Circuit applied the summary-judgment measure of futility where the amendment was proposed in response to a fully briefed Rule 56 motion with all relevant evidence before the court. Mr. Rubin does not contend that posture is present here, and he does not ask the Court to adjudicate the merits on this letter motion.

First, Count 8 is not here because Plaintiffs learned something new; it is here because Plaintiffs earlier chose not to plead it. Every fact Count 8 alleges predates the June 3 representation — all by nearly seven months or more, and the earliest by more than a year. The latest-occurring fact the proposed count alleges against Mr. Rubin is that he "worked in concert . . . to engineer" the adjournment of the November 5, 2025 contempt hearing (ECF 151-1 ¶ 288) — an event of November 2025, seven months before June 3 and eight months before this motion. The favorable termination it pleads accrued on November 6, 2025 (ECF 151-1 ¶ 293). The theory itself is older still: Plaintiffs' state-court brief of April 11, 2025 told that court that "Olden LLC and Rubin appear to be nothing more than fronts to help facilitate Sprei and Graubard's theft" (NYSCEF Doc. 11 at 9 (Ex. A)), and when asked at deposition what Plaintiffs learned about Mr. Rubin after that filing, Mr. Metaxas could not identify anything (Metaxas Tr. 53:6–24). Plaintiffs did not merely possess these facts — they litigated them: fourteen days after the discontinuance, Plaintiffs moved for sanctions in the state court against Seddio and Mr. Rubin jointly, describing Mr. Rubin as Seddio's "apparent alter ego" and enumerating "frivolous conduct" including "[c]ommencing this sham litigation." NYSCEF Doc. 93 (Mot. Seq. 4, filed Nov. 20, 2025) (Ex. B); NYSCEF Doc. 200 (filed Feb. 24, 2026) at 6–7 (Ex. C). A party that accused Mr. Rubin of jointly commencing sham litigation on November 20, 2025 needed no discovery to plead this claim in this Court — where Mr. Rubin was already a defendant — at any point in the nearly eight months that followed; and on June 3, Plaintiffs stated that they did not intend to plead it. (The state court dismissed that sanctions motion as against Mr. Rubin and continued the hearing "against Seddio" alone, NYSCEF Doc. 260 (Rivera, J., Mar. 12, 2026) (Ex. D) — and the state forum remained open to Plaintiffs, who themselves argued there that a discontinuance "does not divest a court of jurisdiction to impose sanctions for frivolous conduct." NYSCEF Doc. 89 at 1 (Nov. 7, 2025) (collecting authority) (Ex. E).)

Second, the same is true of proposed Count 13. By Plaintiffs' own account in the motion letter itself, Graubard "admitted in open court" on January 14, 2026 that he had transferred the escrow deposits in December 2024 at third parties' instructions. ECF 151 at 2. By April 1, 2026, Plaintiffs' discovery requests defined and targeted the "Queen Equities Accounts" (ECF 74), and through April 2026 they litigated — successfully — for Mr. Rubin's and Queen's bank records (ECF 76, 78, 80; Order, ECF 89 (Apr. 30, 2026)). All of it preceded June 3.

Third, Plaintiffs' most recent state-court account of the same events attributes to others the very acts Count 8 now attributes to Mr. Rubin. On June 26, 2026 — three weeks after the June 3 representation and seventeen days before this motion — Plaintiffs filed comprehensive proposed findings of fact in support of sanctions against Graubard and Goldberg, recounting act by act the assertedly frivolous conduct in the State Court Action. NYSCEF Docs. 353, 354 (Mot. Seq. 8) (Ex. F). Those findings attribute the November 5 adjournment request to Seddio alone and the November 5 non-appearance to Graubard and Goldberg (NYSCEF Doc. 353 ¶¶ 76–78, pt. D; NYSCEF Doc. 354 pt. II.A) — the same adjournment Count 8 alleges Mr. Rubin "engineer[ed]" (ECF 151-1 ¶ 288) — without identifying any act by Mr. Rubin in connection

with it. Seventeen days later, Plaintiffs filed this motion asserting the opposite, and they identify nothing that happened in those seventeen days to explain the change.

