# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

_____
                              )
ANGELO METAXAS et al.,        )
                              )
            Plaintiff,        )
                              )  Case No.
      v.                      )  25-cv-5844(AMD)(CLP)
                              )
MARK DAVID GRAUBARD et al.,   )
                              )
            Defendants.       )
_____)

DEPOSITION UNDER ORAL EXAMINATION OF

JONATHAN RUBIN

DATE:  June  11, 2026

REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR

Jonathan Rubin — June 11, 2026

4 (Pages 10 to 13)

Page 10

Q    Have you ever been deposed as a defendant before?

A    I don't know in the Crown Bank matter whether I was a defendant or plaintiff.

Q    Okay.

A    I think I was a defendant.  I'm not sure.

Q    So you're familiar with how this process goes.  I'll ask questions.  You'll give answers.  From time to time your attorney may object.

We'll try not to speak over each other for the benefit of the court reporter and a clear record.

Unless you tell me that you don't understand my question, I'm going to assume you did.  If you don't understand, please ask me to clarify and rephrase, and I'm happy to do that.

Does that sound okay?

A    Okay.

Q    We'll generally take a break every hour or so.  If you need a break and it doesn't line up with one of those benchmarks,

Page 11

we can certainly take a break.  The only thing I'll ask is that you answer any pending questions.

Does that sound okay?

A    Yes.

Q    Do you understand that your --

A    My preference is to have no breaks whatsoever, just go straight through, by the way.

Q    I understand.  We can't do that to the court reporter or the videographer, but I appreciate the desire for efficiency.

I lost my place.

Do you understand that the testimony you're giving today has the same force and effect as if it were being offered in a court of law?

A    Yes.

Q    Is there any reason you can't testify truthfully today, Mr. Rubin?

A    No.

Q    Are you taking any medication that would prevent you from testifying truthfully?

A    No.

Q    Okay.  Have you ever been convicted

Page 12

of a felony or any crimes of dishonesty?

A    No.

Q    What did you do to prepare for your deposition today?

A    I came.

Q    Did you meet with counsel at all?

A    We drove in together.

Q    You drove in together.

You didn't have any meetings in advance of today to discuss?

A    No.

Q    Okay.  Your counsel is Mr. Gross?

A    Yes.

Q    Who is paying for your counsel today?

A    Me.

Q    Okay.

A    Unless someone wants to volunteer, by all means, but -- actually, let me rephrase that.

We filed a motion for sanctions, safe harbor letter, so maybe we'll get sanctions and loan paying for it.

But assuming nothing, I'm paying for it.

Page 13

Q    Understood.

Have you filed any claims against any other parties in this case?

A    I'm not sure how you define -- in this case?  No.

Q    Okay.  Do you have a joint defense agreement with any of the other parties in this case?

A    No.

Q    In preparation for your deposition today, did you review any documents?

A    Briefly looked at some of my bank statements.

Q    And did your review of those bank statements refresh your recollection at all?

A    I wouldn't -- I couldn't answer you that question.

Q    Okay.  Did you take any notes in preparation for your deposition today?

A    No.

Q    Did you discuss your deposition today with anyone else besides your counsel?

A    No -- well, I told my wife I'm going, but that's about it.

Q    Have you discussed your deposition

21 (Pages 78 to 81)

Page 78

Surf 9.  To my mind, it has nothing to do with Surf 9 either.

I don't really care why they want the money, but that I stand by every word of this.  It's unrelated to your client's deposit or matters alleged in your client's complaint.

Q    Okay.  We spoke about how you came to meet or work with Mr. Graubard.

How did you first meeting Mr. Sprei?

A    His brother introduced us -- it's in the interrogatories.  His brother introduced me to him.

Q    Okay.  Is it the brother you mentioned earlier?

A    Yes.

Q    Okay.  When was that?

A    2000 -- I don't know exactly how long ago, but it was before -- at least -- around 15 years ago maybe.

Q    And how did you know Mr. Sprei's brother?

A    We were study partners.

Q    In school?

Page 79

A    Yes.

Q    Okay.

Have you had any business arrangements with Mr. Sprei's brother?

A    Well, yes.  The first deals we did, his brother was the one who dragged me in.

Q    And was Mr. Sprei involved in those deals, also?

A    Yes.

Q    Do you have any ongoing business relationship with Mr. Sprei's brother?

A    No.

Q    Those deals that you worked on have since concluded?

