Benesch

Lauren Zimmerman
1155 Avenue of the Americas, Floor 26
New York, New York 10036
Direct Dial: 646.356.6023
Fax: 646.755.3397
lzimmerman@beneschlaw.com

August 31, 2026

Via ECF

Magistrate Judge Peggy Cross-Goldenberg
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 1230
Brooklyn, New York 11201

Re: *Metaxas et al. v. Graubard et al.*, 25-cv-05844 (AMD) (PCG)

Dear Judge Cross-Goldenberg:

Plaintiffs respectfully move pursuant to Federal Rule of Civil Procedure 64, CPLR Article 62, and Section IV.A of the Court's individual rules for an order of attachment against the property of Defendant Yeschiel Shimon "Sam" Sprei ("Sprei") in the amount of $2,000,000.00, plus interest at the statutory annual rate of 9% from December 6, 2024,[1] until the date of the order.

## Legal Standard

Rule 64 "permits federal litigants to seek an order of attachment in the manner provided by the law of the state in which the district court sits." *IME Watchdog, Inc. v. Gelardi*, 2024 WL 866136, at *3 (E.D.N.Y. Feb. 29, 2024) (citation omitted).

> Under New York law, a plaintiff may obtain an order of attachment if it demonstrates that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) the defendant, "with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered, or secreted property, or removed it from the state or is about to do any of these acts," and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to plaintiff.

*DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318–19 (E.D.N.Y. 2009) (quoting CPLR 6201(3) and citing CPLR 6212(a)). The purpose of attachment is to "provide security for

[1] Federal courts exercising diversity jurisdiction must look to state law to determine prejudgment interest. *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999). Under New York law, prejudgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property," CPLR 5001(a); "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred," CPLR 5001(b); and "shall be at the rate of nine per centum per annum, except where otherwise provided by statute," CPLR 5004(a).

the enforcement of any money judgment which may be recovered by the plaintiff." *Gala Enters., Inc. v. Hewlett Packard Co*., 970 F. Supp. 212, 216 (S.D.N.Y. 1997).

While an attachment order must "specify the amount to be secured . . . including any interest, costs and sheriff's fees and expenses," CPLR 6211(a), it "need not specify the particular items of property or debts to be attached," *Oriental Com. & Shipping Co. v. Rosseel, N.V.*, 125 F.R.D. 398, 401 (S.D.N.Y. 1989); *accord In re Hypnotic Taxi LLC*, 543 B.R. 365, 384 (Bankr. E.D.N.Y. 2016). "All property in which the defendant is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the defendant, shall be subject to" an order of attachment properly levied on the defendant by an authorized sheriff. CPLR 6214(b).

**Argument**

Plaintiffs easily satisfy all four elements required to obtain an attachment order against Sprei, and such a security is more than warranted here.

The first and fourth elements cannot be disputed: Plaintiffs seek a money judgment against Sprei, *see* Am. & Suppl. Compl. at 64 ¶¶ B–C, E–F, and "the amount demanded from the defendants is greater than the amount of all counterclaims," of which currently there are none. *DLJ Mortg. Cap.*, 594 F. Supp. 2d at 319. At issue is only whether Plaintiffs are likely to succeed on the merits against Sprei, and whether Sprei has intentionally sought to defraud his creditors or frustrate the enforcement of a judgment in Plaintiffs' favor by disposing of their assets. As detailed below, both elements are decidedly met here.

## I. Plaintiffs Are Likely to Succeed on the Merits Against Sprei

"Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *IME Watchdog*, 2024 WL 866136, at *3 (citation omitted). In assessing this factor, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Id.* (citation omitted).

Plaintiffs' likelihood of success on their claims against Sprei is virtually certain because Sprei has elected "not [to] contest liability as to any of the claims asserted against him in the Amended Complaint." ECF No. 176, at 2.[2] This includes Plaintiffs' claims that Sprei is directly responsible for the unauthorized dissipation of their $2 million escrow deposits (the "Escrow Deposits") and interfering with Plaintiffs' contractual rights to recoup (and Graubard's fiduciary duties to return) those funds by, among other things, commencing and maliciously bringing and prosecuting a sham state-court action against Plaintiffs (the "State Court Action") through

[2] In light of Sprei's voluntary default after appearing in this action, the Court will be required under Rule 55(b)(2) to accept Plaintiffs' well-pleaded factual allegations of liability against him as true, draw all reasonable inferences in Plaintiffs' favor, and determine whether Plaintiffs' allegations establish Sprei's liability as a matter of law. *E.g.*, *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). If the Court finds him liable, then Sprei will have the opportunity to contest the amount of damages. *Id.*

Defendant Frank R. Seddio, Esq. ("Seddio"), in the name of Defendant Jonathan Rubin ("Rubin"), and in coordination with Defendant Mark David Graubard ("Graubard").

