# Exhibit 18

# EXHIBIT A

Q. When was the last time?
A. A few minutes ago.
Q. Before today when was the last time you spoke to Mr. Nash?
A. Maybe a week ago.
Q. About what?
A. Another matter.
Q. Having nothing to do with Surf nine /-FRPLGTS that's correct?
Q. Have you ever spoken to Mr. Nash or anyone from his law firm about Surf nine or Body Glove or ETC or anything?
A. I don't recall.
Q. Do you have any e-mails with Mr. Nash



on anything in the last 60 days?
A. I think there was an e-mail from my attorney confirming a deposition. It could be Mr. Nash was copied on it. I don't believe it was any other e-mails, no.
Q. Have there ever been any e-mails between Mr. Nash or anyone that you understood to be from Mr. Nash's law firm and you regarding

anything concerning Surf nine or Body Glove ever?
A. Yes. There were some e-mails about the dip financing about projection financing and that kind of stuff.
Q. When was that?
A. I think about a month ago, maybe.
Q. Were you asked to produce any documents in this case?
A. Yes. I did.
Q. Did you produce any documents in this case?
A. No. I did not.
Q. Why not?
A. Because I don't think it's relevant to this case. I think what's relevant to this case is a very simple question. There is one



question. Could I cure the deficiency that's owed to Body Glove and could I fund further the royalties for-- that's the only question. The question is yes and yes and everything else is just a litigation tactic on you people, so I don't think it's relevant to this case, and it's

two parts that's relevant.

Q. Can you repeat to me?

A. Yes if it's-- we can cure the amount owed to Body Glove and if we could come up with the funds needed going forward to pay Body Glove for their royalties fees.

Q. So the reason you haven't produced any documents is because you don't find them relevant to those two questions; is that correct?

A. That is correct.

Q. Has Olden Group filed tax returns in the last five years?

A. I don't know. I don't know.

Q. Have you filed tax returns in the last five years?

A. Yes. I did.

Q. Have you been asked to produce copies of those tax returns?



A. I don't know.

Q. You don't know whether you've been asked.

A. No.

Q. Did you use relevancy, your own view of relevancy /(?
A. Yes. I did.
Q. I asked you earlier what Olden Group owns. You said American attitude and you said-- I think you said you purchased notes from banks?
A. That is correct.
Q. Okay. Does Olden Group own real estate?
A. Owns a particular asset of real estate, no.
Q. I'm not sure I understood the answer, so I'll ask the question a different way. Is there any real estate that is owned by Olden Group?
A. No.
Q. Is there any real estate in which Olden Group has invested in?
A. Possible, yes.
Q. Are you the CEO of Olden Group?
A. That is correct, yes.
Q. Would you consider yourself to be the

Olden Group?
A. President of Olden Group, yes.
Q.
A. /OL den doesn't have employees but to.
Q. Who else would know what Olden Group owns or doesn't own other than you?
A. My accountant.
Q. What's your accountant's name?
A. Allan Guttman.
Q. Spell the last name. /-FRPLGTS GO O DMA N?
Q. D as in David?
A. Yes.
Q. Good man?
A. Yes.
Q. Where is Mr. Goodman's office?
A. I believe on Long Island.
Q. Other than American attitude and bank notes has Olden Group ever purchased anything else?
A. I don't think so.
Q. American attitude, the-- you said is a fashion company; correct?

Q. Do you know what a biannual statement is?



A. I believe the company that forms the entity, they share that.
Q. Do you know whether Olden Group has filed any biannual statements?
A. I don't know.
Q. Who would know that?
A. My accountant.
Q. Is it your accountant's duty to file the biannual statements?
A. I believe so.
Q. When you spoke to Mr. Crosby on Friday did you discuss anything other than what Mr. Cross was explaining was his view of body gloves /STKPER /TPAOERPBS relationship?
A. Yes we discussed how to get more sales we discussed what to do further, how to be able to keep sales going and that was basically the conversation.
Q. Well, what did he explain or what did you explain to him about how to get more sales?

MS. SWEENEY: Objection. You can answer.

MR. LEVY: What's the objection? Other than it was a compound question.



MS. SWEENEY: Compound question hearsay potentially I don't know if Marsh is going to give a deposition or.

MR. LEVY: Well hearsay is not a.

MR. NASH: All right okay just give the answers generally your objection is noted let's calm it done, Sam. Okay.

Q. You can answer the question?

MR. NASH: Let's calm it down. This is not an.

A. We discussed very simple Body Glove let me make the record clear is Body Glove is interfering with the sales with Surf nine and due to the fact that Body Glove was interfering with the sales with suffer nine, we discussed how to fix that problem and what to do, and I told Marsh to speak to his attorney Mr. Nash and discuss that and I discuss this with my attorney,

Mr. Crosby sent it to ETC?
A. Yes.
Q. You said you were traveling. Did you



review it somewhere where you were traveling?
A. Yes. I have an iPad we're living in 2026 today.
Q. 25?
A. Almost 26.
Q. Okay?
A. So I'm sure you review stuff on your phone too right.
Q. Did you approve the application?
A. I said earlier yes /(.
Q. Did you make any changes to them?
A. No.
Q. Okay. I'll tell you what. Let's mark this as Exhibit A. (Document marked Exhibit A for identification)?
Q. Okay, marked as Exhibit A is a December 19, 2025, application for irrevocable letter of credit by Olden Group LLC to express trade capital Inc. ?