Plaintiffs' own authority confirms what this chronology means for Rule 15. In *State Teachers,* the Second Circuit excused a delayed amendment where "no trial date had been set by the court and no motion for summary judgment had yet been filed," and the delay was justified by the plaintiff's need to verify the underlying facts. *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981). As in *State Teachers,* no trial date has been set here. But unlike the *State Teachers* plaintiff, Plaintiffs needed no discovery to "verify" facts they had already asserted in another court eight months earlier — and no *State Teachers* plaintiff first told the court that the claim was not coming. And the delay has already cost Mr. Rubin something concrete. His Rule 12(c) pre-motion request — pending since May 11, 2026 (ECF 98) and renewed on June 5 (ECF 120) — was denied on June 18 with leave to renew only after this motion is decided (June 18, 2026 docket order); a dispositive motion that Mr. Rubin believes would have substantially narrowed the claims against him was thus set aside in favor of this then-anticipated motion, which Plaintiffs did not file for another twenty-five days. Unexplained delay of that character, capped by the reversal of a representation on which Mr. Rubin structured the final month of discovery and his dispositive-motion strategy, warrants denial under *Foman* and *Sacerdote*.

## II.    Proposed Count 8 Is Futile on the Face of the Proposed Pleading.

Under New York law, the elements of malicious prosecution of a civil action are "(1) prosecution of a civil action against the plaintiff, (2) by or at the instance of the defendant, (3) without probable cause, (4) with malice, (5) which terminated in favor of the plaintiff, and (6) causing special injury." *Sapienza v. Notaro,* 241 A.D.3d 1379, 1381 (2d Dep't 2025); *Stewart v. Fein Such & Crain, LLP,* 236 A.D.3d 959, 962 (2d Dep't 2025); see *Engel v. CBS, Inc.,* 93 N.Y.2d 195, 204–06 (1999). The proposed pleading fails at least two independently necessary elements as to Mr. Rubin, and the contemporaneous termination record leaves a third — favorable termination — at best sharply contested.

First, the pleading does not plausibly allege that the State Court Action was prosecuted "by or at the instance of" Mr. Rubin. The specific, chronological allegations place every act of initiation elsewhere: the initiating papers were drafted by Sprei's counsel with "Sprei as the affiant" (ECF 151-1 ¶ 125); "Sprei and Seddio, with and through their agents, falsified the papers before filing" — including by changing "the manager and affiant's name to 'Johnathan Rubin'" and "affix[ing] a legally defective electronic /s/ signature" (ECF 151-1 ¶ 126); and "Sprei told Rubin that Sprei and Seddio . . . had filed the affirmation under Rubin's name" — that is, Mr. Rubin learned of the filing from Sprei after the fact (ECF 151-1 ¶ 127). ECF 151-1 at 28 n.4 attributes the "Graubart" misspelling to Seddio. Against that specific account, the allegations directed to Mr. Rubin are largely conclusory: the assertion that Seddio acted as Mr. Rubin's "own attorney and agent" in the State Court Action (ECF 151-1 ¶ 288) is supported by no pleaded retention, direction, or communication — ECF 151-1 ¶ 127 itself says only that Seddio

4

"represents Rubin in several other legal actions"; the allegation that Mr. Rubin "worked in concert . . . to engineer" the November 5, 2025 adjournment (ECF 151-1 ¶ 288) identifies no act or communication by him; and the allegation that Mr. Rubin "knew . . . at the time they filed" (ECF 151-1 ¶ 140) is pleaded on information and belief, with no source identified, and is in tension with ECF 151-1 ¶ 127's specific allegation of after-the-fact notice. The Court need not credit labels unsupported by factual content. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Nor do the continuation allegations cure the defect. A malicious prosecution claim may rest on wrongful "initiation, procurement or continuation" of the proceeding, *Sapienza*, 241 A.D.3d at 1381; *Stewart*, 236 A.D.3d at 962 — but continuation, like initiation, requires acts, and the pleading alleges none by Mr. Rubin after the filing: no appearance, no submission, no instruction to counsel, no payment, and no communication in the State Court Action. What it alleges instead is "actual" or "constructive" approval, "constant contact with Sprei," and the "engineer[ed]" adjournment (ECF 151-1 ¶ 288) — each stated without a single identified act — and, implicitly, that Mr. Rubin did not undo a filing made in his name without his authorization (ECF 151-1 ¶¶ 126–27). Inaction by a non-party to the proceeding, following an unauthorized use of his name, is not the affirmative prosecution the tort requires; the pleading offers no factual content from which ratification could plausibly be inferred, as opposed to merely labeled.