A    Long since.

Q    Okay.  Looking at the exhibit that's before you, the interrogatories, I think it's Exhibit No. 2.  I'm sure you had a chance to look at it.

In response to interrogatory number 5 about Mr. Sprei, you mentioned that over time, the relationship evolved into more of a lender/borrower relationship.

Do you see that?

A    Yes.

Page 80

Q    Is that still the case?

A    Well, I'm not lending him any more money, if that's what you want to know.

Q    And why not?

A    I think I don't have to answer that one.

Q    I'm curious.  Why won't you lend Mr. Sprei money anymore?

A    Because he owes me too much money, okay?

Q    He owes you more than $10 million?

A    Like that.

Q    Yeah.

Initially, you partnered in purchasing distressed real estate.

Is that right?

A    Yes.

Q    At what point did that relationship become more akin to a lender/borrower relationship?

A    I can't answer you, but for sure, five, six years for sure, probably more.

Q    And at the outset of your lender/borrower relationship with Mr. Sprei, how would you come to lend him money; would

Page 81

he approach you with a particular opportunity?

A    Well, sometimes he would ask me, I need money desperately, give me $20,000 until tomorrow, whatever, until next week until this comes in.

Sometimes he would say, I have money by a lawyer, can you lend me money against that, against a pledge of an attorney.

Q    And so it sort of depended on the circumstances of a particular opportunity?

A    Yes.

Q    Okay.  When did you first learn that Mr. Sprei was considering an investment in Surf 9?

A    By the time I found out about it, he had long since invested in Surf 9.

Q    Okay.  So when was that?

A    I couldn't tell you.

Q    Okay.

A    By the time I found out, it was long after he invested in Surf 9.

Q    In the course of your lender/borrower relationship with Mr. Sprei,

Jonathan Rubin - June 11, 2026

22 (Pages 82 to 85)

Page 82

did you ever have formal loan agreements written?

A      Under escrows.  Only like -- it was like in the e-mail we saw before, Exhibit 1.

Q      And who --

A      Sometimes just texts.  Sometimes even less than that.

Q      So you would communicate via e-mail, via text.

Is that right?

A      Yes.

Q      Via WhatsApp?

A      I don't have WhatsApp.

Q      Okay.  So text or e-mail, were those your primary forms of communication with Mr. Sprei?

A      And phone.

Q      And telephone.

To the best of your recollection, have you ever reduced an agreement to lend money to Mr. Sprei or one of his entities to writing in a formal written agreement?

A      No.  To the best of my recollection, no, unless you're counting the -- well, there's one case where I did.

Page 83

I lent money against --

(Reporter clarification.)

A      -- One Centennial Plaza in Piscataway or Parsippany, and it wasn't really Sprei -- I don't know if it really was Sprei's or Ira Russack's.  That's another question, whose it was, but that's the only case where we had the written loan docs.

Q      And as we discussed earlier -- and correct me if I have this wrong -- Mr. Sprei would come to you, ask for some amount of money as a loan, and you would give it to him and then you would be paid some sort of interest or commission for that loan.

Is that fair?

A      Sometimes.  Usually.  Not always.

Q      Sometimes you were not paid interest or commission because you didn't just pay you or because you decided to just loan the money out of the goodness of your heart?

A      A lot of times he didn't pay me.

Q      Okay.

A      Sometimes I just did it out of the goodness of my heart.

Page 84

Q      Okay.  How many times would you say he didn't pay you?

A      I said already how much he owes me. I couldn't answer you.

Q      Something in the neighborhood of $10 million worth of times?

A      Well, that's including all the escrow money, which we have to find out if it is or isn't, where, et cetera.

Q      How often did your loans to Mr. Sprei involve escrows.

A      That's a complicated question because I also arranged for him to do other people's escrow loans, which is currently a matter of litigation.  I think you know it.

But just -- just -- and who -- I -- I was the broker on that one.

Q      And that case involved an escrow?

A      Yes, but I myself probably did like seven or eight.  Probably seven or eight times.

Q      What's your understanding of what it means to have funds in escrow?

A      That the funds cannot be touched and cannot be moved without the permission of

Page 85

the escrow owner.

Q      For the funds for which you used an escrow agent, did you document that escrow agency with an agreement?

A      I have to go through all of them to see, but generally, yes.

Q      Generally, you had a formal escrow agreement?

A      Well, yes, except in one case where I had a contract on a property and I canceled the contract, so you get the escrow back.