## II. There Is Substantial Evidence of Sprei's Intent to Defraud Creditors and Evade a Judgment

### a. Legal Standards for Determining Fraudulent Intent

Because "[f]raudulent intent is rarely subject to direct proof" and "[f]raudulent acts are as varied as the fish in the sea," courts in this circuit "have developed 'badges of fraud' to establish the requisite actual intent to defraud." *In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983). These "circumstantial" badges include but are not limited to:

> (1) the lack or inadequacy of consideration;
>
> (2) the family, friendship or close associate relationship between the parties [to a potentially fraudulent transfer];
>
> (3) the retention of possession, benefit or use of the property in question;
>
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
>
> (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
>
> (6) the general chronology of the events and transactions under inquiry.

*In re Boyer*, 328 F. App'x 711, 715 & n.2 (2d Cir. 2009).[3] Not all badges must be established, as long as "the collective weight of those factors that have been shown is sufficient to conclude that [the defendant] disposed of property with the intent to defraud [his] creditors or frustrate the enforcement of any judgment in [a] plaintiff's favor." *DLJ Mortg. Cap.*, 594 F. Supp. 2d at 325. A "defendant's fraudulent conduct predating the initiation of suit by the plaintiff" may also be considered. *Allstate Ins. Co. v. Levy*, 478 F. App'x 688, 691 (2d Cir. 2012).

### b. Sprei Has Engaged in Prolific Fraudulent Conduct

Here, Sprei has repeatedly engaged in conduct bearing each of the above hallmark badges of fraud, both before and during the course of this litigation, such that the weight of the factors tips decisively toward inferring his fraudulent intent.

---

[3] Although *Kaiser* and *Boyer* applied federal bankruptcy law, courts look for the same badges of fraud in connection with CPLR 6201(3). *E.g.*, *Foukas v. Foukas*, 2024 WL 4315026, at *3 (E.D.N.Y. Sept. 27, 2024).

Sprei has attempted or completed at least two sets of real-estate transactions with Rubin, his close associate and co-Defendant in this action,[4] for plainly inadequate consideration and while apparently retaining the use of at least some of those properties.

The first set of transactions involves the 30-unit apartment complex located at 287–299 McGuinness Blvd., in Greenpoint, Brooklyn (the "McGuinness Blvd. Property"). *See* Ex. 3. Sprei has testified that the property is held in Rubin's name as collateral for "millions of dollars" owed by Sprei to Rubin. Ex. 4 at 158:4-20, 159:16-19. Rubin purchased the McGuinness Blvd. Property through his wholly owned entity 287 Prop LLC on February 18, 2025, for $11.5 million. *See* Ex. 5 at 10–13. One day earlier, on February 17, 2025, and just two days before Sprei and Rubin commenced the meritless State Court Action against Plaintiffs that is at the heart of this, Sprei and Rubin executed an agreement to assign all of Rubin's 100% membership interests in 287 Prop LLC to Sprei in exchange for $13,150,000. Ex. 6. Sprei and Rubin later agreed to extend the time for Sprei to pay the over $13 million purchase price through at least February 18, 2026—while the instant action was pending. *See* Ex. 7. As of mid-July 2026, however, the McGuinness Blvd. Property was being marketed for sale with an asking price of *$21 million*. Ex. 3. While Rubin remains the 100% owner of 287 Prop LLC, the nonpublic, non-arm's length, and apparently ongoing arrangement between Rubin and Sprei to transfer its ownership, along with the McGuinness Blvd. Property, for less than 63% of its asking price—*during the pendency of this action*—is indicative of fraud. *E.g.*, *CF 135 Flat LLC v. Triadou SPV N.A.*, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016) (finding defendant's "implausible explanation of [a] below-market assignment" and "temporal proximity" to litigation to be indicative of fraud); *DLJ Mortg. Cap.*, 594 F. Supp. 2d at 320 (noting that "a questionable transfer not in the ordinary course of business" and any "secrecy in the transfer" are badges of fraud supporting attachment). Sprei's dealings concerning the McGuinness Blvd. Property have displayed multiple badges of fraud: inadequate consideration, a very close relationship with his counterparty, Rubin, and the fact that the transactions have taken place during the course of this litigation.