A. Yes.
Q. Okay, so I think I know the answer to this. Have you seen this document before?
A. Yes.
Q. What is this?



A. This is an application to receive a LC, letter of credit.
Q. For what?
A. For the purpose of Body Glove for the money that's owed for the previous royalties.
Q. Somewhat do you understand a letter of credit to be?
MR. NASH: Objection. Come on.
Q. You can answer?
A. A letter of credit is like cash. It's an instrument. Basically, in the event the court rules that you're owed a million 165 you take the LC and you cash it and you get money.
Q. Where did you or Mr. Crosby come up with the 1000165?
A. I discussed this with him, and I believe that that was a number we believed he has

all the numbers so I believe that's the numbers he believes that are owed for the royalties.

Q. Okay. This number was given by Mr. Crosby; correct?

A. That is correct, yes.

Q. You agree with this number?

A. I believe the number is actually less



than that, but that's the number he had, so--

Q. Okay. Did you do any due diligence or any investigation to confirm that that's the right number?

MS. SWEENEY: I just want to clarify I think we're the which is for future royalties.

MR. LEVY: Yes that's.

MS. SWEENEY: There should be two different LCs.

MR. LEVY: There are I'm only talking about this one Kev he have can but.

MR. LEVY: I'll ask the questions.

MS. SWEENEY: Okay. I can always raise it later.

any funds it has to have the funds; correct?
A. I believe so, yes.
Q. All right, so what is the liquidity position of Olden Group at present?
A. If I need the money I have the money. That's it.
Q. If you need the money I have the money?
A. Yes. I have a make to decision to fund further I have the money in my account yes.
Q. From where will?
A. Maybe you'll Blank Rome will.
Q.
A. Maybe Kev Vin Stephanie.
Q.
MR. NASH: Sam just a.
A. I just I have the capability if I



need to fund it I have the funds in my account.
Q. Well, you understand that Body Glove has an interest in knowing?
A. The money is in my account.
Q. What is the liquided Dee of Olden

Group at present?
A. Close to $10 million.
Q. Is that liquid money or other monies?
A. Partial liquid partial other money.
Q. What is the source of that liquidity?
A. Cash in the bank.
Q. Controlled by Olden Group?
A. That is correct.
Q. I asked you before whether Olden
Group has filed tax returns in the last five
years, and I think your answer was you don't
know, /-RBG correct?
A. That's correct.
Q. Does Olden Group have a balance sheet
at present?
A. No.
Q. Does it have an income statement?
A. No.
Q. What accounting if any does it have

73

to show what's its liquidity is?
A. I don't know.
Q. You don't know as the president and

CEO of the company?
A. That is correct I don't know.
Q. Who would know that?
A. My accountant.
Q. Turn to section 2.4. Section 2.4 provides that the proceeds of the dip loan shall be used by the debtor only in accordance with the budget; correct?
A. Why he.
Q. Has the budget been complied with to your knowledge?
A. I believe it was.
Q. Has the budget been modified?
A. I don't recall.
Q. Is the debtor in default in any way under this agreement?
A. I don't know.
Q. Who would know?
A. I don't know.
Q. Has a debtor been making interest payments?

74

A. No.

A. No.
Q. Have you had discussions with your account can't about this case?
A. I did.



Q. What were the discussions?
A. Nothing. Just discussing the circumstance what's going on with the company and everything else.
Q. What, if anything did your accountant tell about it?
A. Nothing just don't say anything.
Q. Well that's not much a discussion right?
A. That's correct /(.
Q. So you spoke to him and he didn't respond to you in any way.
A.
Q. What did you say?
A. Don't say anything. Get the facts. That's all. Just get to the facts. Ridiculous.
Q. Were you asked to produce financials or balance sheets concerning Olden Group?

A. I don't know.
Q. Do you have them?
A. No.
Q. You have no balance sheets?
A. No.
Q. No financial reports?



A. No.
Q. Who has them?
A. Maybe my accountant.
Q. Mr. Sprei, you informed me at the beginning of this deposition that there are only two issues. I think I wrote them down right. One was can Olden Group cure the Surf nine default and the second was can Olden Group show funds to support paying royalties going forward for a year; is that right?
A. Yes. That's the main two issues and the other issue with discussed earlier is about the issues with Body Glove interfering with Surf nine.
Q. Okay well we discussed your theory?
A. It's no the a theory it's actually--

it's not a theory I believe it and I know it because.

Q. How do you know it?

A. Because I know it I trust Marsh and I know exactly what's going on and the truth will come out very soon.

Q. Okay so your understanding of that alleged interference is just somewhat Mr. Cross



told you; right?