Second, the proposed pleading does not plausibly allege the absence of probable cause as to Mr. Rubin. The pleading alleges that the emergency application was filed on February 19, 2025 and that the state court granted the TRO the same day (ECF 151-1 ¶¶ 136, 141). The grant of provisional relief in the underlying action creates a presumption of probable cause. *Napoli v. James*, 204 A.D.3d 413, 414 (1st Dep't 2022) (preliminary injunction); *Shawe v. Elting*, 161 A.D.3d 585, 587 (1st Dep't 2018) (TRO "militates against any finding of lack of probable cause"); *Facebook, Inc. v. DLA Piper LLP (US)*, 134 A.D.3d 610, 614 (1st Dep't 2015) (TRO created presumption that "must be overcome by specifically pleaded facts"). Plaintiffs will answer that the TRO issued ex parte on falsified papers, and fraud in the procurement can rebut the presumption. *Facebook*, 134 A.D.3d at 614. But that answer traps Plaintiffs in a dilemma of their own pleading. Either the affirmation was authentic as to Mr. Rubin — that is, Mr. Rubin really was the affiant, as its face recited — in which case the falsification account on which the rebuttal rests (papers falsified by "Sprei and Seddio, with and through their agents," ECF 151-1 ¶¶ 125–126) falls away, and what remains is the assertion that Mr. Rubin himself knowingly swore falsely (ECF 151-1 ¶¶ 138–140): an assertion whose knowledge component is pleaded on information and belief, without any identified source, and in tension with ECF 151-1 ¶ 127's specific allegation of after-the-fact notice — not the "specifically pleaded facts" that overcoming the presumption requires, *Facebook*, 134 A.D.3d at 614, so Count 8 fails on the third element. Or the papers were falsified, as the pleading's detailed chronological account alleges (ECF 151-1 ¶¶ 125–127) — in which case Mr. Rubin was the instrument of the fraud, not its author, and Count 8 fails on the second element, because the action was not prosecuted "by or at the instance of" the man whose name was taken. The remaining path — that Mr. Rubin learned of the falsified

5

filing afterward and then ratified or continued the prosecution — is the continuation theory addressed under First above, and it fails the same way: the pleading identifies no act of ratification or continuation by him. Plaintiffs cannot have it both ways: the same falsification they plead to rebut probable cause is the falsification that removes Mr. Rubin from the prosecution. And even taking the fraud allegations as pleaded, *Napoli* confirms that an allegation of fabricated evidence does not automatically rebut the presumption: the fabrication allegations there were "not sufficient to rebut the presumption of probable cause." *Napoli*, 204 A.D.3d at 414.