Q      But you didn't get the money back?

A      No.

Q      Was Mr. Sprei involved with that deal?

A      Yes.  We're only discussing Mr. Sprei's escrow deals.

Q      Okay.

A      I did a few such escrow deals with other people, and they all working out -- they're all working okay, including ironically those that Mr. Sprei introduced to me.

Q      Have you ever had occasion to chase Mr. Sprei for repayment?

Jonathan Rubin — June 11, 2026

23 (Pages 86 to 89)

Page 86

A   Ever?  Did I ever not have occasion to?

The only occasion I didn't have to chase him is probably a better question.

Q   So more often than not, after you've --

A   Yes.

Q   -- loaned money to Mr. Sprei, you had to --

A   Yes.

Q   -- pursue him to be paid?

A   Yes.

Q   Do you trust Mr. Sprei?

A   Do you?

Q   Do you trust Mr. Sprei?

A   You really want an answer to that?

Q   I do want an answer to that.

A   What do you think?

No.  I never trusted Mr. Sprei.

I trusted a bunch of -- the integrity of a bunch attorneys, Justice -- a sitting judge, et cetera, et cetera.  I trusted them.  I never trusted Mr. Sprei.

Q   Did you trust Mr. Graubard?

A   Yes.

Page 87

Q   Ms. Wachtler?

A   Yes.

Q   Mr. Kalish?

A   Yes.

Q   But not Mr. Sprei?

A   Never.

Q   Did you trust Mr. Seddio?

A   I never gave him a dollar -- let me rephrase.

I never gave him a dollar as in escrow.  I wired him money.

Q   And for what purpose have you wired him money?

A   Legal fees.

Q   So you engaged Mr. Seddio to represent you, but you didn't trust him?

A   I never had occasion to --

MR. GROSS:  Objection.  That was misstating the witness.

You can answer.

A   I never had to trust Mr. Seddio.  I didn't say I do or don't trust him.

Had he asked me to wire money to his escrow account, I probably would have figured he's not going to risk disbarment and

Page 88

possibly jail for some money I probably would have wired him.

As it happens, I never had occasion to do so.

Q   Okay.

A   He was smart enough not to get involved in this stuff.

Q   Let's look at a document.

MS. DELUCIA:  This will be Exhibit 3.

(Above-mentioned document marked for Identification.)

BY MS. DELUCIA:

Q   Now, you mentioned, Mr. Rubin, that you communicated with Mr. Sprei via e-mail, via text and sometimes over the telephone, correct?

A   More often telephone than the other two, yes.

Q   More often telephone than e-mail or text?

A   Yes.

(Brief pause in proceedings.)

BY MS. DELUCIA:

Q   When you communicated by text, was

Page 89

that just by standard text message?

You mentioned that you didn't have WhatsApp.

A   Correct.

Q   About how frequently would you communicate with Mr. Sprei by text?

A   Daily.

Q   Did you produce all of your text messages with Mr. Sprei in this action?

A   I didn't produce any.  My attorney did what he has to do.  I have no idea what he did or didn't do, but I gave my attorney whatever he needed.

Whatever my attorney needs to do, he did.

Q   Did you take any steps to preserve your communications with Mr. Sprei in connection --

A   Preserve what?

Q   Preserve your text messages, for example?

A   Let's go through this again.

Here's my phone.  Whatever -- whatever text messages I had, they took off.

Q   Okay.

Jonathan Rubin - June 11, 2026

80 (Pages 314 to 317)

Page 314

C E R T I F I C A T E

I, CHARLENE FRIEDMAN, a Certified Court Reporter and Notary Public, qualified in and for the State of New Jersey do hereby certify that prior to the commencement of the examination JONATHAN RUBIN was duly sworn by me to testify to the truth the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER certify that I am neither a relative of nor employee nor attorney nor counsel for any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

CHARLENE FRIEDMAN, RPR, CRR, CCR of the State of New Jersey
License No:  30XI00204900
Date:  June 11, 2026

Page 315

LAWYER'S NOTES

PAGE  LINE

____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____
____  ____    _____

Page 316

DEPOSITION ERRATA SHEET

Case Caption:  Metaxas v. Graubard, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20____

_____
JONATHAN RUBIN

Page 317

DEPOSITION ERRATA SHEET

Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____
Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____
Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____
Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____
Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____
Page No. _____Line No. _____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____DATE:_____
JONATHAN RUBIN