The second set of transactions involves a 10-story, 43-unit rental building located at 3052 Brighton 1st Street, in Brighton Beach (the "Brighton Property"), which Sprei, who has claimed in this action to be penniless and assetless, purchased for over $13 million through his wholly owned entity 3052 Brighton Properties LLC ("3052 Brighton") on July 8, 2024. Ex. 8 at 7. On January 30, 2026, *in exchange for just $1,000*, Sprei executed a declaration, in his capacity as sole and managing member of 3052 Brighton, granting Rubin, as managing member of Queen Equities LLC ("Queen Equities"), formal approval rights over any sale of the Brighton Property. Ex. 9 at 5 ¶¶ 1–2. While this declaration was filed on the Brighton Property's public register on February 18, 2026, *id.*, its non-arm's length nature, patently inadequate consideration, and lack of any apparent business purpose are indicia of Sprei's fraud in connection with his assets. *See CF 135 Flat LLC*, 2016 WL 5945912, at *10.

---

[4] Sprei's relationship with Rubin goes back at least 16 years, to 2009 or 2010. Ex. 1 at 15. Between August 2024 and May 2026 alone, Rubin and Sprei shared at least "4,384 substantive email exchanges," and they also communicated by phone calls and text messages. *Id.* The two are in "frequent," "daily" contact by text message, and they communicate even "[m]ore often by telephone." Ex. 2 at 14:17-22, 88:14–89:7.

Moreover, in his sworn interrogatory responses dated July 29, 2026, Sprei claims that he does not possess any interests in real estate, and that his company "3052 Brighton completed a Deed in Lieu of Foreclosure" of the Brighton Property. Ex. 10 at 11; *see also* Ex. 4 at 179:13-14 (testifying that 3052 Brighton is "the entity that [Sprei] assigned over the deed in lieu to the lender [*sic*]"). Given that no such conveyance appears on the 3052 Brighton Property's public register, *see* Ex. 11, it appears that Sprei retains "possession, benefit or use of the property in question," *In re Boyer*, 328 F. App'x at 715 n.2. As with Sprei's McGuinness Blvd. Property transactions, his dealings concerning theBrighton Property betray several badges of fraud: inadequate consideration, a close relationship with his counterparty, Rubin, and suspicious timing during the course of this litigation. Sprei also appears to retain possession and use of the Brighton Property, another badge of fraud.

In addition to these questionable real-estate transactions, Sprei has executed at least two suspicious confessions of judgment in Rubin's favor *again during the course of this litigation*. On January 30, 2026, Sprei confessed to judgment in the amount of $450,000 on behalf of himself and 3052 Brighton in favor of Rubin's wholly owned company Queen Equities, which was then filed on the Brighton Property's public register. Ex. 12. Then on April 7, 2026, Sprei executed another confession of judgment in the amount of $2.5 million in favor of Queen Equities, which was not filed on the 3052 Brighton Property's register but was filed in Kings County Supreme Court, which then issued a $2.5 million judgment against Sprei and his company 3052 Brighton on April 18, 2026.[5] Exs. 13, 14. Each confession contains boilerplate about "a debt justly due" to Queen Equities, without *any* factual details.[6] Sprei's "confessions of judgment, containing no facts about how the alleged debts arose (in violation of CPLR § 3218(a)(2)), appear to be masks for transfers of [Sprei's] money for no consideration to" Rubin. *Coley v. Vannguard Urban Improvement Ass'n, Inc.*, 2016 WL 7217641, at *10 (E.D.N.Y. Dec. 13, 2016).