A. I know that it's accurate. Put it that way.

Q. I'm asking you how do you know that?

A. When I have more information I will share it.

Q. Perhaps, but how do you know that now sitting here today that that's accurate?

A. Because I know it.

Q. Okay. On what basis do you--

A. Because if you have a license with a license company and you sell shoes and sandals to Costco and to other people when you have a license with Surf nine that's a violation of the

license, so I know that's true.
Q. Okay if those /S-PBLS were authorized to be sold by Surf nine through another licensee would that violate the agreement?
A. It was authorized for one year. Not for more than a year. I read the agreement.
MR. NASH: Okay we know what we're talking about so let's just go there. His position is you've over extended whatever authority you had because.



MR. LEVY: Is this an objection Mr. Nash.
MR. NASH: No I'm trying.
MR. LEVY: Okay this is not your deposition you'll have an opportunity to.
MR. NASH:
MR. LEVY: I don't need you telling.
MR. NASH:
MR. LEVY: How to.
MR. LEVY: I don't depositions make believe we're in London there is no discovery they still have trials.

MR. LEVY: That's not true either.
MR. NASH: Okay.
Q. Okay. Your first position is is that the only two relevant issues are can you cure the Surf nine indebtedness?
A. Yes.
Q. So my question is can you?
A. The answer is yes.
Q. How?
A. Money I will seize.
Q. Okay. Have you approached an insurance company or a bank for a bond?



A. I said the only people that I approached was ETC to produce an LC that it's being worked on.
Q. Okay and when did you first approach ETC in this regard?
A. Last week.
Q. Was that Friday?
A.
Q. Well the application was submitted on Friday?

A. Yes.
Q. Okay, so I just want to make sure I understand your testimony. The only way that the Surf nine debt can be cured that you're pursuing is through the letter of credit; correct?
A. I'm sorry?
Q. Is the only way you are pursuing to cure the Surf nine debt through the letter of credit?
A. Let's be very clear. I'll say it again. When we go to trial /( Surf nine has a right to assume it /( the court will determine somewhat amount it is and then the court will determine if the LC is acceptable as to the cash

83

whatever the court will determine I will honor the court's orders.
Q. Okay I'm just asking whether you're doing anything other than trying to post an LC?
A. For now I'm doing the LC.
Q. Okay. The second question you said is parment is that you have to be able to show funds going forward?

A. Right.
Q. Can you do that?
A. Yes I can.
Q.
A. Either with cash in the bank or with an LC.
Q. If you don't get the LC you're going to show it with cash in the bank?
A. That is correct.
Q. What will be the instrument that reflects that cash in the bank?
A. It's a bank statement. It's an account we have the money in.
Q. I understand but do you intend to produce at trial a bank statement saying that you have cash?



A. I don't know. I don't know.
Q. Well, listen. Mr. Spry--
A. You'll find out by the trial.
Q. You introduced these two issues?
A. That is correct.
Q. So I'm asking you other than the LC

them with some form of restructuring?
MS. SWEENEY: Objection.
A. I never said I'm replacing I said we'll /( make a decision what should be done and what shouldn't be done.
Q. Do you envision that Mr. Cross or Mr. Chess will continue with the company after the restructuring?
A. I believe they will.
Q. In what roles?
A. Same roles.
Q. Will you be CEO of the company?
A. No.
Q. Will you be president of the company?
A. No.
Q. Will you be an officer of the company?
A. No.



Q. As part of any restructuring will Mr. Chess or Mr. Cross have to report to you?
A. I don't know.
Q. But it's a possibility?

A. I don't know.
Q. Does Olden Group owe any money to ETC?
A. Does Olden Group owe any money to ETC? I don't know.
Q. Does ETC owe any money to Olden Group?
A. I don't know.
Q. Who would know the answers to those questions?
A. My accountant.
Q. Does Olden Group owe any money to anyone or anything?
A. I don't know.
Q. You don't know if Olden Group has any debt?
A. I have no idea.
Q. Does it have loans out?
A. I don't know.
Q. You don't know.



A. No.
Q. Does anyone other than Surf nine owe

Q. I just want to know whether that's your testimony.
A. How do you know that now it's 5 o'clock. You know when somebody is happy.
MR. NASH: It's 4:45.



A. I mean come on it's ridiculous.
Q. What collateral is securing the letter of credit?
A. Possible cash, possible real estate. We're still negotiating.
Q. Has Mr. Nash observed and you're still negotiating the collateral?
A. I need to have my line of credit posted before January 7th. It will be posted before January 7th to the court when I come to the trial to testify and that's when the LC will be right.
Q. Okay so it's your understanding the LC doesn't have to be ready before then?
A. I didn't say that it will be ready before January 7th.
Q. When before January 7th?

A. A couple of days before.
Q. Do you intend to give it to your counsel?
A. Yes.
Q. Your will give it to us?
A. Yes /(.
Q. You're still negotiating with ETC



what the collateral is to secure the letter of credit?
A. That is correct.
Q. That's with regard to both letters of credit; right?
A. That is correct.
Q. Have there been any discussions at all about what collateral would be used?
A. I discussed it with them, and we have another comps call tomorrow morning to discuss it.
Q. Well, what did you discuss?
A. I'm not-- I discussed with them certain options and I'm not discussing it further.