Third, the fifth element — termination of the State Court Action in Plaintiffs' favor — is at best sharply contested, and the contemporaneous termination record preserves a substantial defense. The termination must have been "under such circumstances as to show . . . nonliability," or an abandonment "under circumstances 'which fairly imply the plaintiff's innocence.'" *Hudson Val. Mar., Inc. v. Town of Cortlandt*, 79 A.D.3d 700, 703 (2d Dep't 2010). The circumstances control. *Stewart*, 236 A.D.3d at 962–64. Mr. Rubin acknowledges that a voluntary discontinuance without prejudice is not categorically disqualifying — *Stewart* sustained such a claim at the pleading stage where the pleaded circumstances of the discontinuance supported the inference of favorable termination. *Id.* at 964. Here, the proposed pleading characterizes the discontinuance as strategic: filed the day after the contempt ruling against Graubard, it alleges, "with the aim of depriving the court of jurisdiction to enforce its contempt order or at least further delaying the proceedings" (ECF 151-1 ¶ 21). Even on that account, the abandonment concerned the contempt proceedings against Graubard — not any assessment of the merits of Olden's claims against Plaintiffs. And the termination record subject to judicial notice states the grounds on which the discontinuance was actually tendered: the contemporaneous explanation letter states that counsel elected to discontinue "[r]ather than litigate the procedural consequences" of the CPLR 3012(b) lapse; that the defendants "have since commenced an action . . . in the United States District Court involving the same subject matter and transactions at issue here" — this case — making it "duplicative and inefficient to maintain this action in parallel"; and that the notice was filed "[i]n the interest of judicial economy and to avoid inconsistent determinations," "without prejudice," with "each party to bear its own fees and costs." GRAUBARD_01576–01577 (NYSCEF Doc. 299, Attachment G) (Ex. G); see also GRAUBARD_01575 (notice of discontinuance). Those competing accounts make favorable termination fact-dependent: they do not supply the clean pleading-stage inference *Stewart* found pleaded, and they confirm that claim-specific discovery would be required if leave were granted — the prejudice addressed in Point V.

### III.    Proposed Count 13 Is Futile on the Face of the Proposed Pleading.

First, the pleaded transferee is Queen Equities LLC — not Mr. Rubin — and the personal-benefit allegations are conclusions. Count 13 alleges that the December 2024 transfers ($350,000 and $250,000) went to "Queen Equities" (ECF 151-1 ¶ 330), and it seeks restitution from Mr. Rubin personally on the strength of his roles: sole manager, 99% member, signing

authority (ECF 151-1 ¶¶ 73, 330–33). But ownership and managerial control of an LLC do not make the LLC's receipt the member's personal receipt, and the pleading identifies no distribution, no withdrawal, no personal expenditure, no asset purchase, and no particular obligation of Mr. Rubin's — as opposed to Queen's — discharged with the funds. The allegations that the funds were "in substance, placed under Rubin's direct and personal control" (ECF 151-1 ¶ 331) and "used . . . for his own personal benefit" "separate and apart from . . . his role" (ECF 151-1 ¶¶ 332–333) plead the conclusion; no fact supports it, and no veil-piercing or alter-ego facts are pleaded that would permit collapsing Queen into its member. *Iqbal*, 556 U.S. at 678–79. *United States v. Rivieccio*, 661 F. Supp. 281 (E.D.N.Y. 1987) (ECF 151 at 5), is not to the contrary: there the complaint's import was that the individual defendants themselves received the diverted funds and passed them to realty corporations they owned or controlled, and the court observed that equitable relief might still require piercing corporate veils. *Id.* at 293. Here the pleading alleges Queen's receipt, and pleads no veil-piercing facts at all.

Second, even treating Queen's receipt as a benefit to Mr. Rubin, the pleading itself characterizes the transfers as compensation for value previously given. Plaintiffs allege that Sprei directed the December 6 payments "as reimbursements to two entities that had previously funded Sprei's investments: $2.5 million to 536 Holdings . . . and $350,000 to Queen Equities" (ECF 151-1 ¶ 70); that Mr. Rubin "moved funds on Sprei's behalf," sometimes receiving "an interest or other payment" — lending compensation — and sometimes acting "as a personal favor" (ECF 151-1 ¶ 74); and their own motion describes the transfers as payment "in connection with Rubin's services for Sprei" (ECF 151 at 5). A pleading that itself alleges the recipient had previously advanced value, and was being repaid or compensated, does not plausibly allege that retention is "against equity and good conscience" without factual content showing why the retention was nonetheless inequitable. None is pleaded. Plaintiffs' own authority marks the boundary: unjust enrichment is an equitable, quasi-contractual theory — recovery lies only where "in equity and good conscience" the defendant should be required to surrender the money, *Rivieccio*, 661 F. Supp. at 293 (cited by Plaintiffs, ECF 151 at 5) — and equity distinguishes the gratuitous recipient from the recipient who gave value: "[a] bona fide purchaser of property upon which a constructive trust would otherwise be imposed takes free of the constructive trust, but a gratuitous donee, however innocent, does not." *Id.* at 292 (quoting *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978)). A transfer received in repayment of a genuine antecedent debt is a transfer for value, not the gratuitous receipt that equity most readily reaches. Once the pleading itself frames the December transfers as "reimbursements" for value previously advanced (ECF 151-1 ¶ 70), inequitable retention cannot be plausibly alleged without nonconclusory facts showing that the recipient knew the funds were not the debtor's to pay — and, as shown next, none is pleaded.