Sprei also recently agreed to pay an undisclosed amount to settle claims against his co-Defendants in this matter, Mark David Graubard, Esq. ("Graubard"), Seddio, and others in a separate litigation, captioned *Oakford Management LLC et al. v. Wachtler et al.*, Index No. 610915/2025 (Nassau Cty. Sup. Ct.), *despite the fact that Sprei is not a defendant in that action*. *See* ECF No. 192-1 (Aug. 19, 2026 letter). While Sprei was named as a *third-party* defendant in a pleading filed by two of the defendants in that action (not Graubard or Sprei) on July 2, 2026, the case docket as of August 21, 2026 did not reflect that Sprei had been served with process or that Sprei had made any payments to those defendants to settle their claims against him. *See* ECF No. 192-2 (*Oakford Mgmt.* docket). It appears that Sprei fraudulently used assets available to him to gratuitously benefit his co-Defendants Graubard and Seddio rather than preserving such assets to pay Plaintiffs' inevitable judgment against him here. The close relationship between Sprei and each of Graubard and Seddio, plus the lack of any clear benefit to Sprei in settling the claims, since they are not asserted against him or his company, are clear badges of fraud.

---

[5] The case is captioned *Queen Equities LLC v. Sprei*, Index No. 513439/2026 (Kings Cty. Sup. Ct.).

[6] The sparseness of Sprei's confessions of judgment in Rubin's favor are in stark contrast to prior confessions of judgment from Sprei to apparently arm's-length counterparties that contained substantial details concerning the underlying debts. *See* Am. Compl. Ex. 1 ¶ 14, ECF No. 169-1 ("This confession of judgment is for a debt justly due to the Plaintiff arising from the following facts …."); Am. Compl. Ex. 2 ¶¶ 4–6, ECF No. 169-2 (describing details).

In addition, Sprei has repeatedly engaged in additional fraudulent activities like check-kiting and falsifying business records. *See Coley*, 2016 WL 7217641, at *8 (noting that "a defendant's drawing a check with the knowledge that there were insufficient funds to satisfy payment" is evidence of fraudulent intent); *Pantheon Props., Inc. v. Houston*, 2022 WL 785168, at *3 (S.D.N.Y. Mar. 14, 2022) ("New York courts have held that evidence that a defendant falsified business records and diverted company funds for personal use … was sufficient to support a finding of fraudulent intent.").

Rubin testified that "50 percent of [checks from Sprei] bounce." Ex. 2 at 96:13-14; *see also id.* at 97:23-25 ("A few times [Sprei] gave me checks from an account that said his name on them. They usually bounced."). Jacob Jacobowitz, whom Sprei described as a "[c]lose friend," Ex. 4 at 180:7, declared under oath that Sprei asked him to issue multiple checks to various parties, with the promise that Sprei would fund his account with the amount of each check before it cleared, but that Sprei ultimately failed to do so, causing Jacobowitz to lose $500,000. Ex. 15. In a similar instance of check-kiting through an intermediary, in November 2025, Sprei transmitted a cashier's check in the amount of $2 million, written from the Chase Bank account of then-Kings County Supreme Court Justice Edward H. King ("King"), to Graubard. *See* Ex. 16. While the purpose of the check was to create the appearance in the State Court Action that Graubard was ready and able to offer to settle his and Sprei's dispute with Plaintiffs, as he had falsely represented to the Court, Sprei knew the check was unusable because Chase had frozen King's account. Ex. 17. Sprei and King were later criminally charged in this district for wire fraud. *See United States v. Sprei*, No. 26-mj-91 (E.D.N.Y.).

And as alleged in the Amended Complaint, on December 6, 2024, Sprei not only instructed Graubard, through Defendant Chaskel Frankl ("Frankl"), to distribute Plaintiffs' escrow deposits to unauthorized third-parties but also accompanied Graubard to the bank to complete at least one of the transfers. Am. Compl. ¶¶ 69–71. Five days *later*, Sprei directed Graubard to fabricate an authorization letter purporting to have been authored and sent by Frankl falsely stating that Frankl had authority to direct the disposition of Plaintiffs' funds. *Id.* ¶ 77. In commencing the State Court Action, Sprei worked with his co-Defendants to intentionally falsify the plaintiff's name as "Olden LLC," create and file a sworn affirmation by Rubin stating that he was the manager of such fictional entity, and intentionally misspelled Rubin's first name as "Johnathan" in an effort to conceal Sprei's involvement in the dispute.[7] Am. Compl. ¶¶ 11–15, 122–127. Sprei also directed Graubard's attorneys to make false statements in filings and communications with the state court, in a brazen (and unfortunately successful) effort to delay the disclosure of Graubard's bank records showing the theft of Plaintiffs' funds, including by orchestrating the recusal of the assigned state-court judge. *See id.* ¶¶ 211–221. This conduct is further uncontroverted evidence of Sprei's fraudulent intent, and specifically with respect to the dissipation of Plaintiffs' $2 million at issue—for which Sprei has admitted liability.