Third, the pleaded relationship is too attenuated, and no nonconclusory fact shows that Mr. Rubin knew the source was Plaintiffs' escrow. Unjust enrichment requires enrichment at the plaintiff's expense in circumstances where "the connection between the parties" is not "too attenuated"; the claim fails where the pleadings do not "indicate a relationship between the

parties that could have caused reliance or inducement," and "mere knowledge" of the plaintiff's dealings does not suffice absent actual dealings between the parties. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516–18 (2012). The proposed pleading alleges no dealings of any kind between Plaintiffs and Mr. Rubin or Queen: Plaintiffs wired their funds to Graubard (ECF 151-1 ¶¶ 58–59), and the only transfer instruction identified is Frankl's (ECF 151-1 ¶ 69). On knowledge, ECF 151-1 ¶ 66 alleges — on information and belief — awareness of the escrow agreements generally; the only transaction-specific allegation is that Mr. Rubin "knew that the $600,000 . . . were unauthorized distributions from the Potential Investors' escrowed funds" (ECF 151-1 ¶ 83), also pleaded on information and belief, without any identified source, communication, document, or event from which such knowledge could plausibly be inferred. Absent any allegation of a business relationship between Mr. Rubin and Plaintiffs — let alone between Plaintiffs and Queen Equities, the entity that allegedly received the funds from Graubard — the unjust enrichment claim fails as too attenuated. *Georgia Malone*, 19 N.Y.3d at 516–18. (The discovery record on these points is addressed separately, and in the alternative, in Point IV.)

## IV.    In the Alternative, the Discovery Record Confirms the Defects and Frames the Conditions Any Leave Must Carry.

Fact discovery closed on June 30, 2026 (ECF 72, so-ordered by minute entry of March 31, 2026; see ECF 118 at 19), after eight depositions, party document productions, and third-party subpoenas, and was reopened once, by order, for the July 14, 2026 deposition of Javid Nesaralli, Esq. (see ECF 161 at 5). Mr. Rubin does not ask the Court to weigh credibility or to adjudicate the merits on this letter motion, and he does not contend that any co-defendant's discovery responses bind Plaintiffs. The record matters here for three limited purposes: it confirms the deficiencies on the face of the proposed pleading; it shows what a fair opportunity to litigate these claims would still require; and it frames the conditions requested below. On each, the available record consistently supports Mr. Rubin's position: the record attributes the initiation, alteration, and filing of the State Court Action to others, Mr. Rubin did not control the Olden entities, the transfers to Queen were consistent with an ongoing lending relationship, and the record identifies no witness or document showing that Mr. Rubin was told any payment derived from Plaintiffs' escrow deposits.

First, Plaintiffs' own witnesses did not identify facts that cure the Rubin-specific defects in either proposed count. Plaintiffs' Rule 30(b)(6) designee, asked for the factual basis for naming Mr. Rubin and for the documents supporting it, was unable to identify either (Macaya Tr. 84:23–85:17; 97:9–98:16), and testified that Plaintiffs wired their funds to Graubard (Macaya Tr. 95:15–18). Mr. Metaxas identified Mr. Rubin's only act as "he sued me" — the filing Plaintiffs now plead was falsified by others (Metaxas Tr. 55:18–21). And Plaintiffs have confirmed in writing that they have nothing to add on the same question: the Court directed Plaintiffs to supplement Interrogatory No. 16 to the extent they had withheld factual, non-privileged information regarding, among other things, the "facts that led them to believe Mr. Rubin was

8

potential defendant and potentially at fault in the state court litigation" (ECF 132 § J). Plaintiffs served no supplement. Their counsel's written position — stated July 8, 2026, and standing unretracted in the parties' correspondence through July 15, two days after this motion — is that "Plaintiffs have not withheld factual, non-privileged information in response to Interrogatory No. 16. There is nothing to supplement." Ex. L. Plaintiffs have thus represented that they withheld no factual, non-privileged information responsive to Interrogatory No. 16 — and the disclosed record is what this Point describes.