---

[7] Sprei informed Rubin that he did not want the filings to accurately identify Sprei or his company Olden Group LLC because he was concerned the dispute would interfere with another pending case, captioned *Olden Group LLC v. Body Glove International Inc. et al.*, Index No. 533445/2024, that Seddio had commenced on Sprei's behalf in Kings County Supreme Court in December 2024, and Sprei further stated that he believed no one would be "dumb enough" to believe that Rubin himself signed a document misspelling his own name. Am. Compl. ¶ 15; Ex. 2 at 26 .

As if all this conduct were not enough (and it is), Sprei's "evasive answers to questions" about his finances, and absolute refusal in this action "to account for how [his] funds were spent are also indicative of fraud." *Pantheon Props.*, 2022 WL 785168, at *3. In a December 22, 2025 deposition in separate proceedings, Sprei testified that his wholly owned company Olden Group LLC ("Olden Group") had "[c]lose to $10 million" in "[c]ash in the bank." Ex. 18 at 73. By the time of his July 16, 2026 deposition in this action, however, Sprei testified that Olden Group's only asset is Surf 9 LLC ("Surf 9"), Ex. 4 at 174:6-10, which is currently in bankruptcy.[8] Sprei further testified that he "didn't really have any income from December 2024" onward apart from "a certain amount of money" loaned to him by Rubin, yet Sprei claimed he could not recall the amount, frequency, or key terms of any such loans. *See id.* at 135:17–136:11. Similarly, Sprei testified that he used cash advances from Rubin to pay his $2,600 monthly rent since December 2024 yet claimed he could not recall whether Rubin had "advanced [Sprei] money for [his] rent recently," or even how he had paid his rent two weeks earlier. *Id.* at 137:20–138:16. And despite claiming poverty in this action, *see* Ex. 10 at 11 (claiming less than $100,000 in total assets, but nearly $20 million in liabilities), Sprei has somehow committed to pay a presumably substantial settlement in the *Oakford Management* case. These contradictions suggest fraud.

Finally, Sprei's blatant stonewalling of discovery into his assets, and his apparent willingness to remain in open contempt of court and pay $5,000 in daily fines rather than identify where his money is coming from, *see* ECF No. 192; 8/4/26 Docket Order; 8/12/26 Order, are further evidence of Sprei's fraudulent concealment of his assets.

* * *

Because Plaintiffs have established, well beyond a preponderance of evidence, all the statutory and discretionary factors, Plaintiffs' proposed attachment order should be entered against Defendant Sprei for $2 million, plus 9% interest from December 6, 2024, until the date of the attachment order, as security to ensure that Plaintiffs can recover against Sprei for his liability, which he concedes, for depriving Plaintiffs of their $2 million escrow deposits.

## I. An Undertaking of $10,000 Is Sufficient

"CPLR § 6212(b) requires a plaintiff seeking an order of attachment to provide an undertaking as security for (1) costs and damages incurred by the defendant in the event that the court subsequently determines that the plaintiff was not entitled to an attachment or if defendant ultimately recovers judgment; and (2) certain fees incurred by the sheriff." *IME Watchdog*, 2024 WL 866136, at *6 (cleaned up). "The amount of the undertaking must be at least $500 but otherwise is within the discretion of the court." *Id.* (citation omitted). "Courts frequently set the undertaking as a fraction of a percent of the value of the attachment." *Id.* (collecting cases setting undertaking as low as 0.04% of the value of the attachment and setting undertaking at 0.5%). Here,

[8] On August 11, 2026, Surf 9's court-appointed bankruptcy trustee filed a motion to dismiss the case or, in the alternative, convert it from a Chapter 11 restructuring to a Chapter 7 liquidation. *In re Surf 9 LLC*, No. 25-40078 (Bankr. E.D.N.Y. Aug. 11, 2026), ECF No. 282. As detailed in the motion, Surf 9 has "few assets to be liquidated, and those assets appear to be entirely subject to [Olden Group's] unassailable lien." *Id.* ¶ 1.

an undertaking of $10,000 amounts to 0.5% of the $2 million principal of the requested attachment order and is more than sufficient to secure Sprei's rights.

Sincerely,

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP

*/s/ Lauren Zimmerman*

Lauren Zimmerman

cc: All Parties via ECF