Second, the Seddio-firm attorneys involved in preparing and filing the State Court Action have no recollection of any role by Mr. Rubin in it. Mr. Seddio testified that he cannot recall whether he ever spoke with Mr. Rubin; that the affiant was "swapped" to Mr. Rubin's name without him — "I was not present, and I did not participate"; that Sprei, not Mr. Rubin, was his client (Seddio Vol. 1 Tr. 21:14–19; 96:2–12; 108:24–109:25; 120:10–23; 210:23–24); and that when Plaintiffs later sought sanctions, it was Sprei who paid the initial retainer for Seddio's own counsel (Seddio Vol. 1 Tr. 350:9–18). Although Mr. Seddio said the affirmation was "filed with the belief that Mr. Rubin had . . . agreed to file that," he admitted in the same breath that he had not spoken with Mr. Rubin before the filing and had not seen the final documents. Seddio Vol. 1 Tr. 96:2–12. At his continued deposition, he confirmed that before the Rubin-named affirmation was filed he never read it, was not present, did not change — or direct anyone to change — the affiant from Sam Sprei to Mr. Rubin, and did not speak with Mr. Rubin: "I wasn't aware that Mr. Rubin was signing anything, nor was I aware that the affirmation was being filed"; and "I never knew that it was filed under Mr. Rubin's name." Seddio Vol. 2 Tr. 122:8–123:9; 155:5–19; see also Seddio Vol. 2 Tr. 160:3–7. A second Seddio-firm attorney, Javid Nesaralli, Esq., testified that, to this day, he does not remember ever communicating with Mr. Rubin in any form; that he has no telephone number for Mr. Rubin and does not know his email address; and that he does not remember ever seeing any document in which Mr. Rubin authorized the use of his name, or Mr. Rubin ever telling him that he authorized the affirmation. Nesaralli Tr. 67:10–21; 68:8–12; 69:7–23. Sprei told attorney Gorkin "I am Olden" (Gorkin Tr. 39:1–4); and Mr. Rubin disavowed the affirmation in writing in April 2025 ("that is not me," Hahn Tr. 260:13–21) and demanded that Sprei withdraw it (Rubin Tr. 27:15–28:1).

Third, Sprei's Rule 36 responses point the same way. Those responses bind Sprei for purposes of this action; they do not bind Plaintiffs, but they corroborate the testimonial and documentary record. Sprei admitted that he never advised Mr. Rubin that the affirmation had been filed before it appeared publicly, and that Mr. Rubin does not control or manage Olden LLC or Olden Group LLC (together, the "Olden entities") — the named plaintiff in the State Court Action. Ex. J Nos. 2.16, 2.35–2.36. And Mr. Rubin's First Set of Requests for Admission to Sprei — dated March 27, 2026, transmitted by email to Sprei's then-counsel on March 29, 2026, with the response deadline extended to May 5, 2026 by an agreement counsel confirmed in writing — was never answered at all, a failure Sprei has admitted. Ex. J No. 2.63; Ex. K; Fed. R. Civ. P. 36(a)(3). The matters in those requests are therefore deemed admitted. Those deemed admissions cover the same ground: that Mr. Rubin did not authorize, direct, or instruct anyone to

commence the State Court Action or to file any paper in it; that Sprei directed Seddio to commence it; and that Mr. Rubin's name was used without his knowledge or consent. Ex. K Nos. 1–2, 5–7, 13–15, 18.

Fourth, the money records and Rule 36 responses are consistent with lending, not enrichment. Queen is a lending business: Mr. Rubin owns 99% of it, with the balance held by his wife (Rubin Tr. 32:23–33:23); Sprei has no interest in it (Rubin Tr. 34:18–20); its lending capital comes from third parties (Rubin Tr. 36:23–37:3; 41:6–42:8); and the Sprei-directed transfers "are all loans," not gifts (Rubin Tr. 36:12–13). The produced statements show the lending relationship running in both directions — including $835,000 wired from Queen to Sprei personally on February 27, 2025 (RUBIN-000309) and five further wires to Sprei totaling $299,000 on June 25–27, 2025 (RUBIN-000392) — and show the January 6, 2025 same-day movement of $2,511,111.11 in from Express Trade Capital and $2,450,000 out to Montclare & Wachtler LLP, with $100,000 wired back to Express Trade on February 25, 2025 (RUBIN-000283; RUBIN-000288; RUBIN-000308). Graubard testified that his ledger does not permit allocation of the $2.5 million transfer to 536 Holdings among the incoming deposits (Graubard Tr. 234:7–17; 274:1–8). Sprei's responses corroborate the character of the December payments: Mr. Rubin's loans to him were "genuine debts" he was obligated to repay; "each payment Jonathan Rubin received from [Sprei], or at [Sprei's] direction, was made to repay a debt [Sprei] owed him"; the $250,000 wired to Queen on December 12, 2024 was the repayment, "irrevocably assigned," of a loan made the day before; and the $350,000 check was likewise "irrevocably assigned" to Queen. Ex. J Nos. 2.37–2.38, 2.41–2.43, the unnumbered request following No. 2.43 (the served document contains no No. 2.44), and Nos. 2.45–2.47, 2.49–2.50, 2.52. The adverse responses are also before the Court, and Mr. Rubin addresses them squarely: Sprei admitted that, as security for one or more of the loans, he "pledged, or represented that [he] held rights to, an escrow account held by M. David Graubard," and that the $350,000 was paid to Mr. Rubin through Queen "either to repay money [Sprei] owed him or as an advance against money he was to provide [Sprei]" (Ex. J Nos. 2.39–2.40, 2.51), and he stated that he lacked knowledge to admit or deny whether Mr. Rubin directed the issuance of the $350,000 check (No. 2.53). But a pledge of collateral does not give a lender knowledge of its provenance, much less knowledge that a particular repayment was drawn from that collateral rather than from Sprei's other resources. And Sprei separately admitted that he never told Mr. Rubin that any repayment came from Plaintiffs' deposits, that the funds were stolen or unlawfully obtained, or that Graubard was acting as Plaintiffs' escrow agent — and that, apart from the assigned $250,000 repayment, Mr. Rubin did not direct the disposition of any funds Graubard held for Plaintiffs. Ex. J Nos. 2.54–2.57, 2.60. So even if Queen's receipt were treated as an indirect benefit to Mr. Rubin, nothing Sprei admits conveying suggested the money was anything other than Sprei's to direct, in repayment of genuine debts.

Mr. Rubin relies on the discovery record only for the limited purposes stated above: to confirm the pleading defects, demonstrate prejudice, and frame appropriate conditions. Any

grant of leave should be without prejudice to Mr. Rubin's Rule 12 defenses and, after any limited discovery, a properly supported Rule 56 motion, on the conditions below.

### V.    Amendment After the Close of Discovery Would Unduly Prejudice Mr. Rubin.

Prejudice turns on whether the amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). Both are true here. Although Mr. Rubin took limited defensive discovery from Sprei concerning initiation of the State Court Action and repayment of antecedent debts (Exs. J, K), Plaintiffs represented that they did not intend to assert these claims while discovery was open, and that representation deprived him of claim-directed discovery from the claimants themselves: on Count 8, the communications and information Plaintiffs contend show knowledge, approval, retention, or direction by Mr. Rubin, and the basis for the "engineer[ed]" adjournment allegation; on special injury, claimed fee damages, and causation, including Plaintiffs' fee invoices, time records, retainer and payment records, and any allocation among the State Court Action, this action, Plaintiffs' own sanctions prosecutions, and unrelated proceedings; on Count 13, the claimed personal benefit and Plaintiffs' tracing methodology, including any expert or forensic-accounting analysis. The discovery dispute is concrete: when Mr. Rubin sought Plaintiffs' communications post-dating the February 19, 2025 commencement of the State Court Action — the period in which Count 8's alleged continuation, termination, and special injury arise, and in which any later knowledge, damages, or recovery bearing on both counts would be found — Plaintiffs refused, and they repeated the refusal to this Court on July 17, four days after filing this motion: that discovery, they wrote, lacks "any relevance or bearing on this matter, especially in the light of the fact that Rubin has asserted no affirmative defenses or counterclaims against Plaintiffs." ECF 161 at 3. The two positions cannot be reconciled. If the post-February 2025 period is irrelevant to this case, Count 8 — which lives in that period — does not belong in it; if these counts come in, then Mr. Rubin closed discovery deprived of the materials that would test what Plaintiffs knew and when, what their claimed fee damages actually are, and whether they have already recovered any part of the $2 million from others. *See* ECF 161 at 5. Plaintiffs' assertion that the amendment "will require no additional discovery" (ECF 151 at 5) cannot be reconciled with their own expanded damages theory of "millions" in legal fees; Defendant Seddio's response makes the same point. ECF 157 at 1–2. Plaintiffs will respond that a short reopening can cure the prejudice — but even targeted reopening imposes real incremental cost, delays the dispositive schedule the parties have deferred (ECF 143), requires revisiting completed examinations, and rewards a post-deadline reversal made on facts Plaintiffs possessed months earlier. That supports denial — or, at minimum, the conditions below.

**Conclusion.** Mr. Rubin respectfully requests that the Court deny leave to add proposed Counts 8 and 13 as against him. In the alternative, if leave is granted in any respect as to Mr. Rubin, he requests that the Court condition it as follows: (1) reopen fact discovery for sixty days, limited to the new claims, commencing upon the later of service of the amended complaint or

Plaintiffs' disclosure of the factual basis and damages computations for those claims; (2) permit supplemental written discovery, third-party subpoenas, and limited re-examination of Plaintiffs, their Rule 30(b)(6) designee, and witnesses on initiation, special injury, tracing, and the alleged personal benefit — including production of Plaintiffs' communications concerning the State Court Action, its prosecution, its termination, and their claimed injuries, from February 19, 2025 through the June 30, 2026 close of fact discovery — the very materials Plaintiffs withheld as irrelevant while these claims stood disclaimed (ECF 161 at 3) — subject to privilege logging, and with a continuing obligation to supplement under Rule 26(e) for so long as the state-court proceedings Plaintiffs have put in issue remain ongoing; (3) to the extent Plaintiffs seek attorneys' fees or litigation expenses as damages on the new claims, require production of the fee invoices, time records, payment records, retainer agreements, and claim-by-claim allocations underlying those claimed damages, with any withholdings logged — relief the Court declined in June under Plaintiffs' joint-and-several damages theory (ECF 132 § H), but which the proposed malicious-prosecution claim would place directly in issue; (4) permit targeted expert or forensic-accounting discovery if Plaintiffs rely on tracing or source-and-use analysis; (5) extend Mr. Rubin's time to answer or otherwise respond to any amended pleading, with no fewer than twenty-one days from service to file any Rule 12 pre-motion-conference letter under Judge Komitee's Individual Practices (accord ECF 157); provide that any Rule 56 pre-motion deadline runs from the close of the limited discovery; and provide that participation in the limited discovery waives no pleading or summary-judgment defense; and (6) permit Mr. Rubin to apply for the reasonable incremental costs of any discovery that must be duplicated solely because of the post-discovery amendment, on a documented showing.

Respectfully submitted,

/s/ Mordy Gross
Mordy Gross, Esq.
Law Offices of Mordy Gross LLC
*Attorney for Defendant Jonathan Rubin*

cc: All counsel of record (via ECF)